UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LA DOLCE VITA FINE DINING COMPANY LIMITED and LA DOLCE VITA FINE DINING GROUP HOLDINGS LIMITED,<br><br>        Petitioners,<br><br>  - against -<br><br>ZHANG LAN, GRAND LAN HOLDINGS GROUP (BVI) LIMITED, and QIAO JIANG LAN DEVELOPMENT LIMITED f/k/a SOUTH BEAUTY DEVELOPMENT LIMITED,<br><br>        Respondents. | Case No. _____<br><br>DECLARATION OF STEVEN B. FEIGENBAUM IN SUPPORT OF PETITIONERS' MOTION FOR AN *EX PARTE* ORDER OF <u>ATTACHMENT</u> |

   Steven B. Feigenbaum, an attorney admitted to practice before the Bar of this Court, hereby declares as follows:

   1.  I am a member of Katsky Korins LLP, attorneys for petitioners La Dolce Vita Fine Dining Company Limited ("LDV Company") and La Dolce Vita Fine Dining Group Holdings Limited ("LDV Holdings," and collectively, "Petitioners"). In accordance with Local Rule 6.1(d) and the requirements of New York CPLR § 6212(a), I submit this declaration in support of Petitioners' petition (the "Petition") for an *ex parte* order of attachment as to certain assets, believed to be held in New York, of respondents Zhang Lan ("Zhang"), Grand Lan Holdings Group (BVI) Limited ("Grand Lan Holdings") and Qiao Jiang Lan Development Limited f/k/a South Beauty Development Limited ("QJL Development," and together with Zhang and Grand Lan Holdings, "Respondents"). The requested order of attachment is in aid of two related arbitrations currently pending before the China International Economic and Trade

Arbitration Commission ("CIETAC") in Beijing (the "Arbitrations"), in which the arbitral panel, on April 28, 2019, its partial disposition in each Arbitration as to liability, awarding Petitioners damages as against Respondents in the combined amount of $142,463,666.28 (the "Arbitral Awards"), plus interest.  I set forth in this declaration the pertinent facts and documentary evidence in support of the Petition.

2. The facts underlying the Petition are derived mainly from two sources:  (i) pertinent documents regarding the Arbitrations and simultaneous injunction proceedings in Hong Kong and Singapore to probe and freeze Respondents' assets, and (ii) an affidavit dated March 29, 2017 of Cosimo Borrelli ("Borrelli Affidavit" or "Borrelli Aff.," Ex. 3), a Managing Director of Borrelli Walsh Limited who serves as one of the two receivers and managers for LDV Holdings.[1]  Mr. Borrelli submitted the affidavit in LDV Holdings' prior contempt proceeding in Hong Kong against Zhang for having breached injunction orders (i) enjoining her from transferring or hiding assets while the Arbitrations were pending, and (ii) requiring Zhang to file and serve affidavits setting out her assets, held anywhere in the world, valued at HKD 500,000 or more.  My knowledge of the facts set forth in this declaration is based on my review of the exhibits to the declaration and the Borrelli Affidavit.

3. The facts fall broadly into two main categories:  (i) the parties' transactions that gave rise to the Arbitrations, Petitioners' commencement of the Arbitrations, the panel's partial rulings in Petitioners' favor, and the current status of the Arbitrations; and (ii) the facts underlying the need for an *ex parte* order of attachment:  the evidence, detailed in the Borrelli Affidavit, of Zhang's prior secreting of assets – acts that give rise to the strong probability that

---

[1] References to "Ex. __" are to true and correct copies of the exhibits to this declaration, many of which were also exhibits to the Borrelli Affidavit.  Because the documents of relevance to this application are voluminous and would overwhelm the Court if submitted in their entirety, Petitioners have limited the exhibits submitted on this application to the most salient ones.

she will continue to conceal or dissipate assets so as to render the Arbitral Awards ineffectual, and the artworks, maintained by Zhang at Christie's, that are among the few assets of which Petitioners are aware that are still available to satisfy a meaningful part of the Arbitral Awards, and that will likely be transferred out of Christie's if they are not attached first.[2]

## THE PERTINENT FACTS

I. The Parties

4. Petitioner LDV Company is a limited liability company incorporated under the laws of the Cayman Islands, with a registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.  LDV Company is a wholly-owned subsidiary of non-party La Dolce Vita Fine Dining Holdings Limited, which in turn is a majority-owned subsidiary of LDV Holdings.

