UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

LA DOLCE VITA FINE DINING COMPANY
LIMITED and LA DOLCE VITA FINE DINING          Case No. 19 Misc. 536 (ALC)
GROUP HOLDINGS LIMITED,

                         Petitioners,

              - against -

ZHANG LAN, GRAND LAN HOLDINGS GROUP
(BVI) LIMITED, and QIAO JIANG LAN
DEVELOPMENT LIMITED f/k/a SOUTH BEAUTY
DEVELOPMENT LIMITED,

                         Respondents.

              - and -

APEX LEAD INVESTMENT HOLDINGS LIMITED,

                         Intervenor-Respondent.
_____

PETITIONERS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION UNDER FED. R. CIV. P.
<u>15(a)(2) FOR LEAVE TO FILE A SECOND AMENDED PETITION</u>

KATSKY KORINS
605 Third Avenue
New York, New York 10158
(212) 953-6000
*Attorneys for Petitioners La Dolce Vita Fine
Dining Company Limited and La Dolce Vita
Fine Dining Group Holdings Limited*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

THE PERTINENT FACTS............................................................................................. 4

     A.    The Procedural History of This Proceeding
          and, in Relevant Part, the Civil Action ................................................. 5

     B.    The Differences Among the Original Petition, the First Amended
          Petition and the Second Amended Petition, and the Conformance of the
          Second Amended Petition with the Amended Petition in the Civil Action ............ 5

     C.    The Facts Pleaded in the Second Amended Petition that Underlie Petitioners'
          Claim for Confirmation of the Attachment Order:  Zhang's Control Over
          and Continued Ownership of the Artworks, and Otherwise Her Fraudulent
          Conveyance of Ostensible Ownership of the Artworks to Apex to Shield
          Them from Eventual Execution ................................................................. 5

ARGUMENT ................................................................................................................ 5

THE SECOND AMENDED PETITION ADVANCES THE OUTCOME OF
THIS PROCEEDING ON THE MERITS, AND LEAVE TO FILE IT UNDER
RULE 15(a)(2) SHOULD BE FREELY GIVEN BECAUSE THE AMENDMENTS
ARE WITHOUT UNDUE DELAY, ARE NOT IN BAD FAITH, DO NOT
PREJUDICE ZHANG OR APEX, AND ARE ANYTHING BUT FUTILE ................................. 5

     A.    The Second Amended Petition Advances
          the Outcome of This Proceeding on the Merits ....................................... 9

     B.    Zhang and Apex Have Not Contended, and Could Not Show in Any Event,
          that the Second Amended Petition Is in Bad Faith or Prejudicial to Them ........... 13

     C.    The Second Amended Petition Asserts Only One Claim – for Confirmation
          of the Attachment Order – and that Claim, as Clarified and Reinforced by
          by the Amendment's Additional Facts and Legal and Jurisdictional Bases,
          Is Valid and Far from Futile ....................................................................... 14

          1.    The Second Amended Petition Alleges a Valid Claim for Confirmation
               of the Attachment Order Based on Zhang's Control Over and *De Facto*
               Ownership of the Artworks, Which Also Underlie the Court's Personal
               Jurisdiction Over Zhang and Apex and *In Rem* Jurisdiction Over the
               Artworks .................................................................................. 16

2.      The Second Amended Petition Alleges a Valid Claim for Confirmation
of the Attachment Order Based on the Alternative and Independent
Ground that Zhang Fraudulently Conveyed the Artworks to Apex...........21

CONCLUSION.........................................................................................................................25

TABLE OF AUTHORITIES

Page(s)

Cases

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 87 F. Supp. 2d 281
(S.D.N.Y. 2000) ................................................................................................ 13, 15

*Aetna Cas. and Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566
(2d Cir. 2005) ......................................................................................... 6, 7, 15, 16

*Allianz Global Investors GmbH v. Bank of Am. Corp.*, 473 F. Supp. 3d 361
(S.D.N.Y. 2020) ....................................................................................................... 10

*Blagman v. Apple, Inc.*, No. 12-cv-5453 (ALC)(JCF), 2014 WL 2106489
(S.D.N.Y. May 19, 2014)......................................................................... 9, 13, 15, 16

*Block v. First Blood Assocs.*, 988 F.2d 344 (2d Cir. 1993) ...................................... 7, 13

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257
(S.D.N.Y. 2012) ......................................................................................................... 6

*Brandr Group v. Port Auth. of N.Y. & N.J.*, 2020 WL 1489802 (S.D.N.Y.
Mar. 26, 2020) ......................................................................................................... 8

*Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 248 F.R.D. 408
(S.D.N.Y. 2008) ....................................................................................................... 10

*Bulger v. Royal Doulton, PLC*, 2006 WL 3771016 (S.D.N.Y. Dec. 19, 2006)........................... 10

*Capital Ventures Int'l v. Rep. of Argentina*, 443 F.3d 214 (2d Cir. 2006) ................................... 15

*Capitol Records, Inc. v. MP3Tunes, LLC*, 2009 WL 3364036 (S.D.N.Y.
Oct. 16, 2009) ......................................................................................................... 9

*Citibank, N.A. v. Benedict*, 2000 WL 322785 (S.D.N.Y. Mar. 28, 2000) ................................... 25

*Cosh v. Atrium Med. Corp.*, 2020 WL 583826 (S.D.N.Y. Feb. 6, 2020) ...................................... 8

*Daelim Trading Co., Ltd v. Giagni Enters., LLC*, 2012 WL 5995119 (S.D.N.Y.
Oct. 16, 2012) ......................................................................................................... 7

*Elatab v. Hesperios, Inc.*, 2021 WL 2226877 (S.D.N.Y. June 2, 2021).......................................... 8

*Foman v. Davis*, 371 U.S. 178 (1962) ........................................................................ 6, 7

*Friedl v. City of N.Y.*, 210 F.3d 79 (2d Cir. 2000) ............................................................. 9

*Gala Enters., Inc. v. Hewlett Packard Co.*, 970 F. Supp. 212 (S.D.N.Y. 1997)........................... 21

*Guedj v. Dana*, 11 A.D.3d 368 (1st Dep't 2004)............................................................... 25

*Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011)........................................ 11

*In re Pfizer Inc. Secs. Litig.*, 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ................................... 13

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, 2009 WL 1357946
(S.D.N.Y. May 12, 2009).............................................................................. 12, 13

*Kraiem v. Jonestrading Inst. Svcs. LLC*, 2021 WL 2134818 (S.D.N.Y. May 26, 2021) ........................................................................................................... 11

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160 (2d Cir. 2015) ....................................................................................... 6, 7, 15

*Miller v. Polow*, 14 A.D.3d 368 (1st Dep't 2005) ................................................. 25

*Mischon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, 2011 WL 6957595 (S.D.N.Y. Dec. 28, 2011) ................................................................................. 14, 15

*Monahan v. N.Y. City Dep't. of Corrections*, 214 F.3d 275 (2d Cir. 2000) ................. 14

*Ohio Cas. Ins. Co. v. Transcon. Ins. Co.*, 2006 WL 1540540 (S.D.N.Y. May 31, 2006) ............................................................................................................ 6

