UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────────

| | |
|---|---|
| LA DOLCE VITA FINE DINING COMPANY LIMITED and LA DOLCE VITA FINE DINING GROUP HOLDINGS LIMITED, | Case No. 19 Misc. 536 (ALC) |
| Petitioners, | |
| - against - | DECLARATION OF STEVEN B. FEIGENBAUM IN SUPPORT OF MOTION UNDER RULE 15(a)(2) FOR LEAVE TO FILE SECOND AMENDED PETITION |
| ZHANG LAN, GRAND LAN HOLDINGS GROUP (BVI) LIMITED, and QIAO JIANG LAN DEVELOPMENT LIMITED f/k/a SOUTH BEAUTY DEVELOPMENT LIMITED, | |
| Respondents. | |
| - and - | |
| APEX LEAD INVESTMENT HOLDINGS LIMITED, | |
| Intervenor-Respondent. | |

───────────────────────────────────────────────

Steven B. Feigenbaum, an attorney admitted to practice before the Bar of this Court, hereby declares as follows:

1.      I am a member of Katsky Korins LLP, attorneys for petitioners La Dolce Vita Fine Dining Company Limited ("LDV Company") and La Dolce Vita Fine Dining Group Holdings Limited ("LDV Holdings," and collectively, "Petitioners"). I submit this declaration in support of Petitioners' motion under Fed. R. Civ. P. ("Rule") 15(a)(2) for leave to file the second amended petition, against Respondent Zhang Lan ("Zhang") and intervenor-respondent Apex Lead Investment Holdings Limited ("Apex"), that was submitted to the Court by letter on June 24, 2021 (ECF No. 87) and is annexed hereto as Ex. 1 (the "Second Amended Petition").

2. In particular, I set forth in this declaration (i) the procedural history of this proceeding, which explains the timing of the Second Amended Petition, and, in relevant part, of the civil action, *La Dolce Vita Fine Dining Company et al. v. Zhang Lan et al.*, No. 21-3178 (MKV), pending before Judge Vyskocil (the "Civil Action"); (ii) the differences among Petitioners' original, first amended and second amended petitions – differences that underscore the appropriateness of the second amendment – and the conformance of the Second Amended Petition with the amended petition in the Civil Action; and (iii) the allegations in the Second Amended Petition that provide the basis for confirming the Attachment Order, as defined below, and render baseless Zhang's and Apex's expected argument that the amendments in the Second Amended Petition are "futile."

A.  The Procedural History of This Proceeding
    and, in Relevant Part, the Civil Action

3. Petitioners commenced this proceeding by a petition dated November 18, 2019 (the "Original Petition," Ex. 2)[1] for an *ex parte* order of attachment pursuant to CPLR § 7502(c) and Article 62, as incorporated by Rule 64.  The Original Petition sought to attach two artworks that Zhang successfully bid on at an auction at Christie's Inc. ("Christie's) held at Christie's Manhattan headquarters on May 12, 2014:  (i) Andy Warhol's "Little Electric Chair" (1965), purchased for $10.5 million, and (ii) Martin Kippenberger's untitled self-portrait (1988), purchased for $18.6 million (the "Artworks").

4. The requested attachment was in aid of two related arbitrations in Beijing that Petitioners commenced on March 5, 2015 against Zhang and her two wholly-owned companies, Respondents Grand Lan Holdings Group (BVI) Limited ("Grand Lan Holdings") and Qiao Jiang Lan Development Limited ("Qiao Jian Lan").  Petitioners asserted claims in each arbitration for,

---

[1]   References to "Ex. __" are to the exhibits to this declaration.

among other things, misrepresentations by Zhang in connection with Petitioners' acquisition in December 2013 of a majority stake in an investment company that owned a chain of restaurants in China. On April 28, 2019, the arbitral panel issued two related arbitral awards, finding in Petitioners' favor on their misrepresentation and contract claims and awarding Petitioners the combined principal amount of $142,463,666.28, plus interest (the "Arbitral Awards").

