UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————

LA DOLCE VITA FINE DINING COMPANY
LIMITED and LA DOLCE VITA FINE DINING           Case No. 19 Misc. 536 (ALC)
GROUP HOLDINGS LIMITED,

                        Petitioners,

            - against -

ZHANG LAN, GRAND LAN HOLDINGS GROUP
(BVI) LIMITED, and QIAO JIANG LAN
DEVELOPMENT LIMITED f/k/a SOUTH BEAUTY
DEVELOPMENT LIMITED,

                        Respondents.

            - and -

APEX LEAD INVESTMENT HOLDINGS LIMITED,

                        Intervenor-Respondent.
——————————————————————————

PETITIONERS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION UNDER RULE
15(a)(2) FOR LEAVE TO FILE A SECOND AMENDED PETITION

KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158
(212) 953-6000
*Attorneys for Petitioners La Dolce Vita Fine
Dining Company Limited and La Dolce Vita
Fine Dining Group Holdings Limited*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................. 3

    I.      Respondents Ignore That The Sole Test on This Motion Is Whether
           The Second Amended Petition States A Valid Claim To Confirm The
           Attachment Order, As It Does ........................................................................ 3

    II.     Respondents' Futility Arguments Fail Because The Second Amended
           Petition Adequately Pleads Zhang's Interest In The Artworks And,
           Alternatively, Her Fraudulent Conveyance Of The Artworks To Apex ....................... 4

    III.    The Court Has *In Rem* and *Quasi-In-Rem* Jurisdiction Over The Artworks ................ 8

    IV.    The Court Has Personal Jurisdiction Over Zhang ....................................................... 8

    V.     The Second Amended Petition Causes No Prejudice to Respondents, Requires No
           Further Discovery, and Hastens – Not Delays – the Resolution of this Proceeding ... 14

CONCLUSION ......................................................................................................................... 15

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Aetna Cas. and Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566
(2d Cir. 2005) ....................................................................................................................3

*Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25
(2d Cir. 1996) ..................................................................................................................10

*Bank Nacional Ultramario, S.A. v. Chan*, 641 N.Y.S. 2d 1006
(Sup. Ct. N.Y. Co. 1996) ................................................................................................13

*Capital Ventures Int'l v. Rep. of Argentina*, 443 F.3d 214 (2d Cir. 2006) .........................4

*Citibank, N.A. v. Benedict*, 2000 WL 322785 (S.D.N.Y. Mar. 28, 2000) .........................7

*CME Media Enterprises B. V. v. Zelezny,* No. 01-cv-1733, 2001 WL 1035138
(S.D.N.Y. Sept. 10, 2001) .................................................................................................8

*CPC Int'l. Inc. v. McKesson Corp.*, 70 N.Y.2d 268 (1987).............................................12

*Crescendo Maritime Co. v. Bank of Commc'ns. Co. Ltd.*, 2016 WL 750351
(S.D.N.Y. Feb. 22, 2016) ..................................................................................................8

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006)....................................9

*Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65 (2006) ..................9, 11

*Experience Hendrix, LLC v. Chalpin*, 461 F. Supp. 2d 165 (S.D.N.Y. 2006).................5

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan
Republic*, 582 F.3d 393 (2d Cir. 2009) .............................................................................8

*Guedj v. Dana*, 11 A.D.3d 368 (1st Dep't 2004)...............................................................7

*Gulf Coast Dev. Group, LLC v. Lebor*, 2003 WL 22871914
(S.D.N.Y. Dec. 4, 2003) ............................................................................................12, 13

*Honda Assocs., Inc. v. Nozawa Trading, Inc.*, 374 F. Supp. 886
(S.D.N.Y. 1974)...............................................................................................................12

*Hudson Ins. Co. v. Oppenheim*, 35 A.D.3d 168 (1st Dep't 2006) .................................12

*Korea Deposit Ins. Corp. v. Jung*, 59 Misc.3d 442 (Sup. Ct. N.Y. Co.
Aug. 18, 2017) ................................................................................................................13

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161
(2d Cir. 2013)..................................................................................................................10

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160
(2d Cir. 2015)....................................................................................................................3

*Miller v. Polow*, 14 A.D.3d 368 (1st Dep't 2005) .............................................................7

*Mischon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, 2011 WL 6957595
(S.D.N.Y. Dec. 28, 2011) ..................................................................................................3

ii

*Morgenthau v. A.J. Travis Ltd.*, 708 N.Y.S. 2d 827 (Sup. Ct. N.Y. Co. 2000) ...............................13

*Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13 (1970) ...............................................11, 12

*Pearson Educ., Inc. v. ABC Books LLC*, No. 19-cv-7642, 2020 WL 3547217
    (S.D.N.Y. June 30, 2020)............................................................................................................9