5. Petitioner LDV Holdings is a limited liability company incorporated under the laws of the Cayman Islands, with a registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.  LDV Holdings is majority owned and controlled by non-party CVC Funds.

6. Respondent Zhang Lan is a citizen and resident of St. Kitts and Nevis, and her last known address is at Room 2903, Shangdu International Center, No. 8 Dongdaqiao Road, Chaoyang District, Beijing, 100022.

7. Respondent Grand Lan Holdings is a limited liability company incorporated under the laws of the British Virgin Islands, with a registered office at PO Box 957, Offshore Incorporations Centre, Road Town, Tortola, BVI.  Grand Lan Holdings is 100% owned by Zhang.

---

[2] To help ensure that Zhang does not move the artworks before an interim attachment order can be rendered, Petitioners are simultaneously moving for leave to file and maintain this attachment application under seal until such time as provisional relief has been granted.

8. Respondent QJL Development is a limited liability company incorporated under the laws of the British Virgin Islands, with a registered office at PO Box 957, Offshore Incorporations Centre, Road Town, Tortola, BVI. QJL Development is 100% owned by Zhang.

9. Zhang, who owns and controls Grand Lan Holdings and QJL Development, was sentenced to prison in March 2019 by a Hong Kong court, for contempt of court, for failing to disclose her assets as part of a Mareva injunction freezing all of her assets worldwide. (*See* Exs. 4-8.) The warrants for Zhang's arrest in Hong Kong remain outstanding. Zhang's history of engaging in acts designed to shield her and her companies' assets from execution underscores Petitioners' concerns that Respondents will take steps – in addition to those, discussed below, they have already taken – to render the arbitral awards ineffectual and gives rise to their need for provisional relief on an *ex parte* basis.

II. The Arbitrations

10. Petitioners commenced the Arbitrations in March 2015 to recover damages they incurred as a result of Respondents' misrepresentations in connection with certain sale and purchase agreements that the parties entered into in December 2013. On April 28, 2019, the arbitral panel issued its partial disposition in each Arbitration as to liability, ruling that Petitioners are entitled to damages from Respondents in the combined amount of $142,463,666.28 (the "Arbitral Awards"), plus interest.

11. The arbitral panel deferred the issue of the amount and allocation of costs for separate resolution, and that issue remains pending. Respondents have since challenged the panel's dispositions on procedural grounds, and that challenge, which Petitioners have opposed, also remains pending.

A.   The Salient Facts Underlying Petitioners'
<u>Claims Against Respondents in the Arbitrations</u>

12.   The facts underlying Petitioners' claims against Respondents in the Arbitrations are set forth in detail in the Arbitral Awards (Exs. 1 and 2). I do not repeat those facts in detail, but instead give a general overview of the transactions and other facts that gave rise to the Arbitrations.

   (i)   Petitioners' Acquisition of Respondents' Controlling Shares in the Companies
      <u>Owning and Operating the South Beauty Chain of Restaurants in China</u>

13.   In December 2013, the Petitioners acquired a majority stake in South Beauty Investment Company Limited ("South Beauty"), which, in turn, owned a chain of restaurants in China known by the name "South Beauty." The acquisition was completed in two stages.

   a.   On December 9, 2013, LDV Company entered into a sale and purchase agreement (the "LDV Company SPA") that provided for LDV Company to acquire 100% of the shares in South Beauty and for (i) 27.3% of the shares in La Dolce Vita Fine Dining Holdings (i.e., the parent company of LDV Company and South Beauty) to be issued to the Grand Lan Holdings, and (ii) a total of 3.5% of the shares in La Dolce Vita Fine Dining Holdings to be issued to QJL Development.

   b.   On December 13, 2013, LDV Holdings entered into a further sale and purchase agreement with Zhang and Grand Lan Holdings (the "LDV Holdings SPA," and together with the LDV Company SPA, the "SPAs"). Under that agreement, LDV Holdings acquired nearly half of the shares of La Dolce Vita Fine Dining Holdings that had previously been issued to Grand Lan Holdings, such that Grand Lan Holdings ultimately retained a 13.8% interest in La Dolce Vita Fine Dining Holdings and in its subsidiary South Beauty restaurants in

China. (The LDV Holdings SPA and LDV Company SPA are referred to collectively as the "Acquisition.")