*Poppel v. Estate of Archibald*, 2020 WL 2749719 (S.D.N.Y. May 27, 2020) .............. 8

*Rachman Bag Co. v. Liberty Mutual Ins. Co.*, 46 F.3d 230 (2d Cir. 1995) ................. 7

*Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119 (2d Cir. 1991) ................................. 6

*Richardson Greenshields Secs., Inc. v. Lau*, 825 F.2d 647 (2d Cir. 1987) ................. 6

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774 (2d Cir. 1984) .............................................................................................................. 15

*Schaper v. Bronx Lebanon Hosp. Ctr.*, 2019 WL 7102144 (S.D.N.Y. Dec. 20, 2019) ......................................................................................................................... 12

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981) .......................... 7

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .................................................. 15

*Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 2012 WL 4903177 (S.D.N.Y. Oct. 12, 2012) .................................................................................................... 6, 8

*U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759 (S.D.N.Y. 2018) ............................................................................................................ 8

*Universitas Educ., LLC v. Nova Group, Inc.*, 2013 WL 6123104 (S.D.N.Y. Nov. 20, 2013) .................................................................................................. 23, 24

*Universitas Educ., LLC v. Nova Group, Inc.*, 2014 WL 113702 (S.D.N.Y. Jan. 13, 2014) ............................................................................................................ 24

*Universitas Educ., LLC v. Nova Group, Inc.*, 2014 WL 3883371 (S.D.N.Y. Aug. 7, 2014). ........................................................................................................... 24

*Wells Fargo Secs., LLC v. LJM Invest. Fund, L.P.*, 2021 WL 1198931 (S.D.N.Y. Mar. 30, 2021) ................................................................................... 11

*Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011) ......................................... 10

*Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284 (S.D.N.Y. 2019) ........................... 8

Statutes

CPLR § 213(8) ............................................................................................................ 25

CPLR § 302(a)(1) ............................................................................................... 4, 10, 21

CPLR § 302(a)(2) ............................................................................................... 4, 10, 21

CPLR § 5225(b) .................................................................................................... passim

CPLR § 6211(b) ...................................................................................................... 1, 14, 16

New York Debtor & Creditor Law § 275 ............................................................. 21, 23

New York Debtor & Creditor Law § 276 ......................................................... 21, 23, 25

Rules

CPLR 7502(c) ............................................................................................................. 14

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 15

Fed. R. Civ. P. 15(a) ............................................................................................ passim

Fed. R. Civ. P. 15(b) ................................................................................................. 11

Petitioners La Dolce Vita Fine Dining Company Limited ("LDV Company") and La Dolce Vita Fine Dining Group Holdings Limited ("LDV Holdings") (collectively, "Petitioners") submit this memorandum of law in support of their motion under Fed. R. Civ. P. ("Rule") 15(a)(2) for leave to file the second amended petition, against Respondent Zhang Lan ("Zhang") and Intervenor-Respondent Apex Lead Investment Holdings Limited ("Apex"), that was submitted to the Court by letter on June 24, 2021 (ECF No. 87) and is annexed as Exhibit 1 to Petitioners' counsel's accompanying declaration (the "Second Amended Petition").

## PRELIMINARY STATEMENT

The Second Amended Petition is designed to advance the outcome of this proceeding on the merits by bringing up to date an otherwise stale pleading – Petitioners' first amended petition, dated December 31, 2020 (the "First Amended Petition," Ex. 3), which primarily only added Apex as an intervenor-respondent insofar as it claims to own the Artworks and is thereby a necessary party, and which is substantively no different from Petitioners' original petition filed in November 2019 (the "Original Petition").[1]  Like the First Amended Petition, the Second Amended Petition asserts only one cause of action:  for confirmation under CPLR § 6211(b) of the Court's November 21, 2019 attachment order (the "Attachment Order," ECF No. 20) attaching two artworks that Zhang bid on at an auction at Christie's Inc. ("Christie's) held at Christie's Manhattan office on May 12, 2014 – Andy Warhol's "Little Electric Chair" (1965), purchased for $10.5 million, and Martin Kippenberger's untitled self-portrait (1988), purchased for $18.6 million (the "Artworks").  The Attachment Order is in aid of two arbitral awards, entered on April 28, 2019 in related arbitrations in Beijing (the "Arbitrations"), in Petitioners' favor and against Zhang and her wholly-owned companies, Respondents Grand Lan Holdings

---

[1]    References to "Ex. __" are to the exhibits to the accompanying July 20, 2021 declaration of Petitioners' lead counsel, Steven B. Feigenbaum ("Feigenbaum Declaration").

Group (BVI) Limited ("Grand Lan Holdings") and Qiao Jiang Lan Development Limited ("Qiao Jian Lan"), in a combined amount exceeding $142 million (the "Arbitral Awards").

The Second Amended Petition, however, updates, clarifies and reinforces the factual, legal and jurisdictional bases for confirmation of the Arbitral Awards by (i) taking into account relevant developments since the filing of the First Amended Petition, including the affirmance of the Arbitral Awards; (ii) incorporating additional pertinent evidence derived from discovery of Apex – all of which took place after the filing of the First Amended Petition – and from Petitioners' own further factual investigations in light of some of Apex's documents; (iii) dropping Grand Lan Holdings and Qiao Jiang Lan as respondents, and thereby helping to streamline this proceeding, since discovery has shown that Zhang alone, not her companies (other than as Zhang's alter egos), has control over and an interest in the Artworks; (iv) clarifies the bases of the Court's subject matter and personal jurisdiction; (v) adds the allegation that Zhang's purported conveyance of the Artworks to Apex was fraudulent, and invokes New York principles of fraudulent conveyance law as an alternative and  independent basis on which to confirm the Attachment Order; and (vi) otherwise conforms Petitioners' pleading to the record, to Petitioners' requested motion to confirm the Attachment Order, and to the existing amended petition filed on June 17, 2021 in the civil action, *La Dolce Vita Fine Dining Company et al. v. Zhang Lan et al.*, No. 21-3178 (MKV), pending before Judge Vyskocil and in which Petitioners intend to move for the turnover of the Artworks under CPLR § 5225(b) (the "Civil Action").

The Second Amended Petition tees up Petitioners' requested motion to confirm the Attachment Order and streamlines the resolution of that motion – not just by eliminating expected attempts to dismiss Grand Lan Holdings and Qiao Jiang Lan, but also by obviating the Court's need to address various arguments that Zhang and Apex could otherwise be expected to

make, however baselessly, on such issues as whether the new evidence, additional legal theory and additional jurisdictional bases set forth in the Second Amended Petition can be considered on the motion.  The Second Amended Petition thereby furthers the goal of advancing the resolution of this dispute on the merits, it has not been unduly delayed, it is proposed in good faith, it does not prejudice Zhang or Apex, and it is anything but futile.  Leave under Rule 15(a)(2) to file the Second Amended Petition should accordingly be granted.