5. On November 21, 2019, the Court entered an order attaching the Artworks (the "Attachment Order," ECF No. 20). At that time, the Arbitral Awards were still subject to an appeal in Beijing. On November 26, 2019, Petitioners moved within the requisite five-day period, on notice to Zhang and her companies, for an order under CPLR § 6211(b) confirming the Attachment Order. That motion, made before Apex emerged, was ultimately never decided.

6. On December 31, 2019, six weeks after the Attachment Order had been entered, Apex, through its New York counsel, first contacted me, claiming that it owned the Artworks. Apex is a shell company that Zhang incorporated in the Republic of Seychelles on May 26, 2014 – two weeks after the May 12, 2014 auction at Christie's – with her son, Wang Xiaofei ("Wang"), as its sole shareholder. Apex's only purpose, Petitioners allege, was to serve as the entity into which Zhang purported to place ostensible ownership of the Artworks as part of her effort to secrete her assets worldwide in anticipation of the eventual entry of the Arbitral Awards.

7. On March 10, 2020, Zhang and her companies moved to vacate the Attachment Order and dismiss the Original Petition, arguing primarily that service on those Respondents had been ineffective. At that time, Apex had not been added as a party to this proceeding and was not involved with the vacatur motion. By Opinion and Order dated December 11, 2020 (ECF No. 71), the Court denied that motion and authorized Petitioners to serve all prior and future

filings on Zhang and her companies by email to their counsel of record. Between March and December 2020, there was essentially no activity in the case and none involving Apex.

8.  Shortly after the Court rendered its December 11, 2019 Opinion and Order, Petitioners filed their first amended petition, dated December 31, 2020 (the "First Amended Petition," ECF No. 74) (Ex. 3), simply to add Apex as an intervenor-respondent insofar as its contention that it owned the Artworks made it a necessary party. Zhang and her companies had never answered the Original Petition after the denial of their vacatur motion, and neither they nor Apex have ever responded to the First Amended Petition.

9.  At the time Petitioners filed the First Amended Petition, the Arbitral Awards were still on appeal, so Petitioners could not have known for sure how the outcome of the appeal might affect their pleading, even though they expected to prevail on appeal. More importantly, no discovery of Zhang, her companies or Apex had by then taken place. Petitioners therefore could not then have known the extent to which documents that Respondents would produce – or would not produce – would bear on the Attachment Order or any other relief they might seek.

10.  At around the same time they filed the First Amended Petition, Petitioners served separate document requests on the original Respondents and Apex for documents relating directly or indirectly to the question of who owns, controls or otherwise has an interest in the Artworks. Zhang and her companies ultimately produced no documents at all. Apex made three separate productions – one on or about February 12, 2021, the second on or about March 1, 2021, and the third on July 1, 2021, after Petitioners had submitted their June 24, 2021 letter to the Court requesting leave to file the Second Amended Petition.

11.  Meanwhile, by separate but substantively identical decisions dated, respectively, December 29 and December 31, 2020 and issued in February 2021, the Second China

International Commercial Court ("CICC") affirmed the Arbitral Awards on appeal, dismissing Zhang's and her companies' application to set aside the Awards. The CICC decisions are final and not subject to appeal, so the Arbitral Awards, too, are final and not subject to further appeal.

12. On April 5, 2021, Petitioners moved in this proceeding to confirm the Arbitral Awards under the New York Convention and for a judgment against Zhang (but not her companies), for $120 million, based on the Court's personal jurisdiction over Zhang under CPLR § 302(a) (the "Confirmation Motion"). By Order dated April 7, 2021 (ECF No. 81), the Court ruled that a motion to confirm arbitral awards does not fit into the miscellaneous categories and directed Petitioners to commence a new civil action and re-file the Confirmation Motion there. Petitioners commenced the Civil Action on April 13, 2021, filing a petition and re-filing the Confirmation Motion. On May 3, 2021, the Civil Action was assigned to Judge Vyskocil.

13. By Stipulation and Order among all of the original parties to the Civil Action and filed on June 11, 2021 (Civil Action ECF No. 38), the parties agreed to stay the Confirmation Motion until after Petitioners had filed an amended petition in the Civil Action and their anticipated motion to confirm the Attachment Order in this proceeding has been decided.