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774
    (2d Cir. 1984).............................................................................................................................3

*Universitas Educ., LLC v. Nova Group, Inc.*, 2013 WL 6123104 (S.D.N.Y.
    Nov. 20, 2013) ...........................................................................................................................6

*Universitas Educ., LLC v. Nova Group, Inc.*, 2014 WL 3883371 (S.D.N.Y.
    Aug. 7, 2014) .....................................................................................................................13, 14

*Wall Street Assocs. v. Brodsky*, 257 A.D.2d 526 (1st Dep't 1999)...........................................7

*Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284 (S.D.N.Y. 2019) .........................................4

Statutes

CPLR § 213(8).............................................................................................................................7

CPLR § 302(a)(1) ................................................................................................................. passim

CPLR § 302(a)(2) ..........................................................................................................2, 9, 12, 13

CPLR § 5225(b).......................................................................................................................2, 4, 14

New York Debtor & Creditor Law § 270 .............................................................................6, 7

New York Debtor & Creditor Law § 275 ................................................................................6

New York Debtor & Creditor Law § 276 .............................................................................5, 6

Rules

CPLR 7502(c) ..............................................................................................................................3

Fed. R. Civ. P. 15(a) ................................................................................................................1, 4

Petitioners submit this reply memorandum of law in further support of their motion under Rule 15(a)(2) for leave to file the Second Amended Petition against Zhang and Apex.[1]

<u>PRELIMINARY STATEMENT</u>

Shorn of their mischaracterizations of the SAP and baseless cries of prejudice, Respondents' arguments in opposition to Petitioners' motion are that the SAP "abandons" Petitioners' assertion that Zhang owns, controls or otherwise has an interest in the Artworks sufficient to warrant their turnover, that Petitioners' reliance on fraudulent conveyance principles as an alternative basis on which to confirm the Attachment Order is futile, and that the Court lacks personal jurisdiction over Zhang.  Those arguments are not just baseless, but in making them, Zhang and Apex ignore that the sole test on this motion is whether the SAP – whose allegations must be accepted as true, something Apex, in particular, does not do – states a valid claim to confirm the Attachment Order.  That is a lenient test, and the SAP clearly meets it.

Apex's suggestion that Petitioners, by adding fraudulent conveyance principles as an alternative basis for confirming the Attachment Order, have "abandoned" their claim that Zhang has an interest in the Artworks is ridiculous.  The SAP, in fact, bolsters that claim based in no small part on what Apex and Zhang did – and did not – produce in discovery.  It shows that Zhang alone, through her agent at Christie's, Xin Li, bid on the Artworks at Christie's May 2014 auction in New York; that she alone was obligated to, and did, pay for the Artworks, providing all of the $29.1 million to Apex – which was created shortly after the auction with $1 in capital – for the three installment payments to Christie's; that she manipulated Christie's invoices to hide that she, not Apex, was the actual buyer of the Artworks; and that she never transferred title to the Artworks to Apex – as Christie's seems to have known in refusing to release the Artworks to

---

[1]      All abbreviated terms are the same as in Petitioners' moving papers, though, to save space, we refer to the Second Amended Petition as the "SAP."   References to "Ex. _" are to the exhibits to the Feigenbaum Declaration.

Apex despite Apex's years-long pleas for it to do so.  Indeed, in its March 2018 Judgment, rendered years after Zhang acquired the Artworks, the Hong Kong Court rejected the same argument that Apex makes for Zhang here, "find[ing] the denials made by Zhang in relation to her ownership of . . . her artwork collection, to be unbelievable," and sentencing Zhang to a year in prison.  (Ex. 28)  That the SAP states a valid claim to confirm the Attachment Order, based on ownership-related allegations that Apex says were "abandoned," is indisputable.  Those allegations also support the Court's personal jurisdiction over Zhang under CPLR § 302(a)(1).

But even if Zhang had transferred title in the Artworks to Apex, the SAP would still state a valid claim to confirm the Attachment Order because any such transfer would have been fraudulent, done as it was to shield Zhang's assets from eventual execution.  The SAP's reliance on fraudulent conveyance principles has ample evidentiary and precedential support, is timely – Petitioners did not know of Apex until December 31, 2019, less than two years ago – and leads to no further discovery.  It also subjects Zhang to personal jurisdiction under CPLR § 302(a)(2).