14. In all, Petitioners paid Zhang and her companies a total of $286,850,887 under the SPAs. Following the Acquisition, South Beauty and its chain of restaurants were majority (82.7%) owned and controlled by Petitioners.

(ii) Petitioners' Post-Acquisition Realization that South Beauty Was Significantly Underperforming Expectations

15. In February 2014, shortly after the Acquisition, Zhang informed Petitioners that South Beauty's financial performance had significantly worsened after the Acquisition, as reflected in South Beauty's financial results for the second quarter of 2014.

16. Petitioners then commenced their own investigation of South Beauty. That investigation included the engagement of experts to review South Beauty's business performance and operational data, as well as of forensic accountants to analyze South Beauty's financial information. Through their investigation, Petitioners learned by early 2015 that South Beauty's transaction sales data had been pervasively manipulated between at least January and April 2014, and that it was highly likely that a similar manipulation of sales data had taken place in 2013, before the Acquisition.

17. After coming to realize that South Beauty's financial condition had been misrepresented, Petitioners commenced legal proceedings in Hong Kong and Singapore to freeze Respondents' assets. On February 26, 2015 and March 2, 2015, Petitioners were granted *ex parte* injunction orders in Hong Kong and Singapore, thereby freezing Respondents' assets. Those orders were later served on Respondents.

18. Petitioners sought and obtained the injunction orders in anticipation of commencing arbitral proceedings against Respondents pursuant to the SPAs. Each SPA

contained an identical arbitration clause requiring disputes arising out of the SPA to be submitted to CIETAC for binding arbitration.

B.         Petitioners' Commencement of the Arbitrations and the
            Panel's Eventual Issuance of the Partial Arbitral Awards

19.       On March 5, 2015, Petitioners commenced the Arbitrations, asserting claims in each Arbitration for, among other things, fraud and misrepresentations by Respondents in connection with the Acquisition.[3]

20.       Over the next two and a half years, the parties participated in vigorously contested proceedings, governed by CIETAC's 2012 procedural rules, that included the introduction of voluminous documentary and testimonial evidence and the submission of extensive expert reports. In November 2017, the arbitral panel held a joint, multi-week hearing on the merits in both Arbitrations, effectively consolidating the Arbitrations insofar as they involved the same parties (though QJL Development was a party to only one of the Arbitrations), facts and claims. A further one-day hearing was held in March 2018, at which counsel on both sides continued their legal arguments. Following the hearings, the arbitral panel ordered and entertained certain post-hearing matters that were addressed well into 2018.

21.       On April 28, 2019, the arbitral panel issued the Arbitral Awards, finding in favor of Petitioners on the merits of their misrepresentation and contract claims, dismissing Respondents' counterclaims, and awarding Petitioners the combined amount of $142,463,666.28 in compensatory damages.

---

[3]       Petitioners, referred to as "Claimants" in the Arbitrations, commenced two arbitration proceedings because there were two SPAs. But the underlying factual allegations and claims are substantively identical in each Arbitration.

C.       The Current Status of the Arbitrations

22.     At the time it issued the Arbitral Awards, the arbitral panel also gave the parties leave to file submissions concerning the amount and allocation of costs. Petitioners and Respondents filed their submissions on, respectively, May 20, 2019 and June 6, 2019, and both sides subsequently filed reply submissions. In the costs submissions, Petitioners and Respondents state that they incurred costs totalling, respectively, approximately $15.8 million and $9.8 million. No ruling has as yet been made on the allocation of costs. Although the arbitral panel was expected to render its ruling by December 31, 2019, that date will likely be extended in light of Respondents' continued refusal to pay their share of the CIETAC and tribunal costs.