In opposing such leave, Zhang and Apex – who have a joint defense agreement, further underscoring Zhang's interest in the Artworks – have never suggested that the Second Amended Petition is being proposed in bad faith or is unduly prejudicial to them.  Their primary argument is expected to be that the amendments are futile insofar as they rely on fraudulent conveyance principles.  But that argument, we submit, is frivolous.  At issue on Zhang's and Apex's expected futility argument is whether the Second Amended Petition, as a whole, would survive a motion to dismiss – and it clearly would.  For even if the fraudulent conveyance allegations were invalid – and they are not – the Second Amended Petition's only claim, for confirmation of the Attachment Order, would remain valid because it continues to allege that Zhang, not Apex, owns, controls and otherwise has an interest in the Artworks under CPLR § 5225(b).  And the fraudulent conveyance allegations and legal principles are, in fact, timely and well-pled, providing an alternative and independent basis on which to confirm the Attachment Order even if Zhang had actually transferred ownership of the Artworks to Apex (she did not).

Indeed, the evidence, as pleaded in the Second Amended Petition, overwhelmingly compels that the Attachment Order stay in place while Petitioners seek the turnover of the Artworks.  It shows that Zhang directly participated in the May 2014 Christie's auction in New York at which she successfully bid on the Artworks, that she later paid for the Artworks in New

York, and that she manipulated Christie's invoices and related documents by using Apex – a company that did not even exist at the time of the May 2014 Christie's auction, whose sole original director and owner of its only share was Zhang's son, Wang Xiaofei ("Wang"), and whose one share had a nominal value of $1 – to camouflage her purchase. Although Zhang and Apex now assert that Apex owns the Artworks, Zhang herself produced no documents at all in discovery, much less documents that would support that position, and Apex produced no documents showing that title to the Artworks was ever transferred to Apex. Apex instead produced only documents showing that Apex, despite having been funded with $1, ostensibly paid the $29.1 million for the Artworks. Yet documents from Christie's confirm that Zhang herself provided the funds for each of the three installment payments for the Artworks, and that she alone was contractually obligated to Christie's to make those payments. And if Zhang had transferred actual ownership of the Artworks to Apex – and she did not – that transfer would have been a fraudulent conveyance designed to shield the Artworks from an eventual judgment against Zhang, done at a time when Zhang knew of the material misrepresentations for which she would later be held liable in the Arbitrations, and when Zhang was in the midst of a years-long campaign to secrete all of her assets worldwide.

Those facts – all of which must be accepted as true on this motion – undisputedly state a valid claim for confirmation of the Attachment Order and form the basis for the Court's personal jurisdiction over Zhang (and Apex) under CPLR §§ 302(a)(1) and (2) and its *in rem* jurisdiction over the Artworks. Zhang's and Apex's expected futility argument is groundless.

<u>THE FACTS</u>

The facts relevant to this motion are set forth in the Feigenbaum Declaration. We do not repeat the facts in this section, but instead identify the paragraphs at which they are found in the Declaration. We discuss the facts in the Argument sub-sections to which they relate.

A.   The Procedural History of This Proceeding
     and, in Relevant Part, the Civil Action

The procedural history of this proceeding and, in relevant part, the Civil Action is set

forth in ¶¶3-15 of the Feigenbaum Declaration and puts this motion in proper context.  That

history is discussed where relevant in Argument sub-sections A and B.

B.   The Differences Among the Original Petition, the First Amended
     Petition and the Second Amended Petition, and the Conformance of the
     Second Amended Petition with the Amended Petition in the Civil Action

The differences among the Original, First Amended and Second Amended Petitions, and

the conformance of the Second Amended Petition to the Civil Action's amended petition, are set

forth in ¶¶16-20 of the Feigenbaum Declaration and discussed in Argument sub-section A.

C.   The Facts Pleaded in the Second Amended Petition that Underlie Petitioners' Claim
     for Confirmation of the Attachment Order:  Zhang's Control Over and *De Facto*
     Ownership of the Artworks, and Otherwise Her Fraudulent Conveyance of Ostensible
     Ownership of the Artworks to Apex to Shield Them from Eventual Execution

The facts establishing the validity of the claim in the Second Amended Petition for

confirmation of the Attachment Order are set forth in ¶¶21-34 of the Feigenbaum Declaration

and discussed in sub-section C of the Argument Section.

ARGUMENT

THE SECOND AMENDED PETITION ADVANCES THE
OUTCOME OF THIS PROCEEDING ON THE MERITS, AND LEAVE TO
FILE IT UNDER RULE 15(a)(2) SHOULD BE FREELY GIVEN BECAUSE THE
AMENDMENTS ARE WITHOUT UNDUE DELAY, ARE NOT IN BAD FAITH,
DO NOT PREJUDICE ZHANG OR APEX, AND ARE ANYTHING BUT FUTILE

The Second Amended Petition states a valid claim for confirmation of the Attachment

Order, and Zhang's and Apex's opposition to the amendment is nothing but another in their line

of attempts to avoid the resolution of this dispute on the merits.  But Rule 15(a)(2) is meant

precisely to promote the resolution of disputes on the merits, and the Supreme Court, the Second

Circuit and this Court have uniformly adhered to that legislative intent.  Rule 15(a)(2) states that

"[t]he court should freely give leave when justice so requires," and the Supreme Court has

instructed that "this mandate is to be heeded."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

As the *Foman* Court, in holding that the denial of leave to amend there was an abuse of

discretion, made clear, "[i]f the underlying facts or circumstances relied upon by a plaintiff may

be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the

merits."  371 U.S. at 182.  The Second Circuit has reiterated that "the permissive standard of

Rule 15 is consistent with our strong preference for resolving disputes on the merits."  *Loreley*

*Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)

(internal citation omitted).  "[I]t is rare," accordingly, "that [leave under Rule 15(a)] should be

denied."  *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (leave to amend

"should ordinarily be granted"; granting leave after complaint had been dismissed); *see also*,

*e.g.*, *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 2012 WL 4903177, at *1 (S.D.N.Y. Oct. 12,

2012) (Carter, J.) ("[c]ourts typically grant requests to amend under Rule 15(a)"); *BNP Paribas*

*Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 272 (S.D.N.Y. 2012) ("the rule [Rule

15(a)] is 'interpreted liberally, [and] an amendment is normally permitted'") (quoting *Ohio Cas.*

*Ins. Co. v. Transcon. Ins. Co.*, 2006 WL 1540540, at *1 (S.D.N.Y. May 31, 2006)).

Consistent with Rule 15(a)'s permissive standard, the Second Circuit has held that a

motion for leave to amend under Rule 15(a) "should be denied ***only*** for such reasons as undue

delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to

the opposing party."  *Richardson Greenshields Secs., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir.

1987) (emphasis added); *accord Aetna Cas. and Surety Co. v. Aniero Concrete Co., Inc.*, 404

F.3d 566, 603-04 (2d Cir. 2005) (quoting *Richardson*); *Foman*, 371 U.S. at 182 ("In the absence

of any apparent or declared reason – such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"); *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith") (citing *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).  As the Supreme Court has emphasized, the "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."  *Foman*, 371 U.S. at 182; *see also*, *e.g.*, *Daelim Trading Co., Ltd v. Giagni Enters., LLC*, 2012 WL 5995119, at *2 (S.D.N.Y. Oct. 16, 2012) (the "outright refusal to grant the leave without [one of the enumerated] justifying reason[s] for the denial is an abuse of discretion") (internal citation omitted).