14. On June 17, 2021, Petitioners filed an amended petition (Ex. 4; Civil Action ECF No. 40) in the Civil Action as a matter of right under Rule 15(a)(1). The amended petition primarily (i) seeks, as an alternative to a judgment against Zhang based on that court's personal jurisdiction over her, a more limited judgment based on the court's *in rem* jurisdiction over the Artworks; (ii) adds a cause of action for fraudulent conveyance under §§ 276 and 275 of the New York Debtor and Creditor Law; (iii) adds a cause of action for a turnover of the Artworks under CPLR § 5225(b); (iv) adds additional facts in support of those new causes of action; and (v) drops Zhang's wholly-owned companies, Grand Lan Holdings and Qiao Jian Lan, as respondents

in the Civil Action, leaving only Zhang and Apex as the respondents.[2]  The Civil Action is now effectively on hold pending the outcome of this proceeding.

15. By their June 24, 2021 letter to the Court, Petitioners sought leave to file a motion to confirm the Attachment Order and to file the Second Amended Petition.  Zhang and Apex previously consented to the filing of the motion, but as stated in their respective counsels' June 29, 2021 letters to the Court (ECF Nos. 88 and 89), they oppose the filing of the Second Amended Petition, primarily contending that the new fraudulent conveyance allegations are futile – a contention rebutted in my July 2, 2021 letter to the Court (ECF No. 91).  By Order dated July 9, 2021 (ECF No. 92), the Court granted Petitioners leave to file this motion.

B. The Differences Among the Original Petition, the First Amended Petition and the Second Amended Petition, and the Conformance of the Second Amended Petition with the Amended Petition in the Civil Action

16. The Second Amended Petition is designed to advance the outcome of this proceeding on the merits by bringing an otherwise stale pleading – the First Amended Petition, which is substantively no different from the Original Petition, filed in November 2019, other than that it adds Apex as an intervenor-respondent – up to date and in conformance with the amended petition filed in the Civil Action on June 17, 2021.  Like the First Amended Petition, the Second Amended Petition asserts only one claim:  for confirmation of the Attachment Order under CPLR 6211(b).  But it updates, clarifies and reinforces the factual, legal and jurisdictional bases for that relief.

17. Annexed as Exhibit 5 to this declaration, as required by the Court's July 9 Order, is a redlined document comparing the First Amended Petition with the Second Amended Petition

---

[2] Although Christie's, as garnishee of the Artworks, would ordinarily have been named a respondent as contemplated by CPLR § 5225(b), Christie's, Petitioners, Zhang and Apex entered into a Stipulation and Order filed on June 18, 2021 (Civil Action ECF No. 41) under which Christie's would not be named a respondent in return for its agreement that, as a disinterested party, it will abide by any court order on the disposition of the Artworks.

and showing the revisions made in the latter. Those revisions show that the Second Amended Petition accomplishes the following:

(a) It takes into account relevant developments since the filing of the First Amended Petition in December 2020, including the affirmance of the Arbitral Awards and the productions – and non-productions – of documents by Apex and Zhang, who produced no documents at all.

(b) It incorporates new evidence, relevant to a confirmation of the Attachment Order, derived from the documents that Apex produced in discovery – all of which came after the filing of the First Amended Petition, with the final production made on July 1 2021 – and from what Apex and Zhang did *not* produce, as well as from Petitioners' own further factual investigations since that time in light of some of Apex's documents.

(c) It drops Grand Lan Holdings and Qiao Jiang Lan as respondents, since discovery has shown that Zhang alone – not her companies, at least not other than as her alter egos – bid on the Artworks; provided the $29.1 million to pay for the Artworks; retains an interest in the Artworks, within the meaning of CPLR § 5225(b), sufficient to warrant the turnover of the Artworks to Petitioners in the Civil Action; and fraudulently transferred the Artworks to Apex to the extent Zhang can be deemed – and the evidence shows she cannot be – to have transferred ownership of the Artworks to Apex.

(d) It clarifies the bases of the Court's subject matter and personal jurisdiction, specifically by pleading the Court's *in rem* jurisdiction over the Artworks, its personal jurisdiction over Zhang under CPLR 302 §§ (a)(1) and (2), and its personal jurisdiction over Apex under CPLR § 302(a)(2).