Although the sole test on this motion is whether the SAP states a valid claim to confirm the Attachment Order, Respondents, particularly Apex, argue key allegations on the merits, and in doing so, they not only miss the point of this motion, but also highlight why the Attachment Order must stay in place, obviating the need for a separate motion to confirm the Attachment Order and teeing up a motion for a turnover of the Artworks under CPLR § 5225(b) in the related civil action to be reinstated before Judge Vyskocil.[2]  That Zhang is still trying to keep Petitioners

---

[2] In that action, *La Dolce Vita Fine Dining Company et al. v. Zhang Lan et al.*, No. 21-3178 (MKV), Petitioners, Zhang and Apex entered into a June 11, 2021 stipulation (ECF No. 39) staying the action pending the outcome of this action.  Although Respondents note that Petitioners' "withdrew" the proceeding, they omit that Judge Vyskocil advised the parties to withdraw it without prejudice, and toll all limitations periods, rather than stay it. (ECF No. 42)  Either way, Petitioners will be reinstating the same claims for a turnover of the Artworks, and to confirm the Arbitral Awards, at the appropriate time.  So conforming the petition in this action with the amended petition in the civil action is not, as Apex suggests (at 7 n.2), a "moot" rationale for the SAP.

from executing on the Artworks reinforces that point, for it again confirms that she has a deep interest in the Artworks and, using Apex as her proxy, is desperate to free them from Christie's.

<u>ARGUMENT</u>

I.      Respondents Ignore That The Sole Test On This Motion Is Whether The Second
        <u>Amended Petition States A Valid Claim To Confirm The Attachment Order, As It Does</u>

        By responding to this motion as if it were seeking summary judgment, Respondents ignore that whether leave to amend should be granted turns solely on whether the SAP states a valid claim, immune from a motion to dismiss, to confirm the Attachment Order.  *E.g.*, *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F. Supp. 2d 281, 298 (S.D.N.Y. 2000) ("[T]he standard [on a motion to amend] . . . is far more liberal than the showing required to survive summary judgment"); *Aetna Cas. and Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 604 (2d Cir. 2005) ("the court must accept the facts alleged by [Petitioners] as true and construe them in the light most favorable to [Petitioners]").  "[T]he permissive standard of Rule 15 is consistent with our strong preference for resolving disputes on the merits," *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), and "if the plaintiff has at least colorable grounds for relief, justice does . . . require" that leave be granted.  *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984).

        The SAP readily meets that test, both on the merits of its claim to confirm the Attachment Order and as to the Court's *in rem* jurisdiction over the Artworks and personal jurisdiction over Zhang.  To succeed on the merits, Petitioners need only show that Zhang has an interest in the Artworks, and that the Arbitral Awards "'may be rendered ineffectual without such provisional relief,'" *Mischon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, 2011 WL 6957595, at *3 (S.D.N.Y. Dec. 28, 2011) (quoting CPLR 7502(c)) – a test that asks "whether the petitioner 'has a need for the attachment.'"  *Id.* (quoting *Capital Ventures Int'l v. Rep. of Argentina*, 443 F.3d 214,

221 (2d Cir. 2006)).  The SAP shows that Zhang has a clear interest in the Artworks and that, as reinforced by Apex documents showing Respondents' efforts to get Christie's to release the Artworks, the Attachment Order must be confirmed for the Arbitral Awards to be effectual.

II.   **Respondents' Futility Arguments Fail Because The Second Amended Petition Adequately Pleads Zhang's Interest In The Artworks And, <u>Alternatively, Her Fraudulent Conveyance Of The Artworks To Apex</u>**

As the ones opposing the amendments, Respondents bear the burden of showing that they are futile – i.e., that the SAP fails to state a claim to confirm the Attachment Order.  *Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 294 (S.D.N.Y. 2019).  Respondents cannot meet that burden under any standard, much less one as lenient as the standard under Rule 15(a)(2).

Respondents do not deny that the Attachment Order must stay in place for the Arbitral Awards to remain effectual.  Their futility arguments focus instead on Zhang's interest in the Artworks, contending that the SAP "abandons" Petitioners' position that Zhang has such an interest, and that fraudulent conveyance principles are not a basis for confirming the Attachment Order.  The first contention, as discussed above, is senseless:  Zhang's ownership of and control over the Artworks give her an interest in the Artworks sufficient to warrant their turnover to Petitioners under CPLR § 5225(b), and that position remains Petitioners' primary basis on which to confirm the Attachment Order.  Apex's contention (at 10) that the SAP "fails to plausibly allege facts showing that Zhang ever owned the artwork" is nonsense:  The SAP cites ample evidence supporting Zhang's ownership or control, going well beyond the requisite "colorable grounds" for confirmation.[3]  (*See* SAP ¶¶44-58; Exs. 6 (at ¶72) through 28; Moving Brief at 16-