23.     Meanwhile, on July 8, 2019, Respondents filed two Applications to set aside the Arbitral Awards with the Second China International Commercial Court ("CICC"). In their applications, Respondents challenge the Arbitral Awards on procedural grounds and seek to set the Awards aside. (*See* Ex. 12.) On September 23, 2019, Petitioners submitted their Statement of Defence opposing Respondents' challenge. (Ex. 13)[4] The parties are currently waiting for the CICC to schedule a hearing on Respondents' challenge.

II.      The Facts Underlying the Need for an Order of Attachment: Zhang's History of Secreting Assets, and the Attachment of Her Artworks at Christie's as One of the Few Known Means of Ensuring that the Arbitral Awards Are Not Rendered Ineffectual

24.     Petitioners' need for an *ex parte* order of attachment is apparent. Zhang, who was previously identified by Forbes as one of the wealthiest persons in China, has had a long and sordid history during the pendency of the Arbitrations of secreting, hiding and misrepresenting her assets. As a result, Petitioners currently know of few assets owned or controlled by Zhang

---

[4]   Because Petitioners' Statement of Defence was filed in Chinese, Exhibit 13 includes both the filed Chinese version and a translation to English that was done at or around the time of the filing but was not itself submitted to the CICC.

that remain available for execution to help satisfy the Arbitral Awards in the expected event that Respondents' challenge of the Awards is rejected. Those assets include Zhang's artworks at Christie's, and for Petitioners to have any chance of executing on the artworks to help enforce the Arbitral Awards, the artworks must first be attached to prevent Zhang from moving them to an unknown location and thereby rendering them immune from execution.

A.  Zhang's History of Secreting Assets to Evade Respondents'
    All But Certain Eventual Obligation to Pay the Arbitral Awards

25. As detailed in the Borrelli Affidavit, Petitioners, while simultaneously pursuing the arbitral proceedings, have pursued extensive injunction proceedings in Hong Kong and Singapore to probe Respondents' assets, particularly Zhang's, and prevent Zhang from secreting them. In those parallel proceedings, Zhang was required to submit affidavits identifying her assets worldwide, and Petitioners were able to obtain information concerning, among other assets, Zhang's bank accounts.

26. By comparing Zhang's affidavits with the evidence obtained in their own investigations, Petitioners discovered numerous instances in which Zhang secreted assets in anticipation of the prospect that she would be held liable to Petitioners in the Arbitrations. A chronology of the salient facts, described in detail in the Borrelli Affidavit, underscores the lengths to which Zhang has gone to evade responsibility for the Arbitral Awards. Thus:

> i. In connection with the Acquisition, Petitioners paid Respondents $286,850,887 in total between December 13, 2013 and January, 28 2014 (the "Acquisition Funds"), and the Acquisition Funds were received by Respondents into a Bank Safra Sarasin account owned by Zhang (the "Safra Sarasin Account"). (Borrelli Aff. ¶¶9, 40)
>
> ii. On January 2, 2014, Zhang incorporated a company named Success Elegant Trading Ltd. ("SETL") in the British Virgin Islands ("BVI") using TMF (B.V.I.) Ltd. as its registered agent. (Borrelli Aff. ¶¶26, 66) Credit Suisse AG Singapore holds an account in the name of SETL (the "SETL CS Account") (*Id.* at ¶¶11(d), 35-36) Up until June 4, 2014, Zhang was the sole shareholder of SETL. On June 4, 2014, however, Zhang transferred or gifted her sole