Adhering to the long-established standard for relief under Rule 15(a), courts in this Circuit, including this Court, have routinely granted Rule 15(a) motions in the absence of undue delay, bad faith, futility or undue prejudice to the opposing party.  *E.g., Rachman Bag Co. v. Liberty Mutual Ins. Co.*, 46 F.3d 230, 234-35 (2d Cir. 1995) (affirming grant of leave to amend four years after action was commenced where, despite unclear reasons for delay, no prejudice or bad faith was shown); *Loreley Financing*, 797 F.3d at 190-91 (reversing district court's denial of leave to amend where none of "the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility . . . were a basis for the denial"); *Aetna Cas.*, 404 F.3d at 603-05 (granting leave to amend to add meritorious claims, rejecting argument that proposed amendments would be futile); *Block*, 988 F.2d at 350-51

7

(affirming grant of leave to amend in absence of bad faith or prejudice); *Elatab v. Hesperios, Inc.,* 2021 WL 2226877, at *6 (S.D.N.Y. June 2, 2021) (Carter, J.) (granting leave to amend in absence of undue delay, bad faith, futility or prejudice)*; Cosh v. Atrium Med. Corp.*, 2020 WL 583826, at *7 (S.D.N.Y. Feb. 6, 2020) (Carter, J.) (granting leave to amend, after dismissal, due to lack of bad faith or prejudice); *Brandr Group v. Port Auth. of N.Y. & N.J.*, 2020 WL 1489802, at *6 (S.D.N.Y. Mar. 26, 2020) (Carter, J.) (granting leave to amend upon finding that "Defendant has not made a showing of bad faith or prejudice"); *Tommy Lee Handbags*, 2012 WL 4903177, at *2 (Carter, J.) (granting motion to amend amended complaint where there was "absolutely no prejudice to defendants" and "defendants will not be forced to expend significant additional resources or face a considerable delay in litigating and defending against the claims in this case"); *Poppel v. Estate of Archibald*, 2020 WL 2749719, at *6 (S.D.N.Y. May 27, 2020) (Carter, J.) (granting leave to amend after dismissal where plaintiff acknowledged allegations were "currently thin" and sought leave to "more fully state a claim for negligent hiring" inasmuch as the information underlying the claim was "rapidly evolving").

Leave under Rule 15(a)(2) to file the Second Amended Petition should likewise be granted here. The Second Amended Petition advances the outcome of this proceeding on the merits, it has not been unduly delayed, it is in the utmost good faith, it does not prejudice Zhang or Apex, and it is anything but futile. "[T]he party opposing the amendment" to a pleading "'bears the burden of showing prejudice, bad faith, and futility of the amendment.'" *Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 294 (S.D.N.Y. 2019) (granting motion to amend where "Defendants have failed to make an adequate showing of prejudice") (quoting *U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 766 (S.D.N.Y. 2018)). Zhang and Apex cannot remotely meet that burden here.

A.      The Second Amended Petition Advances
        <u>the Outcome of This Proceeding on the Merits</u>

As set forth in the Feigenbaum Declaration (at ¶¶16-20), the Second Amended Petition is

designed to advance the outcome of this proceeding on the merits by bringing an otherwise stale

pleading – the First Amended Petition, which is substantively no different from the Original

Petition, filed in November 2019, other than that it adds Apex as an intervenor-respondent – up

to date and in conformance with the amended petition filed in the Civil Action on June 17, 2021.

Like the First Amended Petition, the Second Amended Petition asserts only one claim:  for

confirmation of the Attachment Order under CPLR 6211(b).  But its amendments update, clarify

and reinforce the factual, legal and jurisdictional bases for that relief by:

        (a)      Incorporating relevant new developments since the filing of the First

Amended Petition in December 2020, including the affirmance of the Arbitral Awards and the

production – and non-production – of documents by Apex and Zhang (who produced none).

        (b)      Incorporating new evidence, relevant to a confirmation of the Attachment

Order, derived from the documents that Apex produced in discovery – all of which came after

the filing of the First Amended Petition, with the final production on July 1, 2021 – and from

what Apex and Zhang did ***not*** produce, as well as from Petitioners' own further factual

investigations since that time in light of some of Apex's documents.  *E.g.*, *Blagman v. Apple,*

*Inc.*, No. 12-cv-5453 (ALC)(JCF), 2014 WL 2106489, at *4 (S.D.N.Y. May 19, 2014)

("Amending a complaint to add color and detail gleaned from discovery is permissible";

allowing amendment after discovery revealed additional relevant facts) (citing *Friedl v. City of*

*N.Y.*, 210 F.3d 79, 88 (2d Cir. 2000) (other internal citations omitted)); *Capitol Records, Inc. v.*

*MP3Tunes, LLC*, 2009 WL 3364036, at *9-*10 (S.D.N.Y. Oct. 16, 2009) (granting leave to

amend to add new allegations, including allegations whose factual predicate emerged during

discovery, after finding no undue delay, bad faith or prejudice and rejecting the futility

argument); *Bridgeport Music, Inc. v. Universal Music Group, Inc*., 248 F.R.D. 408, 417

(S.D.N.Y. 2008) (granting leave to amend to add new substantive claims and factual

elaborations, where no prejudice resulted from the new allegations).

        (c)      Dropping Grand Lan Holdings and Qiao Jiang Lan as respondents, since

discovery has shown that Zhang alone bid on the Artworks; provided the $29.1 million to pay for

the Artworks; retains an interest in the Artworks, within the meaning of CPLR § 5225(b),

sufficient to warrant the turnover of the Artworks to Petitioners in the Civil Action; and

fraudulently transferred the Artworks to Apex to the extent Apex can be deemed – and the

evidence shows it cannot be – to own and have control over the Artworks.  By dropping Grand

Lan Holdings and Qiao Jiang Lan as respondents, the Second Amended Petition helps streamline

this proceeding by eliminating the Court's need to resolve questions as to whether those entities

are subject to the Court's jurisdiction, whether they have an interest in the Artworks, and

whether they can be deemed to have such an interest as alter egos of Zhang.

        (d)      Clarifying the bases of the Court's subject matter and personal

jurisdiction, specifically by pleading the Court's *in rem* jurisdiction over the Artworks, its

personal jurisdiction over Zhang under CPLR §§ 302(a)(1) and (2), and its personal jurisdiction

over Apex under CPLR § 302(a)(2).  *E.g.*, *Allianz Global Investors GmbH v. Bank of Am. Corp.*,

473 F. Supp. 3d 361, 364-65 (S.D.N.Y. 2020) (granting leave to file third amended complaint to

cure deficiencies as to personal jurisdiction, noting that the Second Circuit "has stated that '[t]his

[Rule 15(a)(2)'s] permissive standard is consistent with [its] strong preference for resolving

disputes on the merits'") (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir.

2011)); *Bulger v. Royal Doulton, PLC*, 2006 WL 3771016, at \*8-\*9 (S.D.N.Y. Dec. 19, 2006) (granting leave to amend after dismissal to cure deficiencies as to personal jurisdiction).