(e) It adds the evidence showing why Zhang's purported conveyance of the Artworks to Apex is alleged to have been fraudulent, and why New York principles of fraudulent conveyance law are an independent basis on which to confirm the Attachment Order in the event Zhang is found, even if wrongly, to have actually conveyed the Artworks to Apex; and

(f) It otherwise conforms Petitioners' pleading to the current record, to the requested motion to confirm the Attachment Order, and, as noted, to the amended petition in the Civil Action.  For Petitioners to have an updated pleading in the Civil Action and an outdated one here – particularly when the outcome of this proceeding will directly affect the Civil Action – is senseless and could give rise to otherwise avoidable confusion and unnecessary motion practice and its attendant delay.

18. By making the foregoing revisions to the First Amended Petition, the Second Amended Petition also streamlines this proceeding and facilitates the path to its resolution. Zhang's counsel candidly acknowledged during a recent conference call that a principal objective of Zhang's is to delay this proceeding as long as possible, and Zhang and Apex – which have a joint defense agreement, further evidence of Zhang's interest in the Artworks – have in furtherance of that objective made and will continue to make any conceivable argument designed to divert attention away from the merits of this dispute.

19. The Second Amended Petition helps guard against that tactic by preempting any arguments, however baseless, that particular new facts, or newly obtained documents, or new jurisdictional or merits-based legal arguments cannot be considered on Petitioners' eventual motion to confirm the Attachment Order.  Further, by dropping Grand Lan Holdings and Qiao Jiang Lan as respondents, the Second Amended Petition further streamlines this proceeding by

eliminating the Court's need to resolve the question of whether those entities are subject to the Court's jurisdiction and have an interest in the Artworks in their capacity as alter egos of Zhang.

20. Finally, the Second Amended Petition does not cause any delay in this proceeding – indeed, the only delay results from Zhang's and Apex's refusal to consent to the amendment, which under Rule 15(a)(2) would have obviated the need for this motion, even though their consent would have had had no effect on their defenses, and even though they will have to face the same facts and legal arguments anyway on any motion to confirm the Attachment Order. Zhang and Apex do not need to answer or move against the Second Amended Petition, but will instead need only to oppose, assuming they choose to do so, the motion to confirm the Attachment Order. And because Apex has now completed its document production, and Zhang's counsel has represented that Zhang will be producing no documents, the Second Amended Petition does not lead to the need for further discovery.

C. The Facts Pleaded in the Second Amended Petition that Underlie Petitioners' Claim for Confirmation of the Attachment Order:  Zhang's Control Over and Continued Ownership of the Artworks, and Otherwise Her Fraudulent Conveyance of Ostensible Ownership of the Artworks to Apex to Shield Them from Eventual Execution

21. The evidence, as pleaded in the Second Amended Petition, overwhelmingly compels that the Attachment Order stay in place while Petitioners seek the turnover of the Artworks. It shows that Zhang directly participated in the May 2014 Christie's auction in New York at which she successfully bid on the Artworks, that she later paid for the Artworks in New York, and that she manipulated Christie's invoices and related documents by using Apex – a company that did not even exist at the time of the May 2014 Christie's auction, whose sole original director and owner of its only share was Zhang's son, Wang, and whose one share had a nominal value of $1 – to camouflage her purchase. Although Zhang and Apex now assert that Apex owns the Artworks, Zhang herself produced no documents at all in discovery, much less

9

documents that would support that position, and Apex produced no documents showing that title to the Artworks was ever transferred to Apex. Apex instead produced only documents showing that Apex, despite having been funded with $1, ostensibly paid the $29.1 million for the Artworks. Yet documents from Christie's confirm that Zhang herself provided the funds for each of the three installment payments for the Artworks, and that she alone was contractually obligated to Christie's to make those payments. And if Zhang had transferred actual ownership of the Artworks to Apex – and she did not – that transfer would have been a fraudulent conveyance designed to shield the Artworks from an eventual judgment against Zhang, done at a time when Zhang knew of the material misrepresentations for which she would later be held liable in the Arbitrations, and when Zhang was in the midst of a years-long campaign to secrete all of her assets worldwide. The facts, pleaded mainly in Fact Section III the Second Amended Petition (Ex. 1 ¶¶44-58), are as follows:

22. Zhang is known as a public and prolific collector of modern art. In one of her affidavits in the injunction proceedings, she proclaimed herself to have "considerable fame in the Chinese art scene and business circles." (Ex. 6 (Borrelli Aff. ¶72) In a 2015 interview published by Christie's, she stated, "I don't have any savings in the bank. My savings are my art collection." (Ex. 7) She added that her "collection consists of 300 to 400 artworks." (*Id.*) She also explained where she keeps her artworks: "I don't show art at home; I think homes are for living in. I prefer to keep my collection in professional storage facilities to protect it in the long term." (*Id.*)

23. Zhang's collection includes the Artworks. The events underlying Zhang's acquisition of the Artworks began on or about May 12, 2014, the same day as the auction, when she arranged for Christie's to create a new account for her that was intended to be anonymous.

At the time, Zhang already had a client account with Christie's, but she wanted an anonymous account created on her behalf so she could later hide that she was the buyer of the Artworks in the event she successfully bid on them that night.  When a Christie's employee asked Zhang's agent at Christie's, Xin Li, by email for the "identity of this new anon record," Xin Li replied, "Yes.  It's Zhang Lan 4098 8289."  (Ex. 8 (CHR_LDV_000004-05)[3]

24.     Zhang, through her agent in New York, directly participated in the May 12, 2014 auction at Christie's, at which she successfully bid on the Artworks.  Her purchase of the Artworks was reported in a May 30, 2014 article in ArtNet News, which accurately identified the Artworks as Andy Warhol's "Little Electric Chair" (1965) (purchased for $10.5 million) and Martin Kippenberger's untitled self-portrait (1988) (purchased for $18.6 million). (Ex. 9)  The article describes how Zhang was "bidding through Christie's specialist Xin Li over the telephone," and that "she proved a tenacious competitor, sometimes jumping the bid higher in $1 million increments as opposed to the typical $250,000 or $500,000 jumps seen at that price level."  (*Id.*)  According to the article, when Zhang raised her bid on the Kippenberger painting from $12.5 million to $13.5 million, there were "gasps in the salesroom."  (*Id.*)  Zhang's purchases of the Artworks were also reported in an article published in May 2015 on China Daily Asia's website.  (Ex. 10)

25.     Documents produced by Christie's further evidence Zhang's participation in the May 12, 2014 auction in New York.  Days after the auction, Christie's – which at all relevant times acted through its New York office – issued an invoice for the Artworks to the same anonymous client account – "Anon 9 – Xin Li" – that had been created for Zhang on or about the

---

[3]   Although Christie's designated as confidential most of the documents that it produced in response to Petitioners' non-party subpoena, Christie's has since agreed that Petitioners may publicly file the Christie's emails annexed as exhibits to this declaration so long as the names of its employees – other than Xin Li – are redacted, as Petitioners have done.

11

same day of the auction.  (Ex. 8 (CHR_LDV_000004-05), Ex. 11 (CHR_LDV_000037))  On May 20, 2014, Christie's issued an "Extended Payment Terms Summary" to "Ms. Zhang Lan" at a Beijing address setting forth a payment schedule for the Artworks.  (Ex. 11 (CHR_LDV_000038)  The invoice included "Christie's New York Wire Transfer" instructions, with a New York City address for Christie's bank, JPMorgan Chase Bank, N.A.

26. Zhang, who knew of the material misrepresentations she had made in connection with the Acquisitions, knew when she bid on the Artworks that she and her companies faced potential liability as to the more than $286 million they received – $244 million of which Zhang personally received – from the Acquisition.  So she began or resumed a campaign to secrete her assets worldwide – including by fraudulently conveying the Artworks to Apex.