---

[3]      Apex bases that contention entirely on its statement (at 10) that "the SAP alleged no facts showing that 'Anon 9' or Zhang herself" – Anon 9 was Zhang – "made payments and took title to the artwork before Christie's amended its document to reflect Apex as the buyer."  That is a gross misstatement, as Apex's counsel surely knows.  All of the $29.1 million used to pay for the Artworks came from Zhang.  Apex argues (at 12)  that the SAP "falsely alleges" that Zhang, beginning in June 2014, wired those funds to Wang because, Apex says, the SAP also alleges that Zhang closed the UBS Account in her name in March 2014.  That is not a contradiction.  As alleged in the SAP

4

21.)  And neither Apex nor Zhang, who produced nothing at all, produced a single document in discovery showing that Apex has title to the Artworks or, as Apex writes (at 10 n. 5), that "Apex was always the intended buyer of the artwork."  Indeed, Zhang's blithe disregard of Petitioners' document request allows the Court to draw an adverse inference against her on the issue of her ownership and control of and interest in the Artworks.  *E.g.*, *Experience Hendrix, LLC v. Chalpin*, 461 F. Supp. 2d 165, 172 (S.D.N.Y. 2006) ("an adverse inference may be drawn in appropriate circumstances from a party's failure to produce evidence in breach of its discovery obligations").

Respondents' arguments that the SAP's fraudulent conveyance allegations are futile are equally baseless.  Consistent with their joint defense agreement – itself an indication of Zhang's interest in the Artworks – both Respondents feign confusion as to the conveyance underlying Petitioners' allegations.  But the subject of the conveyance alleged in the SAP – the Artworks – is obvious.  So, too, is the fraudulence of the conveyance, done as it was to "hinder, delay, or defraud" Petitioners, within the meaning of DCL § 276, from later executing on the Artworks.

Thus, the SAP and Petitioners' moving papers detail how shortly after receiving more than $250 million from Petitioners in a transaction she knew was the product of a fraud, Zhang engaged in a scheme to secrete her assets worldwide to render herself judgment proof and "ease the concern on the with-recourse term of [the sale to Petitioners]."  (SAP ¶42(viii))  Zhang, an avid art collector flush with tainted cash she knew she was at high risk of having to return to

---

(at ¶¶42(vi)-(ix), in March 2014, as Zhang had begun to secrete her assets, she transferred all of the funds in the UBS Account in her name to other accounts she owned in the name of SETL.  She then closed the UBS account in her name, transferring its funds – all still under her control – to the accounts in SETL's name.  The $29.1 million wired to Wang came from Zhang's account at Credit Suisse in SETL's name, and all of that money was hers – as shown by, for example, her signature on documents authorizing the wires, which also shows that she maintained control over SETL after transferring, in June 2014, ostensible ownership of SETL to a trust named Asiatrust Ltd.  (Exs. 20, 26; SAP ¶¶54(1)-(v))  (The SAP, at ¶54(i), states that the wire transfers came from an account at UBS, rather than Credit Suisse, in SETL's name; in fact, UBS was the correspondent bank for the wires, and Credit Suisse was the originating bank.  Petitioners will make that clarification in the SAP before filing, but the point is the same either way – the $29.1 million all came from Zhang.)

Petitioners, bid so aggressively on the Artworks at the May 12, 2014 auction at Christie's that she caused "gasps" among the crowd.  By successfully bidding on the Artworks and later manipulating Christie's paperwork, Zhang accomplished two prime goals:  (i) acquire two valuable pieces of art she obviously desired, and (ii) secrete $29.1 million used to pay for the Artworks by creating Apex and purporting to make it the Artworks' ostensible owner.

In achieving the second goal, Zhang realized that Christie's invoice and related documents identified her as the buyer of the Artworks, exposing the Artworks to eventual execution.  So she caused Christie's to alter the paperwork to replace her as buyer with her newly-created shell company, Apex, and then funneled $29.1 million to Christie's through her son – Wang, whom she installed as Apex's sole director and shareholder – to pay for the Artworks.  Again, discovery has confirmed that Zhang, who alone was contractually obligated to Christie's to pay for the Artworks, never actually transferred title in the Artworks to Apex.  But if she had, any such transfer would have been fraudulent and "must be voided in its entirety" – as Judge Swain did in *Universitas* as to fraudulent transfers, to shell companies like Apex, "structured with a single purpose, to . . . insulate[] [the funds] from the reach of [the judgment debtor's] creditors (and, of course, from Petitioner's claim)."  *Universitas Educ., LLC v. Nova Group, Inc.*, 2013 WL 6123104, at *8 (S.D.N.Y. Nov. 20, 2013).  The fraudulent conveyance principles pleaded in the SAP are clear and detailed, and while the SAP does not plead a separate cause of action under DCL §§ 276 or 275 – instead using fraudulent conveyance principles as a legal theory providing an alternative ground on which to confirm the Attachment Order – any such claim would be valid.