9

share in SETL to Asiatrust Ltd, a professional trust company incorporated in the Cook Islands, for $1. (Borrelli Aff. ¶¶46-47)

iii. Also on January 2, 2014, entities known as Metro Joy International Limited ("Metro Joy") and Joy Grain Group Limited ("Joy Grain") were incorporated in BVI. (Borrelli Aff. ¶66) Although Petitioners have been unable to obtain documentation to prove that Zhang owns or controls those two entities, both were incorporated using the same registered agent as SETL and, as noted below, Zhang has since transferred large sums of money to each of them. *Id.*

iv. In or around January 2014, Zhang transferred $90 million from the Safra Sarasin Account in Hong Kong to a UBS AG account in her name in Singapore (the "UBS Account"). (Borrelli Aff. ¶¶ 49, 51(a)) Zhang then further disbursed the funds in the UBS Account, including to the SETL Accounts, so that she was able to close the UBS Account in March 2014 with no balance remaining. (*Id.* at ¶¶51(b)-(c))

v. Between March 10, 2014 and July 21, 2014, approximately $118 million in cash and $24.7 million in securities were transferred from the Safra Sarasin Account to the SETL CS Account. (Borrelli Aff. ¶¶42-45) It was during that time period that Petitioners were made aware of South Beauty's underperformance and had initiated their own investigation.

vi. According to internal emails within Bank Safra Sarasin, which Petitioners obtained in discovery, one reason why Zhang was moving money out of her Safra Sarasin account was that "her lawyer [was] helping her to ease the concern on the with-recourse term of her business sold to an [sic] PE." (Borrelli Aff. ¶42(c))

vii. Zhang also maintained an account in the name of SETL at Deutsche Bank AG Singapore (the "SETL DB Account," and together with the SETL CS Account, the "SETL Accounts"). (Borrelli Aff. ¶¶11(d), 37) Between March 27, 2014 and November 27, 2014, Zhang transferred $82,225,000 from the SETL CS Account to the SETL DB Account. (*Id.* at ¶106(35))

viii. On November 26, 2014, Zhang transferred $10,725,000 from the SETL DB Account to Metro Joy. (Borrelli Aff. ¶¶66, 106(30.a))

ix. On March 2, 2015, Zhang was served with the Hong Kong injunction orders (Exs. 4-5) freezing her assets. (Borrelli Aff. ¶¶16-18) These orders were "continued" by separate orders issued on March 6, 2015 (Ex. 6) and April 22, 2015 (Ex. 7). The related Singapore injunction orders were issued on March 2, 2015 and served on Zhang shortly thereafter. (Borrelli Aff.. (*Id.* at ¶11(c)) In the days immediately following receipt of these orders, Zhang transferred more than $35.8 million out of the SETL Accounts:

10

      a. On March 3, 2015, Zhang executed two separate transfers from the SETL DB Account to an HSBC Bermuda account in the name of The Manufacturers Life Insurance Company:

          1. Zhang transferred $9,902,237.00 in connection with two policies for which she was the insured. (*See* Borrelli Aff. ¶¶69, 107; Ex. 14 (DB wire instruction and confirmation).) It is unclear if these policies already existed and Zhang was increasing her investment in them, or if this transfer served as her acquisition of the policies.

          2. Zhang simultaneously transferred $6,037,485 in connection with an insurance policy for her son, Wang Xiaofei. (*See id.* at ¶¶69, 107; Ex. 15 (DB wire instruction and confirmation).) It is similarly unclear if this policy already existed and Zhang was increasing her investment, or if this transfer served as her acquisition of the policy.

      b. On March 4, 2015, Zhang transferred $14,878,868 from the SETL DB Account to an HSBC Bank Hong Kong account in the name of Transamerica Life (Bermuda) Ltd. in connection with an insurance policy for which she was the insured. (*See* Borrelli Aff. ¶¶69, 107; Ex. 16 (DB wire instruction and confirmation).) It is unclear if this policy already existed and Zhang was increasing her investment, or if this transfer served as her acquisition of the policy.

      c. On March 4, 2015, Zhang executed three additional transfers from the SETL DB Account:

          1. Zhang transferred $3 million to Metro Joy. (Borrelli Aff. ¶¶66, 107; Ex. 17 (DB wire instruction and confirmation));

          2. Zhang transferred $2,000,020 to Joy Grain (*Id.* at ¶¶66, 107; Ex. 18 (DB wire instruction and confirmation)); and

          3. Zhang transferred $13,937.50 to Asiaciti Trust Hong Kong Limited, a trust that Zhang created and to which she purportedly sold her interest in SETL in June 2014 for $1. (*Id.* at ¶¶46-47, 107; Ex. 19 (DB wire instruction and confirmation))

   x. Of the $142 million in cash and securities that was transferred from the Safra Sarasin Account to the SETL CS Account, only $22,005,981 remained as of January 31, 2016. (Borrelli Aff. ¶106(34)) Of the $82,225,000 that was transferred from the SETL CS Account to the SETL DB Account, only $33,373,585 remained as of February 29, 2016. (*Id.* at ¶ 106(35))

11

    xi.    In her affidavits in the injunction proceedings in Hong Kong and Singapore, Zhang denied any legal or beneficial interest in SETL and the SETL Accounts, even though she exercised complete control over them. (Borrelli Aff. ¶¶46-48)

    xii.    So despite having received more than $286 million into her Safra Sarasin Account in January 2014 in connection with the Acquisition, Zhang, in a March 13, 2015 disclosure of her assets in the Hong Kong injunction proceeding, listed only the following assets worldwide, none of which she ascribed a value to other than a single bank account:

        a. a 2002 Nissan Jeep;

        b. a 2010 GMC Coach;

        c. 100% ownership of Grand Lan Holdings;

        d. two minority shareholdings in investment companies, specifically a 2.77% interest in Beijing An Run Lin Investment Management Co. and a 4.1% interest in Beijing Shu Run Yuan Investment and Management Co.;

        e. a majority shareholding in what appears to be a holding company for the minority share in South Beauty that she maintained after the Acquisition;

        f. a majority shareholding in a company that holds a 0.44% stake in an aquafeed manufacturing company listed in China;

        g. her Safra Sarasin Account, which she then valued at $1.28 million;

        h. three rooms in a business property in Beijing; and

        i. a 69.4 square meter house in Beijing.

(*See* Borrelli Aff. ¶¶20-21; Ex. 20 at Exhibit ZL-1 (Asset Disclosure Schedule of Zhang as of March 13, 2015).) That list of assets is certainly modest for a person who had been ranked 310th in Forbes Magazine's China Richest List 2007, with a fortune of $240 million that had reportedly increased to $330 million by 2013. (Borrelli Aff. ¶¶22-23, 82; Ex. 21 (ArtNet News Article))

    xiii.    As detailed in the Borrelli Affidavit, Petitioners uncovered multiple examples of Zhang's failure to disclose all of her assets, including but not limited to the SETL Accounts, a 600 square meter property where she lives, and highly valuable artwork and jewelry. (Borrelli Aff. ¶¶ 26-89)

    xiv.    Throughout the Hong Kong and Singapore injunction proceedings, Zhang maintained her position that the list of assets identified in her March 13, 2015

    affidavit was complete as of that date.  (Borrelli Aff. ¶¶ 24-25, 28-32, 46-47, and 109-117)  In light of that position and her other actions in apparent breach of court injunctions, Petitioners were forced to bring committal proceedings to hold Zhang in contempt for those actions and for her misstatements and omissions in the initial disclosure of her assets and in subsequent affidavits in which she purported to defend her position.

 xv. Ultimately, the Hong Kong court found her explanations, at least as to certain undisclosed assets (particularly her art collection), to be "incredible" and "unbelievable," and sentenced her to a one-year imprisonment.  (Ex. 8 at pp. 40-41 (Judgment of Hong Kong High Court); Ex. 9 (Sentencing Judgment of Hong Kong High Court); Exs. 10-11 (Orders For Committal))  Warrants for her arrest have been outstanding in Hong Kong since March 2019.  (Exs. 10-11 (Warrants For Committal))

 27. The foregoing chronology evidences Zhang's brazen willingness to transfer and secrete her assets, in multiple different ways, to render herself judgment proof.  Once the Acquisition was consummated, Zhang personally received more than $244 million of the $286 million purchase price paid by the Petitioners.  Yet the steps she has since taken to shield her assets now seriously jeopardize Petitioners' ability to enforce the Arbitral Awards once, as expected, Respondents' challenge of the Awards is denied.