(e)     Adding the legal argument, and additional relevant evidence, that Zhang's purported conveyance of the Artworks to Apex was fraudulent, and that New York principles of fraudulent conveyance law – asserted not as a new cause of action, but rather as a separate theory of liability – are an independent basis on which to confirm the Attachment Order if Zhang had actually conveyed ownership of the Artworks to Apex (and she did not).  *E.g.*, *Kraiem v. Jonestrading Inst. Svcs. LLC*, 2021 WL 2134818 (S.D.N.Y. May 26, 2021) (Carter, J.) (granting, in part, leave to amend to add certain allegations regarding new theories of liability, rather than new causes of action, where there was no bad faith, undue prejudice or delay).

(f)     Otherwise conforming Petitioners' pleading to the current record, to the eventual motion to confirm the Attachment Order, and to the amended petition in the Civil Action.  As the Second Circuit has stated, "even at trial, '[t]he court should freely permit an amendment' to conform the pleadings to the proof, unless the objecting party can show prejudice."  *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 325 (2d Cir. 2011) (quoting Rule 15(b)(1)); *see also*, *e.g.*, *Wells Fargo Secs., LLC v. LJM Invest. Fund, L.P.*, 2021 WL 1198931, at \*5 (S.D.N.Y. Mar. 30, 2021) (granting leave to amend, even though amendments concerned facts within movant's knowledge at time of prior pleading, where the "new allegations supplement and clarify, rather than directly contradict, [the] prior allegations").  For Petitioners to have an updated pleading in the Civil Action and an outdated one here – particularly when the outcome of this proceeding will directly affect the Civil Action – is senseless and could later give rise to otherwise avoidable confusion and unnecessary motion practice and its attendant delay.

The foregoing amendments help streamline this proceeding and facilitate the path to its resolution.  Zhang's counsel candidly acknowledged during a recent conference call that a principal objective of Zhang's is to delay this proceeding as long as possible, and Zhang and Apex – which have a joint defense agreement – have in furtherance of that objective made and will continue to make any conceivable argument designed to divert attention away from the merits of this dispute.  The Second Amended Petition helps guard against that tactic, and promotes judicial economy, by preempting any arguments, however baseless, that particular new facts, or newly obtained documents, or new jurisdictional or merits-based legal arguments cannot be considered on Petitioners' eventual motion to confirm the Attachment Order.  *E.g.*, *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, 2009 WL 1357946, at *4 (S.D.N.Y. May 12, 2009) (granting leave to amend "[b]ecause the proposed amendment arises from the same operative facts as the claims and events described in the original complaint . . ., granting the proposed amendment would serve the interest of judicial economy").

Finally, the Second Amended Petition causes no delay in this proceeding – indeed, the only delay results from Zhang's and Apex's refusal to consent to the amendments, which under Rule 15(a)(2) would have obviated the need for this motion, even though their consent would have had no effect on their defenses, and even though they will have to face the same facts and legal arguments anyway on any motion to confirm the Attachment Order.  Zhang and Apex do not need to answer or move against the Second Amended Petition, but will instead need only to oppose, assuming they choose to do so, the motion to confirm the Attachment Order.  And because Apex has now completed its document production, and Zhang will be producing no documents at all, the Second Amended Petition does not lead to the need for further discovery.  *E.g.*, *Schaper v. Bronx Lebanon Hosp. Ctr.*, 2019 WL 7102144, at *2 (S.D.N.Y. Dec. 20, 2019)

(Carter, J.) (granting leave to amend where plaintiff "simply intend[ed] to add previously obtained information to her complaint," obviating the need for further discovery and meaning that "Defendants would not be required to expend significant additional resources").  Nor would it matter if the amendments did require further discovery, since an "adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *JPMorgan*, 2009 WL 1357946, at *4 (internal citation omitted).

B.     Zhang and Apex Have Not Contended, and Could Not Show in Any Event,
       that the Second Amended Petition Is in Bad Faith or Prejudicial to Them

        In their respective counsels' June 29, 2021 letters to the Court opposing Petitioners' request for leave to amend, Zhang and Apex do not contend that the Second Amended Petition is being proposed in bad faith or that it unduly prejudices them.  That the amendment is not proposed in bad faith is obvious.  And any contention of undue prejudice would be frivolous.

        "Prejudice to the opposing party has been described as the most important reason for denying a motion to amend." *Blagman*, 2014 WL 2106489 at *3 (internal citation omitted). "However, only ***undue*** prejudice justifies denial of leave to amend." *Id.* (emphasis in original).  In determining what constitutes undue prejudice, the Second Circuit has stated that it considers "whether the assertion of the new claim would:  (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff [or, as here, a respondent] from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350 (collecting cases).  "Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute undue prejudice." *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (granting leave to amend) (citing *Block*, 988 F.2d at 351); *accord In re Pfizer Inc. Secs. Litig.*, 2012 WL 983548, at *3 (S.D.N.Y. Mar. 22, 2012) (granting leave to

amend and reasoning that "[Plaintiffs'] use of . . . discovery to supplement the complaint does not unduly prejudice Defendants"); *cf. Monahan v. N.Y. City Dep't of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000) (affirming allowance of untimely assertion of *res judicata* defense, rejecting plaintiffs' assertion of prejudice based on expenditure of resources caused by new defense).

None of the three factors identified by the Second Circuit in *Block* as potential bases of undue prejudice exist here. As already shown, the Second Amended Petition does not require Zhang or Apex to devote any new resources to discovery; it does not delay, much less significantly, the resolution of this dispute on the merits – to the contrary, it facilitates such resolution; and, were this factor relevant, it would not affect Zhang's or Apex's right to bring a timely action in another jurisdiction. Leave to file the Second Amended Petition, in short, causes Zhang and Apex no undue prejudice at all. Its denial, however, would prejudice Petitioners.

C.     The Second Amended Petition Asserts Only One Claim – for Confirmation of the Attachment Order – and that Claim, as Clarified and Reinforced by the Amendment's Additional Facts and Legal and Jurisdictional Bases, Is Valid and Far from Futile

As gleaned from their counsels' respective June 29, 2021 letters, the main argument that Zhang and Apex are expected to make in opposition to this motion is that the Second Amended Petition is "futile" insofar as its fraudulent conveyance allegations are not "well-pled" and are time-barred. But that argument, we submit, is frivolous. The sole issue raised by Zhang's and Apex's futility argument is whether the Second Amended Petition, as a whole, would survive a motion to dismiss – and it clearly would. Even if the fraudulent conveyance allegations were invalid – and they are not – the Second Amended Petition's only claim, for confirmation of the Attachment Order, would remain valid insofar as it continues to allege that Zhang, not Apex, owns, controls and otherwise has an interest in the Artworks under CPLR § 5225(b). But the fraudulent conveyance allegations are, in fact, timely and well-pled, and they provide an

14

alternative and independent basis on which to confirm the Attachment Order even if Zhang had

transferred ownership of the Artworks to Apex.[2]

   "In addressing the proposed futility of an amendment, the proper inquiry is comparable to

that required upon a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Aetna Cas.*, 404

F.3d at 604 (granting leave to amend upon concluding that "there is merit in the proposed

amendments") (collecting cases); *see also*, *e.g.*, *Blagman*, 2014 WL 2106489 at *5 ("Leave to

amend may . . . be denied as futile when the pleading would not survive a motion to dismiss"

(collecting cases)); *A.V. by Versace*, 87 F. Supp. 2d at 298 (leave to amend will be denied only

"if the proposed amended complaint would be subject to immediate dismissal for failure to state

a claim or on some other ground") (internal citation omitted).  "[I]f the plaintiff has at least

colorable grounds for relief, justice does . . . require" that leave be granted.  *Ryder Energy*

*Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984) (internal

citation omitted).  Put otherwise, parties seeking to amend should be given "the opportunity to

demonstrate that their claims deserve to be decided on the merits."  *Loreley*, 797 F.3d at 190-91.