27. As evidenced by documents produced by Christie's and Apex – including Apex's Certificate of Incorporation (Ex. 12), Certificate of Incumbency (Ex. 13), and Original Register of Directors (Ex. 14) – Apex was incorporated in Seychelles on or about May 26, 2014 – two weeks after Zhang successfully bid on the Artworks at the May 12 auction – and Wang became its sole shareholder and director on or about June 9, 2014 – the same day Zhang asked that payment for the Artworks be processed through Wang and that Zhang's name be removed altogether.  In establishing Apex, Zhang did not fund it with capital, a loan or anything else – another sign that Apex was never meant to be a legitimate company with actual operations.  Thus, as shown in the Certificate of Incumbency (Ex. 13), Wang was given one share of Apex with a nominal value of $1, and as Apex's counsel would later confirm in response to Petitioners' document request, "business and marketing plans for Apex do not exist."  Wang, on March 1, 2016, was replaced as Apex's sole director by Tian Yijin (Ex. 15 (APEX0000196), who appears to be a front for Tian Yibin, Zhang's second husband and Wang's stepfather, and to

whom Zhang tried to get Christie's to deliver the Artworks in February 2016.  (*See* Ex. 1 ¶42(iii).)

28. After setting up Apex, Zhang, at the time she received Christie's invoice and payment terms, instructed Xin Li to manipulate the billing documentation for her purchases so as to suggest that she herself was not the buyer.  Thus, on June 9, 2014, Christie's employees raised internally that Zhang – whom they referred to as the "actual buyer" who "bought [the Artworks] in our NY evening sales" – wanted payment for the Artworks to be processed by her son, Wang, through "his personal or BVI account."  (Ex. 16 (CHR_LDV_000072)

29. Christie's then amended its documentation to remove Zhang's name and show that payment for the Artworks would be made by Apex, which did not even exist at the time of the May 12 auction and obviously had nothing to do with the bidding on the Artworks.  Christie's sent a revised invoice dated June 11, 2014 to Wang and Apex, at Apex's P.O. address in Seychelles, that was otherwise identical to the May 20, 2014 invoice addressed to Zhang. (Ex. 17 (CHR_LDV_000081)  On June 12, 2014, however, Rebecca Mo, a Director at Cornucopiae Asset Management Ltd. in Hong Kong – a company that Zhang owns or uses as her investment advisors – emailed Xin Li to say that the "correspondence address" for Apex should be Cornucopiae's address in Hong Kong, not the Seychelles "registered address."  (Ex. 18 (CHR_LDV_000092-94)  Christie's then revised its June 11 invoice to make that address change.  (Ex. 19 (CHR_LDV_000109)  So while the invoice now listed Apex in place of Zhang, the delivery address was Zhang's agent's, rather than any address associated with Apex.

30. Although Zhang tried to hide that she herself bought the Artworks – by using an anonymous account and having Christie's amend the billing documentation to suggest that Apex would be paying for the Artworks – further evidence betrays her efforts and confirms that she

13

alone paid for the Artworks.  That evidence thereby further confirms that Apex was just a front used by Zhang to shield the Artworks – and the $29.1 million used to pay for them – from Petitioners, as her future creditors.

   31.  Thus, under the Extended Payment Terms Summary (Ex. 11), the Artworks were to be paid in three separate installments:  $12,057,000 by June 11, 2014, $12,057,000 by August 8, 2014, and $5,000,000 by September 9, 2014.  The documentary evidence shows that Zhang herself made each of those payments:

   (i)  On or about June 10, 2014, Zhang authorized a wire transfer of $12,057,000 from her account at UBS AG to Wang's account at UBS AG, and the transfer was confirmed on June 12, 2014.  (Ex. 20)  On June 16, 2014, Wang wired the same amount, $12,057,000, from his UBS AG account to Christie's JPMorgan account in New York.  (Ex. 21 (APEX0000088))

   (ii)  On or about July 30, 2014, an individual within Christie's Client Operations and Accounting department checked with Xin Li on the status of the second installment payment then coming due on August 8.  Xin Li responded that she had "sent reminder a couple of days ago to the client, *she*" – a reference to Zhang – "is aware of the payment date."  (Ex. 22 (CHR_LDV_000136) (emphasis added))

   (iii)  On or about August 7, 2014, Zhang wired an additional $12,057,000 to Wang's UBS account.  (Ex. 23)  On August 8, 2014, Wang wired the same amount, $12,057,000, from his UBS AG account to Christie's JPMorgan account in New York.  (Ex. 24 (APEX0000157))