Zhang and Apex collaborate in arguing that Zhang's transfer of the Artworks to Apex does not meet the definition of a "conveyance" under DCL § 270.  Zhang (at 10) purports to characterize her manipulation of Christie's invoices and related documentation as a request to Christie's to "issue updated invoices" for the Artworks, and says that "such a change in the billing

documentation would not have constituted a 'conveyance . . .'" Zhang further argues (at 11-12) that her wire transfers of $29.1 million to her son "do not describe" a conveyance of the Artworks to Apex. But Zhang and Apex undermine their argument just by quoting DCL § 270's definition of "conveyance," which expressly includes any "transfer . . . of tangible . . . property." Zhang's manipulation of Christie's documents and payment for the Artworks through her wires to Wang effectuated the "transfer of tangible property," from her to Apex, that the SAP alleges. New York courts have made clear, moreover, that "DCL § 270 defines 'conveyance' broadly." *Wall Street Assocs. v. Brodsky*, 257 A.D.2d 526, 528 (1st Dep't 1999). Its definition easily includes Zhang's conveyance of the Artworks to Apex to shield $29 million from eventual execution.

Respondents' contention that the SAP's fraudulent conveyance allegations are untimely also fails. The statute of limitations does not apply here because the SAP relies on fraudulent conveyance principles as a legal theory supporting confirmation of the Attachment Order, not as cause of action *per se*. But those principles have been timely pleaded in all events. The fraud perpetrated here was Zhang's conveyance of the Artworks to Apex, and under the discovery rule in CPLR § 213(8), the relevant inquiry is when Petitioners learned of the conveyance. That occurred only after Petitioners learned of Apex on December 31, 2019, when its New York counsel emailed Petitioners' counsel about Apex. Although Apex contends (at 14) that Petitioners knew years ago about certain unspecified wire transfers, any such knowledge did not alert Petitioners to the fraud because, unaware of Apex, they could not have known that the transfers were in furtherance of Zhang's fraudulent conveyance of the Artworks to Apex. And only the discovery of the fraud itself matters for statute of limitations purposes. *E.g.*, *Guedj v. Dana*, 11 A.D.3d 368, 368 (1st Dep't 2004); *Miller v. Polow*, 14 A.D.3d 368, 368 (1st Dep't 2005); *Citibank, N.A. v. Benedict*, 2000 WL 322785, at *13-*14 (S.D.N.Y. Mar. 28, 2000) (all describing the applicable period under the discovery rule as two years after the fraud was

discovered).  Because Petitioners first learned of Apex on December 31, 2019, the two-year

discovery period began only then, so the SAP's fraudulent conveyance allegations are timely.

III.    <u>The Court Has *In Rem* and *Quasi-in-Rem* Jurisdiction Over The Artworks</u>

Zhang, who focuses only on whether the Court has personal jurisdiction over her, and

Apex, which subjected itself to the Court's personal jurisdiction by intervening in this action,

ignore that the Court has jurisdiction to confirm the Attachment Order based solely on its *in rem*

and *quasi-in-rem* jurisdiction over the Artworks, which Christie's holds at its Manhattan

headquarters.  "[W]here *quasi in rem* jurisdiction is used to attach property to collect a debt based

on a claim already adjudicated in a forum where there was personal jurisdiction over the

defendant" – as is the case here, Zhang having been subject to the arbitral panel's jurisdiction in

the arbitrations in Beijing – a federal court has jurisdiction over the property so long as the

defendant has an interest in or control over it, and regardless of whether the court has personal

jurisdiction over the defendant.[4]  So even if the Court lacked personal jurisdiction over Zhang –

and it does not – the Court would still have jurisdiction to confirm the Attachment Order.

IV.    <u>The Court Has Personal Jurisdiction Over Zhang</u>

Apex does not contend that it is outside the Court's personal jurisdiction and, having

intervened in this action, it could not in all events.  Zhang, meanwhile, tries to evade the Court's

personal jurisdiction by arguing (at 4) that "the underlying dispute arose halfway round the world,

in connection with Petitioners' purchase of a 'majority stake' in non-party South Beauty," the