B. <u>Zhang's Artworks at Christie's</u>

 28. Zhang is known as a public and prolific collector of modern art.  In one of her affidavits in the injunction proceedings, she proclaimed herself to have "considerable fame in the Chinese art scene and business circles."  (Borrelli Aff. ¶72)  In a 2015 interview published by Christie's, she stated, "I don't have any savings in the bank.  My savings are my art collection."  (Ex. 22)  She added that her "collection consists of 300 to 400 artworks."  (*Id.*)

 29. But despite her artwork collection, Zhang's March 13, 2015 asset disclosure list contained no artwork at all.  Zhang's inability to credibly explain her failure to disclose on that list certain artworks worth millions of dollars is what ultimately led the Hong Kong court to find

her in contempt and issue a warrant for her arrest.  (*See* Ex. 8 at pp. 40-41 (Judgment of Hong Kong High Court); Ex. 9 (Sentencing Judgment of Hong Kong High Court).)

30.     Zhang's artwork collection includes at least two paintings of which Petitioners are aware that are believed to be held at Christies.  In an article published on ArtNet News dated May 30, 2014 (Ex. 21), Zhang was reported to have purchased two paintings then worth some $30 million at a single auction at Christie's held on May 12, 2014:  (i) Andy Warhol's "Little Electric Chair" (1965), which Zhang purchased for $10.5 million, and (ii) Martin Kippenberger's untitled self portrait (1988), which she purchased for $18.6 million.  The article reported that Zhang was "bidding through Christie's specialist Xin Li over the telephone," and that "she proved a tenacious competitor, sometimes jumping the bid higher in $1 million increments as opposed to the typical $250,000 or $500,000 jumps seen at that price level."  (*Id.*)  According to the article, when Zhang raised her bid from $12.5 million to $13.5 million, there were "gasps in the salesroom."  (*Id.*)  Having recently been paid more than $286 million by Petitioners, Zhang undoubtedly had the financial means to ensure she won those auctions.

31.     Zhang's purchases of the Warhol and Kippenberger paintings were also reported in an article published in May 2015 on China Daily Asia's website.  (Ex. 23)

32.     Petitioners have firm reason to believe that the Warhol and Kippenberger paintings are being stored at Christie's today.  In the 2015 Christie's interview, Zhang explained where she keeps her artworks:  "I don't show art at home; I think homes are for living in.  I prefer to keep my collection in professional storage facilities to protect it in the long term."  (Ex. 22)  Those statements strongly suggest that Zhang, having bought the two artworks at a Christie's auction, still maintains them there.  Petitioners are unaware of any evidence to the contrary.

33. In May 2019, Petitioners, through counsel, contacted Christie's Hong Kong to notify them of the outcome of the Arbitral Awards and to ensure that any accounts or assets held or beneficially owned by Zhang remained subject to the Hong Kong injunctions and were therefore still frozen. Christie's Hong Kong responded that Respondents do not have any artworks or other assets within Hong Kong, in their own names or beneficially owned, but specifically noted that it has no information about artworks or other assets held in any other Christie's locations. (*See* Exs. 24-26 (letters to and from Christie's Hong Kong).) Christie's Hong Kong explicitly directed Petitioners' counsel to contact Christie's New York.

34. By letter dated June 24, 2019, Petitioners made a similar inquiry of Christie's (i.e., Christie's New York), and specifically to its General Counsel. (Ex. 27) Christie's has never responded to that letter, suggesting that it would prefer not to be involved in this matter unless judicially compelled to be. That also suggests, however, that if Christie's no longer held the Warhol and Kippenberger paintings, or any other assets, on Zhang's behalf, it would simply have said as much to Petitioners (as Christie's Hong Kong had done).

\* \* \*

35. No prior application has been made to this Court for the relief requested in the Petition, and no other provisional remedy has been secured or sought in this action as against Respondents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct. Executed in New York, New York on November 18, 2019.

STEVEN B. FEIGENBAUM

15