   "Under this standard, '[t]he issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims.'"  *Blagman*, 2014 WL

2106489 at *5 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)); *accord A.V. by*

*Versace*, 87 F. Supp. at 298 ("[T]he standard for granting leave to amend is far more liberal than

the showing required to survive summary judgment").  Further, "the court must accept the facts

---

[2]      To succeed on the merits of a motion to confirm the Attachment Order, Petitioners need only additionally
show that the Arbitral Awards "'may be rendered ineffectual without such provisional relief.'"  *Mischon de Reya*
*N.Y. LLP v. Grail Semiconductor, Inc.*, 2011 WL 6957595, at *3 (S.D.N.Y. Dec. 28, 2011) (quoting CPLR 7502(c)
and collecting cases).  "The Second Circuit has stated that such a requirement amounts to inquiring whether the
petitioner 'has a need for the attachment.'"  *Id.* (quoting *Capital Ventures Int'l v. Rep. of Argentina*, 443 F.3d 214,
221 (2d Cir. 2006)).  The three other showings needed to confirm the Attachment Order – that (1) there is a cause of
action; (2) probability of success on the merits; and (3) the amount demanded from Zhang exceeds all counterclaims
known to Petitioners (*see Mischon*, 2011 WL 6957595, at *3) – are clear and beyond dispute.

alleged by the party seeking to amend as true and construe them in the light most favorable to that party." *Aetna Cas.*, 404 F.3d at 604.  The opposing party bears the burden of showing that leave to amend would be futile.  *Blagman*, 2014 WL 2106489 at *5 (internal citations omitted).

Zhang and Apex cannot meet that burden here.  Set forth in sub-sections C.1 and C.2 below are the salient facts, pleaded mainly in Fact Section III the Second Amended Petition (at ¶¶44-58) and discussed in Section C of the Feigenbaum Declaration (at ¶¶21-34), showing that Petitioners have stated a valid claim for confirmation of the Attachment Order under CPLR § 6211(b), and that Zhang's and Apex's futility argument is itself futile.

1.    The Second Amended Petition Alleges a Valid Claim for Confirmation
of the Attachment Order Based on Zhang's Control Over and *De Facto*
Ownership of the Artworks, Which Also Underlie the Court's Personal
Jurisdiction Over Zhang and Apex and *In Rem* Jurisdiction Over the Artworks

Zhang is known as a public and prolific collector of modern art.  In one of her affidavits submitted in an injunction proceeding in Hong Kong, she proclaimed herself to have "considerable fame in the Chinese art scene and business circles."  (Ex. 6 (Borrelli Aff. ¶72)  In a 2015 interview published by Christie's, she stated, "I don't have any savings in the bank.  My savings are my art collection."  (Ex. 7)  She added that her "collection consists of 300 to 400 artworks."  (*Id.*)  She also explained where she keeps her artworks:  "I don't show art at home; I think homes are for living in.  I prefer to keep my collection in professional storage facilities to protect it in the long term."  (*Id.*)

Zhang's collection includes the Artworks.  The events underlying Zhang's acquisition of the Artworks began on or about May 12, 2014, the same day as the auction, when she arranged for Christie's to create a new account for her that was intended to be anonymous.  At the time, Zhang already had a client account with Christie's, but she wanted an anonymous account created on her behalf so she could later hide that she was the buyer of the Artworks in the event

she successfully bid on them that night.  When a Christie's employee asked Zhang's agent at Christie's, Xin Li, by email for the "identity of this new anon record," Xin Li replied, "Yes.  It's Zhang Lan 4098 8289."  (Ex. 8)

Zhang, through her agent in New York, directly participated in the May 12, 2014 auction at Christie's, at which she successfully bid on the Artworks.  Her purchase of the Artworks was reported in a May 30, 2014 article in ArtNet News, which accurately identified the Artworks as Andy Warhol's "Little Electric Chair" (1965) (purchased for $10.5 million) and Martin Kippenberger's untitled self-portrait (1988) (purchased for $18.6 million).  (Ex. 9)  The article describes how Zhang was "bidding through Christie's specialist Xin Li over the telephone" and "proved a tenacious competitor, sometimes jumping the bid higher in $1 million increments as opposed to the typical $250,000 or $500,000 jumps seen at that price level."  (*Id.*)  According to the article, when Zhang raised her bid on the Kippenberger painting from $12.5 million to $13.5 million, there were "gasps in the salesroom."  (*Id.*)  Zhang's purchases of the Artworks were also reported in an article published in May 2015 on China Daily Asia's website.  (Ex. 10)

Documents produced by Christie's confirm Zhang's participation in the May 12, 2014 auction in New York.  Days after the auction, Christie's – which at all relevant times acted through its New York office – issued an invoice for the Artworks to the same anonymous client account – "Anon 9 – Xin Li" – that had been created for Zhang on or about the same day of the auction.  (Ex. 8, Ex. 11)  On May 20, 2014, Christie's issued an "Extended Payment Terms Summary" to "Ms. Zhang Lan" at a Beijing address setting forth a payment schedule for the Artworks.  (Ex. 11)  The invoice included "Christie's New York Wire Transfer" instructions, with a New York City address for Christie's bank, JPMorgan Chase Bank, N.A.

Zhang knew by the time of the May 2014 auction of the material misrepresentations she had made in connection with Petitioners' acquisition in December 2013 (the "Acquisition") of the restaurant chain, known as "South Beauty," sold by companies owned by Zhang.  She knew, then, when she bid on the Artworks that she faced potential liability as to the more than $286 million they received – $244 million of which Zhang personally received – from the Acquisition. So she began or resumed a campaign to secrete her assets worldwide, including by purporting to fraudulently convey the Artworks to Apex.

As evidenced by documents produced by Christie's and Apex – including Apex's Certificate of Incorporation (Ex. 12), Certificate of Incumbency (Ex. 13), and Original Register of Directors (Ex. 14) – Apex was incorporated in Seychelles on or about May 26, 2014 – two weeks after Zhang successfully bid on the Artworks at the May 12 auction – and Wang became its sole shareholder and director on or about June 9, 2014 – the same day Zhang asked that payment for the Artworks be processed through Wang and that Zhang's name be removed altogether.  In establishing Apex, Zhang did not fund it with capital, a loan or anything else – another sign that Apex was never meant to be a legitimate company with actual operations. Thus, as shown in the Certificate of Incumbency (Ex. 13), Wang was given one share of Apex with a nominal value of $1, and as Apex's counsel would later confirm in response to Petitioners' document request, "business and marketing plans for Apex do not exist."  Wang, on March 1, 2016, was replaced as Apex's sole director by Tian Yijin (Ex. 15), who appears to be a front for Tian Yibin, Zhang's second husband and Wang's stepfather, and to whom Zhang tried to get Christie's to deliver the Artworks in February 2016.  (*See* Ex. 1 ¶42(iii).)