   (iv)  On or about September 9, 2014, the due date of the final installment payment, an agent of Zhang's, Rebecca Mo, emailed Xin Li of Christie's to inform her that "*since Ms. Zhang is out of town*, the final payment of the painting will be delayed a couple of days, we'll let you know once it's done."  (Ex. 25 (CHR_LDV_000213-20 (emphasis added))

   (v)  On or about September 25, 2014, Zhang wired an additional $5,000,000 to Wang's account at UBS AG, and the transfer was confirmed on September 29, 2014.  (Ex. 26)  On September 30, 2014, Wang wired the same amount, $5,000,000, from his UBS AG account to Christie's JPMorgan account in New York. (Ex. 27 (APEX0000161))

   32.  Zhang's payment for the Artworks and her simultaneous effort to conceal that she had done so – by manipulating Christie's billing and sending the money to Christie's indirectly through her son's bank account – confirms that she controlled and remained the *de facto* owner

of the Artworks even after she created Apex. Zhang, as the successful bidder on the Artworks, alone had the contractual obligation to Christie's to pay for the Artworks, and that obligation did not change simply by her arranging to have the three installment payments appear to come from Apex. And Zhang, after all, is the collector of art, not her son; Apex was simply a tool to aid Zhang's scheme to defraud Petitioners, as her then-future creditors. Indeed, in a Judgment entered on March 2018 in an injunction proceeding brought by Petitioners against Zhang in Hong Kong, the court rejected Zhang's claim that she did not own the artwork collection about which she boasted in her 2015 interview with Christie's, "find[ing] the denials made by Zhang in relation to her ownership of . . . her artwork collection, to be unbelievable." (Ex. 28 at pp. 36-41; *see* Ex. 1 ¶42(xvii)) The court sentenced Zhang to a year in prison.

33. The evidence thus shows that Zhang retains an interest in the Artworks and never transferred ownership of them to Apex. But as alleged in the Second Amended Petition (at ¶¶72-73), even if she had actually made such a transfer, the transfer would be a nullity under New York fraudulent conveyance principles embodied in §§ 276 and 275 of New York's Debtor & Creditor Law, Zhang would still retain an interest in the Artworks, and the Attachment Order would still be subject to confirmation.

34. Zhang's transfer of ostensible ownership of the Artworks to Apex was for no consideration, in furtherance of her scheme to secrete her assets worldwide, and carried out with intent to hinder, delay, or defraud Petitioners, as future creditors that Zhang knew would very likely commence an arbitration against her, having suffered significant financial loss as a result of her misrepresentations. (Ex. 1 ¶72) Specifically:

i. At the time of the fraudulent conveyance, Zhang was aware that the dramatic decline in South Beauty's financial performance would eventually lead to the discovery of the

15

pervasive manipulation and material misrepresentations for which she and her companies would later be found liable in the Arbitrations. (Ex. 1 ¶72(i))

    ii.     She was also aware that the monetary amount of her potential liability was in nine figures, since she and her companies had been paid more than $286 million for the Acquisition, of which she herself received more than $244 million. (Ex. 1 ¶72(ii))

    iii.     Zhang and her agents therefore undertook a broad scheme to secrete her assets worldwide so as to make herself insolvent and thereby unable to satisfy any potential judgment obtained by Petitioners. As she told her personal bankers, she was moving around her assets to "ease the concern on the with-recourse term of her business sold to" Petitioners. (Ex. 1 ¶72(iii))

    iv.     As part of her scheme and with intent to defraud, Zhang formed Apex for the sole purpose of putting the Artworks in its name and thereby render them judgment-proof. Zhang's creation of Apex enabled her to manipulate the invoices and other documents relating to the Artworks so as to hide her ownership of them. That Apex is a ruse is manifest: Zhang funded Apex with $1; Apex has never had any business or valid operations; Zhang's son was its original sole shareholder and director; and Apex has been disregarded except when Zhang has used it in recent years to immunize the Artworks from execution. (Ex. 1 ¶72(iv))

\*   \*   \*

35.     Petitioners have not previously applied for the relief sought on this motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in New York, New York on July 20, 2021.

/s/Steven B. Feigenbaum<br>Steven B. Feigenbaum