---

[4]    *CME Media Enterprises B. V. v. Zelezny,* No. 01-cv-1733, 2001 WL 1035138, at *3 (S.D.N.Y. Sept. 10, 2001) (citing *Shaffer v. Heitner*, 33 U.S. 186, 199 n. 17 (1977) and holding that the court had *quasi-in-rem* jurisdiction to enforce a foreign arbitral award, though it lacked personal jurisdiction over the respondent, "because respondent maintains property, specifically, the Account, in this District."); *see also*, *e.g.*, *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 396-98 (2d Cir. 2009) ("the location of his [a respondent's] property" in a court's district will "justify his being subject to the court's power"); *Crescendo Maritime Co. v. Bank of Commc'ns. Co. Ltd.*, 2016 WL 750351, at *4 (S.D.N.Y. Feb. 22, 2016) (court had *quasi-in-rem* jurisdiction to enforce a foreign arbitral award as against the assets of a respondent maintained in New York).

restaurant chain that Zhang sold to Petitioners.  That is nonsense.  Petitioners' acquisition of South Beauty underlay the arbitration in Beijing and the Arbitral Awards.  What underlies this post-arbitration attachment action, and the Court's personal jurisdiction over Zhang, is Zhang's acquisition of the Artworks in New York:  her bidding on the Artworks at Christie's auction here, her payment of them by transferring $29.1 million, through Wang, to Christie's bank account in New York, and her manipulation of Christie's paperwork in New York to hide that she, not Apex, bought and owns the Artworks.  Zhang, who acted in part through her agent, Christie's Xin Li, need not have been physically present in New York – though she may at times have been, since she bought two condominiums in 2014 at the Baccarat Hotel & Residences in  Manhattan – for the Court to have personal jurisdiction over her under CPLR § 302(a)(1) or (2).

CPLR § 302(a)(1):  Under CPLR § 302(a)(1), "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  CPLR § 302(a)(1) "permits a court to exercise personal jurisdiction over an out-of-state party if that party transacts any business within the state and if the claim arises from these business contacts."  *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (internal quotation omitted).  New York's Court of Appeals has described § 302(a)(1) as a "single act statute" whereby "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006) (internal quotation omitted).[5]

---

[5]        *See also D.H. Blair*, 462 F.3d at 105 (CPLR § 302(a)(1)'s "'arising out of' requirement" is met so long as there is "'a substantial nexus' between the transaction of business and the claim"); *Pearson Educ., Inc. v.  ABC Books LLC*, No. 19-cv-7642, 2020 WL 3547217, at *7 (S.D.N.Y. June 30, 2020) ("The 'arising from' element does not require 'a causal link between the defendant's New York business activity and a plaintiff's injury,' but rather a

As pleaded in the SAP, Zhang's acts underlying her purchase of the Artworks in New

York and concealment of the purchase come well within the realm of CPLR § 302(a)(1).  Thus:

- Zhang, through her agent, Xin Li, had Christie's establish a new, anonymous account at Christie's even though Zhang already had an account there.  When a Christie's employee asked Xin Li who the anonymous account holder was, she replied, "It's Zhang Lan 4098 8289."  (Feigenbaum Decl. ("Decl.") ¶23; Ex. 8)

- Zhang, bidding through Xin Li, directly participated in Christie's May 12, 2014 auction held in New York City, successfully bidding on the Artworks.  (Decl. ¶24; Ex. 9)

- Zhang had Xin Li instruct those at Christie's who prepared the invoices and other billing-related documents for the Artworks to revise the documents – such as an "Extended Payment Terms Summary" that Christie's issued on May 20, 2014 and that was addressed to "Ms. Zhang Lan" (Ex. 13) – to remove any references to herself – although she continued to be referred to by those at Christie's as the "actual buyer" – and replace them with her son, Wang, through "his personal or BVI account."  (Decl. ¶28; Ex. 16)

- Zhang later paid for the Artworks through three separate wire transfers – on June 10, 2014 for $12,057,000, on August 7, 2014 for $12,057,000, and on September 25, 2014 for $5,000,000 – deposited in Christie's bank account at JPMorgan Chase in New York City, routing the wires through her son's personal account at UBS so as to hide that the funds were in reality coming from her.  (Decl. ¶¶30-31; Exs. 20-27)

- As part of her effort to conceal that she herself bought the Artworks, Zhang established Apex, with Wang as its sole shareholder, two weeks after the May 12, 2014 auction so as to place ostensible ownership of the Artworks in Apex's name rather than her own.  Zhang capitalized Apex with $1, underscoring that Apex, which has never had business or marketing plans, was just one of her vehicles for the concealment of her assets.  (Decl. ¶27; Exs. 12-14)

- Zhang, after acquiring the Artworks, stored them at Christie's headquarters in New York, where they remain today despite her and Apex's subsequent efforts to get Christie's to release them.  (SAP ¶¶17-18)

In short, Zhang purposely availed herself of the benefits of doing business in New York

by bidding on the Artworks, through Xin Li, at Christie's auction in New York, and she later

manipulated Christie's paperwork to try to hide that she bought and owns them.  Those acts create

---

'relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former.'") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-69 (2d Cir. 2013) (internal citation omitted)).  A "variety of factors" bear on whether a non-domicile has transacted business in New York under § 302(a)(1), including whether a transaction required the defendant to "send . . . payments into the forum state," as Zhang did.  *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996).

the "substantial relationship" between Zhang's New York contacts and Petitioner's claim to confirm the Attachment Order.  That Zhang may not have physically entered New York to participate in the Christie's auction or to consummate her purchase of the Artworks is irrelevant.