After setting up Apex, Zhang, at the time she received Christie's invoice and payment terms, instructed Xin Li to manipulate the billing documentation for her purchases so as to

suggest that she herself was not the buyer.  Thus, on June 9, 2014, Christie's employees raised internally that Zhang – whom they referred to as the "actual buyer" who "bought [the Artworks] in our NY evening sales" – wanted payment for the Artworks to be processed by her son, Wang, through "his personal or BVI account."  (Ex. 16)

Christie's then amended its documentation to remove Zhang's name and show that payment for the Artworks would be made by Apex, which did not even exist at the time of the May 12 auction and obviously had nothing to do with the bidding on the Artworks.  Christie's sent a revised invoice dated June 11, 2014 to Wang and Apex, at Apex's P.O. address in Seychelles, that was otherwise identical to the May 20, 2014 invoice addressed to Zhang.  (Ex. 17)  On June 12, 2014, however, Rebecca Mo, a Director at Cornucopiae Asset Management Ltd. in Hong Kong – a company that Zhang owns or uses as her investment advisors – emailed Xin Li to say that the "correspondence address" for Apex should be Cornucopiae's address in Hong Kong, not the Seychelles "registered address."  (Ex. 18)  Christie's then revised its June 11 invoice to make that address change.  (Ex. 19)  So while the invoice now listed Apex in place of Zhang, the delivery address was Zhang's agent's, rather than any address associated with Apex.

Although Zhang tried to hide that she herself bought the Artworks – by using an anonymous account and having Christie's amend the billing documentation to suggest that Apex would be paying for the Artworks – further evidence betrays her efforts and confirms that she alone paid for the Artworks.  That evidence thereby further confirms that Apex was a front used by Zhang to shield the Artworks – and the $29.1 million used to pay for them – from Petitioners, as her future creditors.

Thus, under the Extended Payment Terms Summary (Ex. 11), the Artworks were to be paid in three separate installments:  $12,057,000 by June 11, 2014, $12,057,000 by August 8,

2014, and $5,000,000 by September 9, 2014.  The documentary evidence, including documents

produced by Apex, shows that Zhang herself made each of those payments:

> (i)     On or about June 10, 2014, Zhang authorized a wire transfer of $12,057,000 from her account at UBS AG to Wang's account at UBS AG, and the transfer was confirmed on June 12, 2014.  (Ex. 20)  On June 16, 2014, Wang wired the same amount, $12,057,000, from his UBS AG account to Christie's JPMorgan account in New York.  (Ex. 21)

> (ii)    On or about July 30, 2014, an individual within Christie's Client Operations and Accounting department checked with Xin Li on the status of the second installment payment then coming due on August 8.  Xin Li responded that she had "sent reminder a couple of days ago to the client, *she*" – a reference to Zhang – "is aware of the payment date."  (Ex. 22)

> (iii)   On or about August 7, 2014, Zhang wired an additional $12,057,000 to Wang's UBS account.  (Ex. 23)  On August 8, 2014, Wang wired the same amount, $12,057,000, from his UBS AG account to Christie's JPMorgan account in New York.  (Ex. 24)

> (iv)    On or about September 9, 2014, the due date of the final installment payment, an agent of Zhang's, Rebecca Mo, emailed Xin Li of Christie's to inform her that "*since Ms. Zhang is out of town*, the final payment of the painting will be delayed a couple of days, we'll let you know once it's done."  (Ex. 25 (emphasis added))

> (v)     On or about September 25, 2014, Zhang wired an additional $5,000,000 to Wang's account at UBS AG, and the transfer was confirmed on September 29, 2014.  (Ex. 26) On September 30, 2014, Wang wired the same amount, $5,000,000, from his UBS AG account to Christie's JPMorgan account in New York.  (Ex. 27)

Zhang's payment for the Artworks and her simultaneous effort to conceal that she had

done so – by manipulating Christie's billing and sending the money to Christie's indirectly

through her son's bank account – confirms that she controlled and remained the *de facto* owner

of the Artworks even after she created Apex.  Zhang, as the successful bidder on the Artworks,

alone had the contractual obligation to Christie's to pay for the Artworks, and that obligation did

not change simply by her arranging to have the three installment payments appear to come from

Apex.  And Zhang, after all, is the collector of art, not her son; Apex was simply a tool to aid

Zhang's scheme to defraud Petitioners, as her then-future creditors.  Indeed, in a Judgment

entered on March 2018 in an injunction proceeding brought by Petitioners against Zhang in

Hong Kong, the court rejected Zhang's claim that she did not own the artwork collection about which she boasted in her 2015 interview with Christie's, "find[ing] the denials made by Zhang in relation to her ownership of . . . her artwork collection, to be unbelievable."  (Ex. 28; *see* Ex. 1 ¶42(xvii))  The court sentenced Zhang to a year in prison.

These allegations, which must be accepted as true on this motion, establish that Zhang retains control over, *de facto* ownership of, and an interest in the Artworks more than sufficient to keep the Attachment Order in place while Petitioners seek a turnover of the Artworks under CPLR § 5225(b) in the Civil Action.  *E.g.*, *Gala Enters., Inc. v. Hewlett Packard Co.*, 970 F. Supp. 212, 217 (S.D.N.Y. 1997) (in context of attachment application, "under New York law, a defendant has an 'interest' in the funds if any part of the money is within the present or future control of the defendant," and "the mere fact that the [funds were] held by a [third party associated with the judgment debtor] does not preclude attachment") (internal citation omitted). They further establish that the Court has personal jurisdiction over Zhang and Apex under CPLR §§ 302(a)(1) and (2) and *in rem* jurisdiction over the Artworks.  The Second Amended Petition, on the independent basis of Zhang's interest in the Artworks, accordingly states a valid claim for confirmation of the Attachment Order.  Zhang's and Apex's futility argument thereby fails, and Petitioners are entitled to leave to file the Second Amended Petition.

>    2.    The Second Amended Petition Alleges a Valid Claim for Confirmation
>          of the Attachment Order Based on the Alternative and Independent
>          Ground that Zhang Fraudulently Conveyed the Artworks to Apex

The evidence shows that Zhang retains an interest in the Artworks and never transferred ownership of them to Apex.  But even if she had actually made such a transfer, the transfer would be a nullity under New York fraudulent conveyance principles embodied in §§ 276 and

275 of New York's Debtor & Creditor Law ("DCL"), Zhang would still retain an interest in the Artworks, and the Attachment Order would still be subject to confirmation.