Under similar circumstances, the New York Court of Appeals has consistently found personal jurisdiction under CPLR § 302(a)(1) over non-domiciles, sued for claims relating to their New York contacts, who were never physically present here.[6]  Closely on point is *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13 (1970), on which the Court of Appeals relied in *Deutsche Bank*, and in which it upheld jurisdiction under CPLR § 302(a)(1) over a California resident who participated by phone in an art auction held in New York, successfully bid on two paintings through an agent employed by the auction house, failed to pay for the paintings, and was sued by the auction house.  The Court stated that the defendant, "although never actually present, was receiving and transmitting bids over an open telephone line and was an active participant in an auction held [in New York]" (*id.* at 17); that "the defendant, in a very real sense, projected himself into the auction room in order to compete with the other prospective purchasers who were there" (*id.* at 18); that "[t]his activity far exceeded the simple placing of an order by telephone" (*id.*); and that the defendant's "active participation in the bidding which resulted in the paintings being sold to him amounted to the sustained and substantial transaction of business [in New York]" – conduct that "affected not only the plaintiff but all those who were in the auction room" (*id.*).  The Court concluded that the defendant had "purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of the laws relating to the conduct of auctions." *Id.* (internal quotation omitted).  "The

---

[6]      *E.g.*, *Deutsche Bank*, 7 N.Y. 3d at 71 (securities firm outside New York that negotiated a bond deal with a bank employee in New York using instant messenger held to be subject to personal jurisdiction; CPLR § 302(a)(1) confers personal jurisdiction "over commercial actors and investors using electronic and telephonic means to project themselves into New York to conduct business transactions"; and "due process is not offended if that party is subjected to jurisdiction even if not 'present' in [New York]").

mere fact," the Court added, "that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts." *Id.* at 19.

Zhang's conduct here – her active participation in the Christie's auction in New York, her wiring of $29.1 million into New York to purchase the Artworks, and her attempts through her agent in New York, Xin Li, to conceal that she herself bid on and paid for the Artworks – was considerably more extensive than the defendant's conduct in *Parke-Bernet*.  Her conduct endows this Court with personal jurisdiction over her under CPLR § 302(a)(1).

CPLR § 302(a)(2):  Because the Court has personal jurisdiction over Zhang under CPLR § 302(a)(1), it need not decide whether it also has jurisdiction over her under CPLR § 302(a)(2). *E.g.*, *Hudson Ins. Co. v. Oppenheim*, 35 A.D.3d 168 (1st Dep't 2006) ("There being jurisdiction under CPLR 302(a)(1), it is immaterial whether there is also jurisdiction under CPLR 301 or CPLR 302(a)(2) and (3)"); *CPC Int'l. Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 287 (1987) (because § 302(a)(2) applied, it was "unnecessary to decide whether personal jurisdiction was also acquired under CPLR 302(a)(1)").  Still, jurisdiction under CPLR § 302(a)(2) exists too.

"[T]he 'tortious act' prong of CPLR § 302(a)(2) . . . allows courts in New York to exercise jurisdiction over nondomiciliaries who, in person or through an agent, commit tortious acts within the state." *Gulf Coast Dev. Group, LLC v. Lebor*, 2003 WL 22871914, at *4 (S.D.N.Y. Dec. 4, 2003).  It "requires no specified level of activity within the State, but only that the plaintiff suffer some damage as a result of a tortious act committed by defendant or its agent in New York." *Honda Assocs., Inc. v. Nozawa Trading, Inc.*, 374 F. Supp. 886, 889 (S.D.N.Y. 1974).  A fraudulent conveyance is a tort that confers jurisdiction under CPLR § 302(a)(2). *Gulf Coast*, 2003 WL 22871914, at *4 ("fraudulent conveyance is a tort"; ruling that "[s]ince New

York was intimately involved in the conveyance . . . the alleged tort occurred within this state").[7] And while Zhang argues (at 6) that the SAP's "failure to allege Zhang's physical presence in New York is fatal to any assertion of specific jurisdiction under Section 302(a)(2)," that is wrong. "[F]or jurisdiction to be so acquired [under § 302(a)(2)], it is not necessary that the defendant be physically present within the state." *Id.* (citing *Bank Nacional Ultramario, S.A. v. Chan*, 641 N.Y.S. 2d 1006, 1009-10 (Sup. Ct. N.Y. Co. 1996)); *Morgenthau*, 708 N.Y.S. 2d at 843 (same).