As alleged in the Second Amended Petition (at ¶¶72-73), Zhang's transfer of ostensible ownership of the Artworks to Apex was for no consideration, in furtherance of her scheme to secrete her assets worldwide, and carried out with intent to hinder, delay, or defraud Petitioners, as future creditors that Zhang knew would very likely commence an arbitration against her, having suffered significant financial loss as a result of her misrepresentations.  Specifically:

      i.      At the time of the fraudulent conveyance, Zhang was aware that the dramatic decline in South Beauty's financial performance would eventually lead to the discovery of the pervasive manipulation and material misrepresentations for which she and her companies would later be found liable in the Arbitrations.  (Ex. 1 ¶72(i))

      ii.     She was also aware that the monetary amount of her potential liability was in nine figures, since she and her companies had been paid more than $286 million for the Acquisition, of which she herself received more than $244 million.  (Ex. 1 ¶72(ii))

      iii.    Zhang and her agents therefore undertook a broad scheme to secrete her assets worldwide so as to make herself insolvent and thereby unable to satisfy any future judgment obtained by Petitioners.  As she told her personal bankers, she was moving her assets around to "ease the concern on the with-recourse term of her business sold to" Petitioners.  (Ex. 1 ¶72(iii))

      iv.    As part of her scheme and with intent to defraud, Zhang formed Apex for the sole purpose of trying to place ostensible ownership of the Artworks in its name and thereby render them judgment-proof.  Zhang's creation of Apex enabled her to manipulate the invoices and other documents relating to the Artworks so as to hide her ownership of them.  That Apex is a ruse is manifest:  Zhang funded Apex with $1; Apex has never had any valid operations; Zhang's

son was its original sole shareholder and director; and Apex has been disregarded except when Zhang has used it to immunize the Artworks from execution.  (Ex. 1 ¶72(iv))

As alleged in ¶73 of the Second Amended Petition, Zhang's conveyance of ostensible ownership of the Artworks to Apex constitutes a violation of DCL § 276 insofar as it was made with intent to "hinder, delay, or defraud" Petitioners within the meaning of § 276.  Her conveyance independently constitutes a violation of DCL § 275 insofar as it was made for no consideration at a time when she knew she faced a potential liability to Petitioners that would be beyond her ability to pay.  Apex, as the Artworks' transferee, is also liable for both violations.

Although Petitioners have asserted a cause of action in the Civil Action against Zhang and Apex for violations of DCL §§ 276 and 275, the Second Amended Petition does not, and need not, assert the same cause of action in this proceeding.  Instead, it relies on Zhang's fraudulent conveyance of the Artworks, and principles of fraudulent conveyance law, as an alternative and independent basis on which to confirm the Attachment Order – relief that, again, requires only a showing that the Arbitral Awards may be rendered ineffectual if the Attachment Order were vacated before Petitioners are able to move for a turnover of the Artworks.

A series of decisions rendered by Judge Swain in *Universitas Educ., LLC v. Nova Group, Inc.*, illustrate the use of fraudulent conveyance principles, in judgment enforcement proceedings like those here, as a legal theory in support of an attachment or turnover rather than as a cause of action *per se*.  There, the Court found that the judgment debtor had "caused the Life Insurance Proceeds" – an asset on which the petitioner sought to execute – "to be transferred to and through entities that he controlled, either directly or indirectly . . . for the personal benefit of [him] and his affiliates."  *Universitas Educ., LLC v. Nova Group, Inc.*, 2013 WL 6123104, at *7 (S.D.N.Y. Nov. 20, 2013).  The Court ruled that the fraudulently conveyed funds were subject to

23

execution to satisfy the judgment creditor's judgment, stating that "[a] judgment creditor may use [CPLR] Section 5225(b) as the means to set aside a transfer made by a judgment debtor to defraud his creditors." *Id.* at *8 (internal citations omitted).  The Court explained that "if any component of a transfer is deemed fraudulent, the entire transfer must be voided in its entirety," and that "if the original transfer away from the control of the judgment debtor . . . was a fraudulent conveyance, the entire transaction was fraudulent and void." *Id.*

The transfers of the funds through shell companies – a tactic identical to what Zhang did as to ostensible ownership of the Artworks – led Judge Swain to conclude that the transfers were "structured with a single purpose, to . . . insulate[] [the funds] from the reach of [the judgment debtor's] creditors (and, of course, from Petitioner's claim)." *Id.*  The Court adopted petitioner's fraudulent conveyance theory and held that "[t]herefore, the judgment debtor . . . has an interest in the [property and funds at issue]" and granted the judgment creditor's turnover petition on that basis. *Id.* at *12-*13.  The Court undertook the same analysis for additional transactions that were part of the judgment debtor's scheme and reached the same conclusion in a subsequent decision granting a separate turnover motion based on a fraudulent conveyance theory. *See Universitas Educ., LLC v. Nova Group, Inc.*, 2014 WL 3883371 (S.D.N.Y. Aug. 7, 2014).[3]

Finally, Apex's expected statute of limitations argument fails for at least two reasons. First, the Second Amended Petition does not, as noted, assert a claim *per se* for fraudulent conveyance, but instead relies on fraudulent conveyance principles as an alternative and independent basis on which to confirm the Attachment Order.  Second, Petitioners' fraudulent

---

[3]     In January 2014, Judge Swain, based largely on a fraudulent conveyance theory, granted the petitioner's application for a preliminary injunction restraining the judgment debtor's use of his assets pending the outcome of that separate turnover motion. *See Universitas Educ., LLC v. Nova Group, Inc.*, 2014 WL 113702 (S.D.N.Y. Jan. 13, 2014).  That injunction is effectively the same relief Petitioners seek here:  to keep the Attachment Order in place to secure the Artworks pending the outcome of Petitioners' eventual turnover motion in the Civil Action.

conveyance allegations are timely in all events.  Such allegations must be made within six years

of the conveyance *or* within two years after the fraud was discovered.  *E.g.*, *Guedj v. Dana*, 11

A.D.3d 368 (1st Dep't 2004) (fraudulent conveyance claim "commenced within two years of

plaintiffs' discovery of the transfers" was timely); *Miller v. Polow*, 14 A.D.3d 368 (1st Dep't

2005) (action for fraudulent conveyance under DCL § 276 "must, like other actions based on

fraud, be commenced within six years from the date of the fraud, or within two years after the

plaintiff discovered the fraud, or could with reasonable diligence have discovered it, whichever

is longer"); *Citibank, N.A. v. Benedict*, 2000 WL 322785, at \*13-\*14 (S.D.N.Y. Mar. 28, 2000)

(quoting CPLR § 213(8) and ruling that a fraudulent conveyance claim, brought more than six

years after the transfer, was timely because it was brought within two years of when it was

discovered).  Here, Petitioners first learned of Apex and its claimed ownership of the Artworks

on December 31, 2019, when Apex's New York counsel contacted Petitioners' counsel, and only

thereafter did Petitioners start obtaining the documents, from Christie's and from Apex itself,

evidencing Zhang's fraudulent transfer of ostensible ownership of the Artworks to Apex.

## CONCLUSION

For the foregoing reasons, Petitioners' motion should be granted, and Petitioners should

be given leave under Rule 15(a)(2) to file the Second Amended Petition.

Dated:   New York, New York
       July 20, 2021

KATSKY KORINS LLP

By: /s/Steven B. Feigenbaum
    Steven B. Feigenbaum
    Timothy J. Holland
605 Third Avenue
New York, New York 10158
(212) 953-6000
sfeigenbaum@katskykorins.com
tholland@katskykorins.com
*Attorneys for Petitioners*