Here, Zhang's conveyance of the Artworks to Apex was a tort, committed in New York, that subjects her to the Court's personal jurisdiction under CPLR § 302(a)(2). That conduct included manipulating Christie's payment documents in New York to hide that Zhang, not Apex, bought and owns the Artworks; sending the formation documents for Apex, a sham company, to Christie's in New York to pass it off as the purported buyer; wiring, through Wang, $29.1 million to New York to pay for the Artworks, all in a way to hide that she was the payor; and storing the Artworks in New York in Apex's name. Those acts were done at a time when Zhang knew she could eventually be found liable to Petitioners for her role in the sale of South Beauty, and were an attempt to shield the Artworks from the relief Petitioners now seek. That Zhang stored the Artworks at Christie's solidifies New York – the only place where Petitioners could attach and execute on the Artworks – as the situs of Petitioners' injury. *Universitas*, 2014 WL 3883371, at

---

[7]     *See also*, *e.g.*, *Universitas Educ., LLC v. Nova Group, Inc.*, 2014 WL 3883371, at *6 (S.D.N.Y. Aug. 7, 2014) (personal jurisdiction existed based on alleged fraudulent conveyance; stating that "fraudulent conveyance is a species of tort"); *Morgenthau v. A.J. Travis Ltd.*, 708 N.Y.S. 2d 827, 843 (Sup. Ct. N.Y. Co. 2000) (same); *Korea Deposit Ins. Corp. v. Jung*, 59 Misc.3d 442, 450 (Sup. Ct. N.Y. Co. Aug. 18, 2017) ("fraudulent conveyance through which [defendant] transmitted funds to a bank in New York for the purchase of real property here constitutes a tortious act directed at New York sufficient to confer personal jurisdiction").

        These authorities also show why Apex's contention (at 16-18) that Chinese law applies to the SAP's fraudulent conveyance principles is baseless. The fraud occurred in New York, not China, and it is irrelevant that the parties involved in the fraud are not New York residents or corporations.

*6 ("[r]endering a creditor unable to recover on a defaulted debt in New York through a fraudulent conveyance constitutes injury in New York that is reasonably foreseeable").

V.    The Second Amended Petition Causes No Prejudice to Respondents, Requires No Further Discovery, and Hastens – Not Delays – the Resolution of this Proceeding

Respondents' contention that the SAP's amendments will prejudice them, delay this proceeding, and "come too late" are frivolous.  Petitioners did not know of Apex when they commenced this action and had to amend their original petition to add Apex as a respondent. They then sensibly deferred the SAP until after discovery.  The SAP requires no further discovery, and Zhang never even sought any discovery or produced any documents anyway.  And while Apex complains (at 20) that its document request was objected to, it ignores that it served the request five months too late, that it abandoned its request a month ago (from the time of this reply brief), and that it already has most if not all of the documents it requested.

Nor will the SAP delay this proceeding in any way – a hypocritical argument for Zhang to make considering her objective, by her attorney's admission, has been to delay this proceeding whenever possible.  Once this motion has been decided, Petitioners' motion to confirm the Attachment Order can, with the Court's leave, proceed immediately.  And the SAP, as fleshed out by the briefing on this motion, hastens the resolution of this action by, we submit, obviating the need for a separate motion to confirm the Attachment Order and rendering Petitioners' eventual motion for a turnover of the Artworks under CPLR § 5225(b) ripe in the civil action to be reinstated.  The Attachment Order may be confirmed based simply on a finding that Zhang has a potential interest in the Artworks sufficient to warrant a turnover, and that the Arbitral Awards would be rendered ineffectual if the Order were not kept in place.  The facts supporting such a finding are evident from the parties' submissions on this motion, and all of the most salient documents supporting those facts are already in the record.

<u>CONCLUSION</u>

For the foregoing reasons and those stated in Petitioners' moving papers, Petitioners' motion should be granted, and leave to file the Second Amended Petition should be given.

Dated:  New York, New York
        August 16, 2021

KATSKY KORINS LLP

By: <u>/s/Steven B. Feigenbaum</u>
      Steven B. Feigenbaum
      Timothy J. Holland
605 Third Avenue
New York, New York 10158
(212) 953-6000
sfeigenbaum@katskykorins.com
tholland@katskykorins.com
*Attorneys for Petitioners La Dolce Vita Fine Dining Company Limited and La Dolce Vita Fine Dining Group Holdings Limited*

15