UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LA DOLCE VITA FINE DINING COMPANY
LIMITED and LA DOLCE VITA FINE DINING
GROUP HOLDINGS LIMITED,

                                Petitioners,

        - against -

ZHANG LAN,

                                 Respondent.

        - and -

APEX LEAD INVESTMENT HOLDINGS LIMITED,

                           Intervenor-Respondent.

Case No. 19-mc-00536-ALC

(Related: 1:23-cv-06273-ALC)

 

### SECOND AMENDED PETITION FOR AN
### ORDER OF ATTACHMENT IN AID OF ARBITRATIONS

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1050 K Street NW, Suite 400
Washington, DC 20001
(202) 833-8900
*Attorneys for Petitioners La Dolce Vita Fine
Dining Company Limited and La Dolce Vita
Fine Dining Group Holdings Limited*

<u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ................................................................................1

THE PARTIES...................................................................................................5

JURISDICTION AND VENUE ..........................................................................7

THE FACTS .....................................................................................................8

I.    The Arbitrations, the Arbitral Awards, and the Affirmance of the Awards on Appeal.......9

    A.    Petitioners' Claims Against Zhang and Her Companies in the Arbitrations ..........9

        (i)    Petitioners' Acquisition of the Arbitral Respondents' Controlling Shares in the Companies Owning and Operating the South Beauty Chain of Restaurants in China ................................................10

        (ii)    Petitioners' Post-Acquisition Realization that South Beauty Was Significantly Underperforming Expectations ...................................11

    B.    Petitioners' Commencement of the Arbitrations and the Panel's Eventual Issuance of the Arbitral Awards ...............................................12

    C.    The Arbitral Respondents' Appeal of the Arbitral Awards, and the Appellate Court's Unanimous Affirmance of the Awards ................................12

II.    The Facts Underlying the Continued Need for the Attachment Order:  Zhang's History of Secreting Her Assets Worldwide, Including the Artworks, in an Effort to Render Ineffectual Arbitral Awards She Knew Were at High Risk of Being Entered Against Her.......................................................................13

III.    Zhang's Purchase of, Control Over and *De Facto* Ownership of the Artworks, and Her Fraudulent Conveyance of Ostensible Ownership of the Artworks to Apex in an Effort to Shield the Artworks from Eventual Execution...............................20

IV.    The Procedural History of This Proceeding to Date ........................................27

FIRST CLAIM FOR RELIEF – For Confirmation of the Attachment Order Under CPLR § 6211(b), as Incorporated by Fed. R. Civ. P. 64 ...................................29

Petitioners La Dolce Vita Fine Dining Company Limited ("LDV Company") and La Dolce Vita Fine Dining Group Holdings Limited ("LDV Holdings") (collectively, "Petitioners"), by their attorneys, Katsky Korins LLP, for their Second Amended Petition against Respondent Zhang Lan ("Zhang") and Intervenor-Respondent Apex Lead Investment Holdings Limited ("Apex"), allege as follows:

<u>NATURE OF THE ACTION</u>

1.      Petitioners commenced this action by filing a petition dated November 18, 2019 (the "Original Petition," ECF No. 9) for an *ex parte* order of attachment pursuant to New York CPLR § 7502(c) and Article 62, as incorporated by Fed. R. Civ. P. 64.  The Court entered an attachment order on November 21, 2019 (the "Attachment Order," ECF No. 20) attaching two artworks – Andy Warhol's "Little Electric Chair" (1965) and Martin Kippenberger's untitled self-portrait (1988) (collectively, the "Artworks") – that Zhang, an avid art collector, successfully bid on at an auction at Christie's Inc. ("Christie's) held in May 2014, that she paid for in full, for the sum of $29.1 million, by September 2014, and that Apex – an off-shore shell company whose sole director was originally Zhang's son and is now an individual who is related to or associated with and otherwise a front for Zhang's second husband – purports to own. Christie's has at all times held the Artworks at its Manhattan headquarters, as it still does today. The Attachment Order remains in place as of the time of this Second Amended Petition, by which Petitioners seek to confirm the Attachment Order under CPLR § 6211(b).

2.      The Attachment Order is in aid of two related arbitrations before the China International Economic and Trade Arbitration Commission ("CIETAC") in Beijing (the "Arbitrations").  Petitioners commenced the Arbitrations in March 2015 against Zhang and her two wholly owned companies, Grand Lan Holdings Group (BVI) Limited ("Grand Lan Holdings") and Qiao Jiang Lan Development Limited f/k/a South Beauty Development Limited

("Qiao Jiang Lan"), to recover damages they incurred as a result of Zhang's misrepresentations in connection with the sale to Petitioners in December 2013 of a majority stake in a company that owned a chain of restaurants in China known as "South Beauty" (the "Arbitrations"). On April 28, 2019, the arbitral panel issued two related awards, finding in Petitioners' favor on their misrepresentation and contract claims, dismissing Respondents' counterclaims, and awarding Petitioners the combined principal amount of $142,463,666.28, plus interest that as of the time of this Second Amended Petition exceeds $14 million (the "Arbitral Awards").

3.      By separate but substantively identical decisions dated, respectively, December 29 and December 31, 2020 and issued in early February 2021, the Second China International Commercial Court ("CICC") affirmed the Arbitral Awards, rejecting Respondents' position on appeal and dismissing their application to set aside the Awards. Having been upheld on appeal and become final, the Arbitral Awards may now be confirmed under the New York Convention, and a judgment may be entered against Zhang. Petitioners seek that relief in their related civil action in this Court before the Honorable Mary Kay Vyskocil, *La Dolce Vita Fine Dining Company et al. v. Zhang Lan et al.*, 21-cv-3178 (MKV) (the "Civil Action"), in which Petitioners filed an amended petition on June 17, 2021 to confirm the Arbitral Awards, obtain a judgment against Zhang, and assert claims against Zhang and Apex for fraudulent conveyance of the Artworks and for the turnover of the Artworks to Petitioners under CPLR § 5225(b).

4.      Meanwhile, in this proceeding, Apex first emerged on December 31, 2019, six weeks after the Attachment Order had been entered, when its New York counsel contacted Petitioners' counsel and claimed that it owned the Artworks. After this Court, by Opinion and Order dated December 11, 2020 (ECF No. 71), denied Zhang's and her companies' motion to vacate the Attachment Order, Petitioners filed their first amended petition, dated December 31,

2020 (ECF No. 74), to add Apex, with its consent, as an intervenor-respondent.  At around the same time, Petitioners served a document request, for documents relating to the ownership of or control over the Artworks, on Zhang, Grand Lan Holdings and Qiao Jiang Lan, and a separate request on Apex.  Zhang and her companies did not produce a single document in response to the document request, and Apex has completed its production of documents.  Those documents help confirm that Apex was formed by Zhang within weeks after the May 2014 auction at Christie's solely to camouflage her purchase of the Artworks – all as part of her worldwide campaign, then well underway, to secrete her assets and thereby immunize them from execution in anticipation of her eventual liability to Petitioners for her misrepresentations regarding the South Beauty restaurant chain.

5.     The time is now ripe for Petitioner to move to confirm the Attachment Order under CPLR § 6211(b), as they will imminently be seeking the Court's leave to do.  This second amended petition takes into account relevant developments since the filing of the first amended petition, which served only to add Apex as a respondent and to which neither Zhang nor Apex ever responded, as well as to incorporate the additional evidence that has since been derived from Apex's documents and Petitioners' own factual investigation, to clarify the bases of the Court's jurisdiction, and to conform the petition to Petitioners' eventual confirmation motion.

6.     As discussed below, the evidence relevant to that motion confirms (i) that Zhang is the *de facto* owner of the Artworks, has full control over them, and otherwise has an interest in them sufficient to confirm and maintain their attachment under CPLR Article 62 and render them subject to turnover under CPLR § 5225(b); and (ii) that even if Apex were the genuine owner of the Artworks with independent control over them – and it is not – the Attachment Order would still be confirmable under CPLR § 6211(b) based on Zhang's having fraudulently conveyed the

Artworks to Apex to shield them from the then-likely prospect that Zhang would eventually be liable to Petitioners in a nine-figure amount. Petitioners also readily meet the remaining requirements for confirmation of the Attachment Order: They have succeeded on the merits of their causes of action against Zhang, the Arbitral Awards having been affirmed on appeal and become final; Zhang has no counterclaims against Petitioners, her claims having been dismissed in the Arbitration; and the Arbitral Awards will be rendered ineffectual if the Attachment Order is not kept in place between now and when Petitioners obtain a ruling on their intended motion in the Civil Action for a turnover of the Artworks under CPLR § 5225(b).

7.      It is hard to imagine more compelling evidence that, absent the continued attachment of the Artworks, the Arbitral Awards, already compromised, will be rendered all but entirely ineffectual. Prior injunction proceedings against Zhang in Hong Kong and Singapore have revealed the extreme lengths, discussed below, to which she has gone to secrete her assets to make herself judgment-proof. Zhang personally received some $244 million out of the $286 million paid by Petitioners for its majority stake in the South Beauty restaurant chain, yet she has hidden or dissipated virtually all of that money, claiming in 2015 that she has only $1.28 million in cash. She lied to the Hong Kong court regarding her artwork collection and other assets, and the Hong Kong court consequently held her in contempt as part of a Mareva injunction freezing all her assets worldwide. The Hong Kong court issued an Order of Committal on March 5, 2019, and warrants for Zhang's arrest have been outstanding in Hong Kong ever since.

8.      Due to Zhang's secreting of assets, the Artworks are among the few known assets still in her possession or control that, if liquidated, can meaningfully help satisfy the Arbitral Awards. Yet absent confirmation of the Attachment Order, Zhang, before Petitioners can effectuate a turnover of the Artworks in the Civil Action, will inevitably have Apex transfer the

ks out of New York and to an undisclosed location where they will, in all likelihood, forever be sheltered from execution.  Zhang will have then gotten away with her fraudulent conduct yet again, to Petitioners' continuing detriment.

9.      By this second amended petition and Petitioners' motion to confirm the Attachment Order, Petitioners seek limited relief – to maintain the status quo, based on Zhang's interest in the Artworks, so the Artworks are not removed from this District while Petitioners later pursue a judgment against Zhang and the turnover of the Artworks in the Civil Action.  As a matter of fact, law and equity, that limited relief must be granted to prevent another injustice perpetrated by Zhang, this time with Apex's cooperation.

<u>THE PARTIES</u>

10.     Petitioner LDV Company is a limited liability company incorporated under the laws of the Cayman Islands, with a registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.  LDV Company is a wholly-owned subsidiary of non-party La Dolce Vita Fine Dining Holdings Limited, which in turn is a majority-owned subsidiary of LDV Holdings.  LDV Company was a petitioner in the Arbitrations.

11.     Petitioner LDV Holdings is a limited liability company incorporated under the laws of the Cayman Islands, with a registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.  LDV Holdings is majority owned and controlled by non-party CVC Funds ("CVC").  LDV Holdings was the other petitioner in the Arbitrations.

12.     Respondent Zhang is a citizen and resident of China.  According to her New York counsel, Zhang has an address at Unit 2310, 127 Building, Shi Li Pu Dong Li, Chaoyang District, Beijing, Post code 100025.  But Petitioners have been unable to verify that that address, or any other address in Beijing that Zhang has been said to have, is one that she occupies.

13.     Zhang was a respondent in the Arbitrations, and she is the 100% owner of the two limited liability companies – Grand Lan Holdings and Qiao Jiang Lan, both of which are incorporated under the laws of the British Virgin Islands – that were the other two respondents in the Arbitrations.  Although Grand Lan Holdings and Qiao Jiang Lan were originally named as respondents in this proceeding, they are not named as respondents in this second amended petition because they themselves do not appear to have any ownership interest in the Artworks other than as presumed alter egos of Zhang.  Petitioners reserve the right to reinstate them as respondents, or seek a judgment or amended judgment that covers them, to the extent evidence later emerges that warrants either result.

14.     Respondent Apex is a holding company organized under the laws of Seychelles and incorporated there on May 26, 2014.  Apex has a registered mailing address at P.O. Box 1239, Offshore Incorporations Centre, Victoria, Mahe, Republic of Seychelles, but according to certain documents that Christie's produced in response to a subpoena in the Attachment Proceeding, Apex prefers to receive correspondence at a different address – 3408 One Exchange Square, 8 Connaught Place, Central, Hong Kong – that is the mailing address for another company that Zhang owns or uses as her investment advisors.

15.     Zhang created Apex two weeks after she purchased the Artworks, with her son, Wang Xiaofei ("Wang"), as Apex's sole director and sole holder of Apex's only share, with a nominal value of $1.  Apex's New York counsel told Christie's in March 2016 that Apex is owned by an entity called Metro Joy Trust, over which Zhang exercises control as discussed in ¶42(iii)-(iv) below.

16.     Petitioners were unaware that Apex existed when they commenced this proceeding on November 18, 2019.  They first learned of Apex when Apex's New York counsel

contacted Petitioners' counsel on December 31, 2019, claiming that Apex owned the Artworks. Apex, with its consent, was added as an intervenor-respondent in Petitioners' first amended petition in this proceeding filed on December 31, 2020.

17.    Non-party Christie's is the garnishee of the Artworks with a principal place of business at 20 Rockefeller Plaza in Manhattan, where it maintains the Artworks. Christie's is engaged in the business, among others, of selling artworks through private sales and auctions

<u>JURISDICTION AND VENUE</u>

18.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331, since the action arises under the laws of the United States, and specifically Chapter Two of the Federal Arbitration Act ("Convention on the Recognition and Enforcement of Foreign Arbitral Awards"). *See* 9 U.S.C. § 203. The Court independently has *in rem* jurisdiction over the Artworks, both of which are held in this District.

19.    [Deleted pursuant to Stipulation and Order, 12/27/24 (Doc. 118)]

20.    [Deleted pursuant to Stipulation and Order, 12/27/24 (Doc. 118)]

21.     Venue is appropriate in this district pursuant to 9 U.S.C. § 204 and CPLR § 7502(a)(ii).  Venue is also appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2), since the property subject to the Attachment Order is situated within this district.

<u>THE FACTS</u>

22.     The facts relevant to this second amended petition are derived mainly from three sources:  (i) documents regarding the Arbitrations and simultaneous injunction proceedings in Hong Kong and Singapore to probe and freeze Zhang's and her companies' assets; (ii) an affidavit dated March 29, 2017 of Cosimo Borrelli ("Borrelli Affidavit" or "Borrelli Aff."), a Managing Director of Borrelli Walsh Limited who serves as one of the two receivers and managers for LDV Company; and (iii) documents relating to the Artworks and to Apex, most of which were produced by Christie's in response to a subpoena Petitioners served on Christie's in January 2020, and by Apex.

23.     The Borrelli Affidavit was submitted in legal proceedings that Petitioners, after realizing that South Beauty's financial condition had been misrepresented, commenced in early 2015 in Hong Kong and Singapore to freeze Zhang's assets in anticipation of commencing the Arbitrations, as they did on March 5, 2015.  On February 26, 2015 and March 2, 2015, respectively, Petitioners were granted *ex parte* injunction orders in Hong Kong and Singapore freezing Zhang's assets.  In light of Zhang's repeated failures, in violation of court orders, to disclose her assets truthfully, Petitioners submitted the Borrelli Affidavit in March 2017 on their application for an order of committal against Zhang.  As described in paragraph __(xv) below, the Hong Kong court issued an Order of Committal on March 5, 2019, and warrants for Zhang's arrest remain outstanding.

24.     The facts fall broadly into three main categories:

8

(i)      The parties' transactions that gave rise to the Arbitrations, the panel's issuance of the Arbitral Awards, and the affirmance of the Awards on appeal;

(ii)     The facts underlying the continued need for the Attachment Order, and specifically the evidence, detailed in the Borrelli Affidavit, of Zhang's long history of secreting her assets in an attempt to shield them from eventual execution – a history that shows that Zhang will inevitably conceal or dissipate the Artworks so as to render the Arbitral Awards ineffectual, if she and Apex and are given an opening to do so; and

(iii)    The facts confirming (a) that Zhang, not Apex, controls and is the *de factor* owner of the Artworks; and (b) that Zhang fraudulently conveyed the Artworks to Apex with Apex's cooperation, nullifying any purported transfer of the Artworks' ownership to Apex.

I.     The Arbitrations, the Arbitral Awards,
        and the Affirmance of the Awards on Appeal

25.    The Arbitrations, consolidated in a single proceeding, commenced on March 5, 2015 and continued for two-and-half years, resulting in awards in Petitioners' favor totaling more than $142 million.  Summarized below are the main facts elicited at the Arbitrations, the Arbitral Awards themselves, and the recent court decisions unanimously affirming the Awards.

A.    Petitioners' Claims Against Zhang
      and Her Companies in the Arbitrations

26.    The facts underlying Petitioners' claims against Zhang and her companies in the Arbitrations are set forth in detail in the Arbitral Awards.  What follows is a general overview of the transactions and other facts that gave rise to the Arbitrations.

(i)     Petitioners' Acquisition of the Arbitral Respondents' Controlling
        Shares in the Companies Owning and Operating the South Beauty
        Chain of Restaurants in China

27.     In December 2013, the Petitioners acquired a majority stake in South Beauty

Investment Company Limited ("South Beauty"), which, in turn, owned a chain of restaurants in

China known by the name "South Beauty."  The acquisition was completed in two stages.

        a.      On December 9, 2013, LDV Company entered into a sale and purchase

agreement (the "LDV Company SPA") that provided for LDV Company to acquire 100% of the

shares in South Beauty and for (i) 27.3% of the shares in La Dolce Vita Fine Dining Holdings

Limited (i.e., the parent company of LDV Company and South Beauty) to be issued to Grand

Lan Holdings, and (ii) a total of 3.5% of the shares in La Dolce Vita Fine Dining Holdings

Limited to be issued to Qiao Jiang Lan.

        b.      On December 13, 2013, LDV Holdings entered into a further sale and

purchase agreement with Zhang and Grand Lan Holdings (the "LDV Holdings SPA"), and

together with the LDV Company SPA, the "SPAs").  Under that agreement, LDV Holdings

acquired nearly half of the shares of La Dolce Vita Fine Dining Holdings Limited that had

previously been issued to Grand Lan Holdings, such that Grand Lan Holdings ultimately retained

a 13.8% interest in La Dolce Vita Fine Dining Holdings Limited and in its subsidiary South

Beauty restaurants in China.  (The two SPAs are referred to collectively as the "Acquisition.")

28.     In all, Petitioners paid Zhang and her companies a total of $286,850,887 under the

SPAs.  Following the Acquisition, South Beauty and its chain of restaurants were majority

(82.7%) owned and controlled by Petitioners.

29.     That Zhang knew at the time of the Acquisition that Petitioners had been misled is

now evident by certain terms she requested before the transaction closed.  For example, Zhang

wanted all of the purchase price to be paid up front rather than have any substantial amount held in escrow; ultimately, only $14,829,101 of the more than $286 million purchase price was held in escrow.  On or about November 22, 2013, a few weeks before the closing, Zhang sought to change the deal by requesting that the information warranty in the SPAs be removed; that the indemnity cap be significantly reduced – as it was, which is what resulted in the Arbitral Awards being set at roughly 50% less than the purchase price for the Acquisition; and that the time to bring any breach of warranty claim be reduced to one year.  Around that same time, Zhang used certain purported antitrust issues to renegotiate the deal by relinquishing an additional 13-14% of South Beauty – whose value she knew had been far overstated – in exchange for additional cash.

      (ii)     Petitioners' Post-Acquisition Realization that South
               Beauty Was Significantly Underperforming Expectations

30.     Shortly after the Acquisition, South Beauty's financial performance appeared to decline dramatically, as reflected in South Beauty's financial results for the second quarter of 2014.  Unable to identify a legitimate reason for this decline, Petitioners carried out their own investigation of South Beauty, including the engagement of forensic accountants and other experts to review South Beauty's business performance and operational data and analyze its financial information.  Through their investigation, Petitioners learned by early 2015 that South Beauty's transaction sales data had been pervasively manipulated between at least January and April 2014, and that it was highly likely that a similar manipulation of sales data had taken place in 2013, before the Acquisition.

31.     After coming to realize that South Beauty's financial condition had been misrepresented, Petitioners commenced legal proceedings in Hong Kong and Singapore to freeze Respondents' assets.  On February 26, 2015 and March 2, 2015, Petitioners were granted *ex parte* injunction orders in Hong Kong and Singapore freezing Respondents' assets.  Petitioners

sought the injunction orders in anticipation of commencing arbitral proceedings against

Respondents under the respective arbitration clauses, Sections 10 and 13, of each SPA requiring

that disputes under the SPA be submitted to CIETAC for binding arbitration.[1]

B.    Petitioners' Commencement of the Arbitrations and
      the Panel's Eventual Issuance of the Arbitral Awards

    32.    On March 5, 2015, Petitioners commenced the Arbitrations, asserting claims in

each Arbitration for, among other things, fraud and misrepresentations by Respondents in

connection with the Acquisition.  Petitioners commenced two arbitrations because there were

two SPAs, but the factual allegations and claims were substantively identical in each one.

    33.    On April 28, 2019, the arbitral panel issued the Arbitral Awards, finding in

Petitioners' favor on their misrepresentation and contract claims, dismissing Respondents'

counterclaims, and awarding (i) on the first Award, $92,029,457.28 in compensatory damages,

plus interest at the effective rate of 4.75% per annum from April 28, 2019, in favor of LDV

Company and against Zhang, Grand Lan Holdings and Qiao Jiang Lan; and (ii) on the second

Award, $50,434,209 in compensatory damages, plus interest at the effective rate of 4.75% per

annum from April 28, 2019, in favor of LDV Holdings and against Zhang and Grand Lan

Holdings.  The combined principal amount of the Awards is $142,463,666.28, and accumulated

interest already exceeds $14,000,000.

C.    The Arbitral Respondents' Appeal of the Arbitral Awards, and
      the Appellate Court's Unanimous Affirmance of the Awards

    34.    On July 8, 2019, Respondents appealed the Arbitral Awards by filing with the

CICC two applications to set aside the Awards.  Respondents based the appeal on the position

---

[1]    Zhang, as noted, has been sentenced to prison by a Hong Kong court, for contempt of court, for failing to
comply with court orders requiring her to disclose her assets – in particular, her collection of artworks – as part of a
Mareva injunction freezing all of her assets worldwide.

that the panel of three arbitrators had been improperly constituted, and that CIETAC should have appointed all three panel members pursuant to a provision, Article 27.3, of the CIETAC Rules.[2]

35.    By separate but substantively identical decisions dated, respectively, December 29 and December 31, 2020 and issued in early February 2021, the CICC affirmed the Arbitral Awards, rejecting Respondents' position and dismissing their application to set aside the Awards.  The CICC decisions upholding the Arbitral Awards are final and not subject to appeal. They accordingly render the Arbitral Awards final and ready to be confirmed.

II.    The Facts Underlying the Continued Need for the Attachment Order:  Zhang's History of Secreting Her Assets Worldwide, Including the Artworks, in an Effort to Render Ineffectual Arbitral Awards She Knew Were at High Risk of Being Entered Against Her

36.    Petitioners' continuing need to maintain the Attachment Order is apparent. Zhang, who was previously identified by Forbes as one of the wealthiest persons in China, has had a long and sordid history during the pendency of the Arbitrations of secreting, hiding and misrepresenting her assets.  As a result, Petitioners know of few assets owned or controlled by Zhang that remain available for execution to help satisfy the Arbitral Awards.  Those assets include the Artworks, and for Petitioners to have any chance of executing on the Artworks, the Artworks first had to be attached – and now must stay attached – to prevent Zhang or Apex from moving them to an unknown location and thereby rendering them immune from execution.

37.    As detailed in the Borrelli Affidavit, Petitioners, while simultaneously pursuing the Arbitrations, pursued extensive injunction proceedings in Hong Kong and Singapore to probe Respondents' assets, particularly Zhang's, and prevent Zhang from secreting them.  In those

---

[2]    Shortly before the appeal was filed, Petitioners and Respondents filed their submissions for the costs incurred in the Arbitrations.  In the costs submissions, Petitioners and Respondents state that they incurred costs totaling, respectively, approximately $15.8 million and $9.8 million, and each side seeks to have the other side pay its costs.  As of the time of this second amended petition, no ruling has as yet been made on the allocation of costs, due primarily to the arbitral Respondents' ongoing refusal to pay their share of the CIETAC and tribunal fees.  But the ruling on those applications will be rendered in an award separate from the Arbitral Awards.

parallel proceedings, Zhang was required to submit affidavits identifying her assets worldwide, and Petitioners were able to obtain information concerning, among other assets, Zhang's bank accounts.  By comparing Zhang's affidavits with the evidence obtained in their own investigations, Petitioners discovered numerous instances in which Zhang secreted assets in anticipation of the prospect that she would be held liable to Petitioners in the Arbitrations.  A chronology of the salient facts, described in detail in the Borrelli Affidavit, underscores the lengths to which Zhang has gone to evade responsibility for the Arbitral Awards.  Thus:

38.     As noted, in the second quarter of 2014, shortly after the Acquisition, it became apparent to Petitioners that South Beauty's financial performance had significantly worsened since the Acquisition, and that there was no rational, legitimate explanation for that decline. In the fourth quarter of 2014, Petitioners engaged forensic accountants and other experts to review South Beauty's business performance and operational data and analyze its financial information, and they soon discovered that the accounting irregularities in South Beauty had stopped during the first quarter of 2014, which had, in turn, led to the dramatic decline in its financial results.

39.     By May 2014, when she successfully bid on the Artworks, Zhang knew that Petitioners were investigating South Beauty, and that she faced the prospect of legal claims against her, based on the manipulated data and her material misrepresentations, that exposed her to a very high risk of enormous personal liability.  So throughout early 2014, she took steps to try to shield actual information about South Beauty from CVC, which majority owns and controls LDV Holdings.  As evidenced by documents adduced at the Arbitrations:

i.     On February 24, 2014, An Yong, then the CEO of South Beauty, emailed Francis Leung ("Leung"), an executive at CVC, telling him that CVC's investigation of South Beauty's past transactions was "unhelpful."

      ii.      On February 28, 2014, Zhang sent a WeChat message to Leung complaining about an audit of South Beauty that PriceWaterhouseCoopers ("PwC") had by then undertaken for CVC, including PwC's questions about past transactions.

      iii.      On or about March 31, 2014, Luo Qiaoyun ("Luo"), a "Special Assistant of Zhang and vice-president of South Beauty," complained to Allen Han ("Han"), an executive at CVC, that CVC staff, and in particular Stephen Li**,** had attempted to obtain data on South Beauty's performance directly from South Beauty.

      iv.      On April 22, 2014, Zhang sent a WeChat message to Leung (i) acknowledging that South Beauty's profit did not meet expectations, (ii) demanding final payment anyway, and (iii) complaining about PwC's audit of South Beauty.

      v.      On April 30, 2014, Stephen Li complained to Han that CVC had been denied access to South Beauty's data and had been told that CVC must go through Luo to get any such access.

40.      Zhang's efforts to conceal information about South Beauty from CVC continued throughout 2014, further evidencing her awareness of her legal exposure to Petitioners.  Thus:

      i.      In August 2014, Zhang became so frustrated with CVC's investigation of South Beauty that she (a) sent messages to senior managers of South Beauty telling them not to respond to or cooperate with CVC, and (b) instructed South Beauty's IT department to block all emails from CVC, thereby ensuring that CVC would be denied access to data.  The block appears to have remained in place for at least a week.

      ii.      By September 2014, one of the consultants that Petitioners had engaged for their investigation of South Beauty, Alix Partners, had observed that South Beauty's management "clearly did not want us to look at 2013 at all."

      iii.      The new CFO whom South Beauty hired in August 2014, Xue Enyuan ("Xue"), told Han that, in late September 2014, Zhang had instructed him not to provide any 2013 accounting records and operation data to Alix Partners.  Bain Capital, another consultant to CVC, had also been denied access to 2013 data.

      iv.      Xue further informed Han that, on December 10, 2014, Zhang had directed him to delete restaurant-level financial and operational data for 2013 and the first quarter of 2014.  Xue added that, in January 2015, Zhang had on several occasions told him not to provide data to KPMG, South Beauty's then newly appointed auditor.

41.      Petitioners concluded their investigation of South Beauty in early 2015, by which time they had uncovered the pervasive manipulation of South Beauty's sales data – misconduct

that formed a major basis for Petitioners' claims in the Arbitrations.  Among their findings was

that South Beauty had kept two sets of books, records and data since May 2012:  one for internal

benchmarking, and another, for sharing with CVC, that inflated the sales data.

42.     Meanwhile, between early 2014 and early 2015, Zhang engaged in a broad

scheme to secrete her assets worldwide so as to shield them from eventual arbitral awards that,

she realized, would almost certainly be obtained against her and her wholly-owned companies.

The Borrelli Affidavit sets forth a chronology of the salient facts.  Thus:

> i.      In connection with the Acquisition, Petitioners paid Zhang and her two companies a total of $286,850,887 between December 13, 2013 and January, 28 2014 (the "Acquisition Funds"), and the Acquisition Funds were received by Zhang in a Bank Safra Sarasin account that she owned (the "Safra Sarasin Account").  (Borrelli Aff. ¶¶9, 40)

> ii.     On January 2, 2014, Zhang incorporated a company, Success Elegant Trading Ltd. ("SETL"), in the British Virgin Islands ("BVI") using TMF (B.V.I.) Ltd. as its registered agent.  (Borrelli Aff. ¶¶26, 66)  SETL holds an account in its own name with Credit Suisse AG Singapore (the "SETL CS Account").  (*Id.* at ¶¶11(d), 35-36)  Up until June 4, 2014, Zhang was SETL's sole shareholder.  On June 4, 2014, however, Zhang transferred her sole share in SETL to Asiatrust Ltd, a professional trust company incorporated in the Cook Islands, for $1.  (Borrelli Aff. ¶¶46-47)

> iii.    Petitioners have since learned through documents produced by Apex that Asiatrust Ltd is the Trustee of the Metro Joy Trust, which includes Apex, whose original director, as noted, was Zhang's son, Wang.  According to Apex's Register of Directors, Wang was replaced as director on March 1, 2016 by Tian Yijin, who is related to or associated with and otherwise a front for Tian Yibin, Zhang's second husband and Wang's stepfather.  Thus, on February 10 and 12, 2016, Apex's New York counsel sent emails to Christie's stating that the Warhol and Kippenberger paintings – which counsel had been pressing Christie's to release – should be delivered to Tian Yibin, Zhang's husband.  And on Christie's completed "Purchaser Shipping Form (New York)" that counsel attached to his February 12 email, Apex identified the recipient of the paintings as Tian Yibin with an email address at tianyijin888@sohu.com.[3]

---

[3]     Tian Yibin and Tian Yijin not only share the same surname, but both were born in Daqing, China, and Yibin, a well-known photographer known in China as the "Sixth Child" because he is the sixth child in his family, may well be Yijin's younger brother.

In their amended petition in the Civil Action, Petitioners correctly identified Tian Yijin as the one who replaced Wang as Apex's sole director but referred to him, not Tian Yibin, as Wang's stepfather.  Petitioners have

iv.    Although Metro Joy Trust appears ostensibly to be under Wang's control, it is in reality under Zhang's control, since Wang acts solely as she instructs him. Wang is, after all, Zhang's son and Tian Yibin's stepson, and parent-child relationships in Chinse culture are traditionally hierarchical.  And Zhang is the one who bid on and paid for the Artworks (and bought the Baccarat condominiums discussed below) and the one who collects art.

v.    Also on January 2, 2014, entities known as Metro Joy International Limited ("Metro Joy Int'l") and Joy Grain Group Limited ("Joy Grain") were incorporated in BVI.  (Borrelli Aff. ¶66)  Both entities were incorporated using the same registered agent as SETL and, as noted below, Zhang has since transferred large sums of money to each of them.  *Id.*  And as stated in paragraph 15 above, Apex's New York counsel has represented that Apex is owned by an entity named Metro Joy Trust.

vi.    In or around January 2014, Zhang transferred $90 million from the Safra Sarasin Account in Hong Kong to a UBS AG account in her name in Singapore (the "UBS Account").  (Borrelli Aff. ¶¶49, 51(a))  Zhang then further disbursed the funds in the UBS Account, including to the SETL Accounts, so that she was able to close the UBS Account in March 2014 with no balance remaining.  (*Id.* at ¶¶51(b)-(c))

vii.    Between March 10, 2014 and July 21, 2014, approximately $118 million in cash and $24.7 million in securities were transferred from the Safra Sarasin Account to the SETL CS Account.  (Borrelli Aff. ¶¶42-45)  Petitioners had by then been made aware of South Beauty's underperformance, and the accounting irregularities at South Beauty had by then stopped.

viii.    According to internal emails within Bank Safra Sarasin, which Petitioners obtained in discovery in the Asia proceedings, one reason why Zhang was moving money out of her Safra Sarasin account was that "her lawyer [was] helping her to ease the concern on the with-recourse term of her business sold to an [sic] PE [i.e. Petitioners]." (Borrelli Aff. ¶42(c))

ix.    Zhang also maintained an account in the name of SETL at Deutsche Bank AG Singapore (the "SETL DB Account," and together with the SETL CS Account, the "SETL Accounts").  (Borrelli Aff. ¶¶11(d), 37)  Between March 27, 2014 and November 27, 2014, Zhang transferred $82,225,000 from the SETL CS Account to the SETL DB Account.  (*Id.* at ¶106(35))

x.    On November 26, 2014, Zhang transferred $10,725,000 from the SETL DB Account to Metro Joy Int'l.  (Borrelli Aff. ¶¶66, 106(30.a))  That sum was used to buy a condominium apartment at the Baccarat Hotel & Residences (the "Baccarat"), in midtown Manhattan, that Zhang placed in the name of Metro Joy International LLC ("Metro Joy"), another shell company of Zhang, and that is the subject of two other

revised that allegation herein after further reviewing various documents produced by Apex and finding certain information on the internet.

related proceedings in this Court against Zhang.[4]  After the purchase of the apartment was completed with a mortgage of about $5 million, Metro Joy Int'l returned the surplus of more than $5 million to Zhang's SETL DB Account.

      xi.      On March 2, 2015, Zhang was served with the Hong Kong injunction orders freezing her assets.  (Borrelli Aff. ¶¶16-18)  These orders were "continued" by separate orders issued on March 6, 2015 and April 22, 2015.  The related Singapore injunction orders were issued on March 2, 2015 and served on Zhang shortly thereafter.  (*Id.* at ¶11(c))  In the days immediately following receipt of these orders, Zhang transferred more than $35.8 million out of the SETL Accounts:

      a.      On March 3, 2015, Zhang executed two separate transfers from the SETL DB Account to an HSBC Bermuda account in the name of The Manufacturers Life Insurance Company:

      1.      Zhang transferred $9,902,237.00 in connection with two policies for which she was the insured.  (Borrelli Aff. ¶¶69, 107; DB wire instruction and confirmation)  Those policies either already existed and Zhang was increasing her investment in them, or the transfer was to acquire the policies.

      2.      Zhang simultaneously transferred $6,037,485 in connection with an insurance policy for her son, Wang Xiaofei.  (*Id.* at ¶¶69, 107; DB wire instruction and confirmation)  That policy either already existed and Zhang was increasing her investment, or the transfer was to acquire the policy.

      b.      On March 4, 2015, Zhang transferred $14,878,868 from the SETL DB Account to an HSBC Bank Hong Kong account in the name of Transamerica Life (Bermuda) Ltd. in connection with an insurance policy for which she was the insured.  (*See* Borrelli Aff. ¶¶69, 107; DB wire instruction and confirmation.)  That policy either already existed and Zhang was increasing her investment, or the transfer was to acquire the policy.

      c.      On March 4, 2015, Zhang executed three additional transfers from the SETL DB Account:

      1.      Zhang transferred $3 million to Metro Joy Int'l.  (Borrelli Aff. ¶¶66, 107; DB wire instruction and confirmation);

---

[4]      One of those proceedings before this Court is *La Dolce Vita Fine Dining Company et al. v. Zhang Lan et al.*, 20 Misc. 200 (ALC) ("*Metro Joy I*"), in which the Court entered an Order on May 8, 2020, later confirmed, attaching the Baccarat condominium, which is one of two condominium apartments Zhang had bought at the Baccarat.  (She sold the other one just before Petitioners commenced *Metro Joy I*.)  In accordance with this Court's April 9, 2021 Order in *Metro Joy I*, Petitioners commenced a new civil action in this Court, *La Dolce Vita Fine Dining Company et al. v. Zhang Lan et al.*, 21 Civ. 3071 ("*Metro Joy II*"), by petition seeking an order confirming the Arbitral Awards and a limited judgment against Zhang capped by Petitioners' share of the net proceeds from an eventual sale of the Baccarat apartment.

2.      Zhang transferred $2,000,020 to Joy Grain (*Id.* at ¶¶66, 107; DB wire instruction and confirmation); and

3.      Zhang transferred $13,937.50 to Asiaciti Trust Hong Kong Limited ("Asiaciti Trust"), (*Id.* at ¶ 107; DB wire instruction and confirmation)  According to an undated document produced by Apex, Asiaciti Trust was retained to provide services for Metro Joy Trust, which contains Apex.

xii.      Of the $142 million in cash and securities that was transferred from the Safra Sarasin Account to the SETL CS Account, only $22,005,981 remained as of January 31, 2016.  (Borrelli Aff. ¶106(34))  Of the $82,225,000 that was transferred from the SETL CS Account to the SETL DB Account, only $33,373,585 remained as of February 29, 2016.  (*Id.* at ¶ 106(35))

xiii.      In her affidavits in the injunction proceedings in Hong Kong and Singapore, Zhang denied any legal or beneficial interest in SETL and the SETL Accounts, even though she exercised complete control over them.  (Borrelli Aff. ¶¶46-48)

xiv.      So despite having received more than $286 million into her Safra Sarasin Account in January 2014 in connection with the Acquisition, Zhang, in a March 13, 2015 disclosure of her assets in the Hong Kong injunction proceeding, listed only the following assets worldwide, none of which she ascribed a value to other than a single bank account:

a.  a 2002 Nissan Jeep;

b.  a 2010 GMC Coach;

c.  100% ownership of Grand Lan Holdings;

d.  two minority shareholdings in investment companies, specifically a 2.77% interest in Beijing An Run Lin Investment Management Co. and a 4.1% interest in Beijing Shu Run Yuan Investment and Management Co.;

e.  a majority shareholding in what appears to be a holding company for the minority share in South Beauty that she maintained after the Acquisition;

f.  a majority shareholding in a company that holds a 0.44% stake in an aquafeed manufacturing company listed in China;

g.  her Safra Sarasin Account, which she then valued at $1.28 million;

h.  three rooms in a business property in Beijing; and

i.  a 69.4 square meter house in Beijing.

(*See* Borrelli Aff. ¶¶20-21; Asset Disclosure Schedule of Zhang as of March 13, 2015.) Zhang's list of assets belies her having been ranked 310th in Forbes Magazine's China Richest List 2007, with a fortune of $240 million that had reportedly increased to $330 million by 2013.  (Borrelli Aff. ¶¶22-23, 82; ArtNet News Article)

xv.       As detailed in the Borrelli Affidavit, Petitioners uncovered multiple examples of Zhang's failure to disclose all of her assets, including but not limited to the SETL Accounts, a 600 square meter property where she lives or has lived, and highly valuable artwork and jewelry.  (Borrelli Aff. ¶¶26-89)

xvi.       Throughout the Hong Kong and Singapore injunction proceedings, Zhang maintained her position that the list of assets identified in her March 13, 2015 affidavit was complete as of that date.  (Borrelli Aff. ¶¶24-25, 28-32, 46-47, and 109-117)  In light of that position and her other actions in apparent breach of court injunctions, Petitioners were forced to bring committal proceedings to hold Zhang in contempt for those actions and for her misstatements and omissions in the initial disclosure of her assets and in subsequent affidavits in which she purported to defend her position.

xvii.       Ultimately, the Hong Kong court found her explanations, at least as to certain undisclosed assets (particularly her art collection), to be "incredible" and "unbelievable," and sentenced her to a one-year imprisonment.  (Judgment of Hong Kong High Court); (Sentencing Judgment of Hong Kong High Court); (Orders For Committal)) Warrants for her arrest have been outstanding in Hong Kong since March 2019. (Warrant For Committal))

43.       The foregoing chronology evidences Zhang's efforts to secrete her assets, in multiple ways, to render herself seemingly insolvent and judgment-proof.  Zhang personally received more than $244 million of the $286 million purchase price paid by Petitioners for the Acquisition.  The steps she later took to secrete her assets – including making Apex the ostensible owner of the Artworks – were all designed to immunize her assets from execution on claims she knew Petitioners would bring against her in a nine-figure amount.

III.    Zhang's Purchase of, Control Over and *De Facto* Ownership of the Artworks, and Her Fraudulent Conveyance of Ostensible Ownership of the Artworks to Apex in an Effort to Shield the Artworks from Eventual Execution

44.       The evidence shows that Zhang directly participated in the May 2014 Christie's auction in New York at which she successfully bid on the Artworks, that she later paid for the Artworks in New York, and that she manipulated Christie's invoices and related documents by

using Apex to camouflage her purchase.  Those acts,

, amount to a fraudulent conveyance by Zhang to

shield the Artworks from an eventual judgment against her, done at a time when Zhang knew of

the material misrepresentations for which she would later be held liable in the Arbitrations.  The

facts come mainly from Christie's documents and in part from Apex's (Zhang, as noted,

produced no documents in discovery) and are as follows:

45.     Zhang is known as a public and prolific collector of modern art.  In one of her

affidavits in the injunction proceedings, she proclaimed herself to have "considerable fame in the

Chinese art scene and business circles."  (Borrelli Aff. ¶72)  In a 2015 interview published by

Christie's, she stated, "I don't have any savings in the bank.  My savings are my art collection."

She added that her "collection consists of 300 to 400 artworks."  (*Id.*)  She also explained where

she keeps her artworks:  "I don't show art at home; I think homes are for living in.  I prefer to

keep my collection in professional storage facilities to protect it in the long term."[5]  (*Id.*)

46.     Zhang's collection includes the Artworks.  The events underlying Zhang's

acquisition of the Artworks began on or about May 12, 2014, the same day as the auction, when

she arranged for Christie's to create a new account for her that was intended to be anonymous.

At the time, Zhang already had a client account with Christie's, but she wanted an anonymous

account created on her behalf so she could later hide that she was the buyer of the Artworks in

the event she successfully bid on them that night.  When a Christie's employee asked Zhang's

agent at Christie's, Xin Li, by email for the "identity of this new anon record," Xin Li replied,

"Yes.  It's Zhang Lan 4098 8289."  (CHR_LDV_000004-05)

---

[5]      Based on that last statement, Petitioners had reason to believe when they commenced this proceeding that
the Warhol and Kippenberger paintings were still being held by Christie's.  Christie's has since confirmed just that:
After it was served with the Attachment Order, Christie's sent a Garnishee's Statement dated December 13, 2020 to
Petitioners' counsel, in compliance with CPLR § 6219, stating that the Artworks remain in Christie's custody.

47.    Zhang, through her agent in New York, directly participated in the May 12, 2014 auction at Christie's, at which she successfully bid on the Artworks.  Her purchase of the Artworks was reported in an article published on ArtNet News dated May 30, 2014, which identified, accurately, the Artworks as Andy Warhol's "Little Electric Chair" (1965) (purchased for $10.5 million) and Martin Kippenberger's untitled self-portrait (1988) (purchased for $18.6 million).  The article describes how Zhang was "bidding through Christie's specialist Xin Li over the telephone," and that "she proved a tenacious competitor, sometimes jumping the bid higher in $1 million increments as opposed to the typical $250,000 or $500,000 jumps seen at that price level."  According to the article, when Zhang raised her bid on the Kippenberger painting from $12.5 million to $13.5 million, there were "gasps in the salesroom."  Zhang's purchases of the Artworks were also reported in an article published in May 2015 on China Daily Asia's website.

48.    Documents produced by Christie's further evidence Zhang's participation in the May 12, 2014 auction in New York.  Days after the auction, Christie's – which at all relevant times acted through its New York office – issued an invoice for the Artworks to the same anonymous client account – "Anon 9 – Xin Li" – that had been created for Zhang on or about the same day of the auction.  (CHR_LDV_000004-05, CHR_LDV_000037)  On May 20, 2014, Christie's issued an "Extended Payment Terms Summary" to "Ms. Zhang Lan" at a Beijing address setting forth a payment schedule for the Artworks.  (CHR_LDV_000038)  The invoice included "Christie's New York Wire Transfer" instructions, with a New York City address for Christie's bank, JPMorgan Chase Bank, N.A.

49.    Zhang, who knew of the material misrepresentations she had made in connection with the Acquisitions, knew when she bid on the Artworks that she and her companies faced potential liability as to the more than $286 million they received – $244 million of which Zhang

personally received – from the Acquisition.  So she began or resumed a campaign to secrete her assets worldwide – including by fraudulently conveying the Artworks to Apex.

50.     As evidenced by documents produced by Christie's and Apex – including Apex's Certificate of Incorporation, Certificate of Incumbency, and Original Register of Directors – Apex was incorporated in Seychelles on or about May 26, 2014 – two weeks after Zhang successfully bid on the Artworks at the May 12 auction – and Wang became its sole shareholder and director on or about June 9, 2014 – the same day Zhang asked that payment for the Artworks be processed through Wang and that Zhang's name be removed altogether.  In establishing Apex, Zhang did not fund it with capital, a loan or anything else – another sign that Apex was never meant to be a legitimate company with actual operations.  Thus, as shown in the Certificate of Incumbency, Wang was given one share of Apex with a nominal value of $1, and as Apex's counsel would later confirm in response to Petitioners' document request, "business and marketing plans for Apex do not exist."  Wang, on March 1, 2016, was replaced as Apex's sole director by Tian Yijin, who appears to be a front for Tian Yibin, Zhang's second husband and Wang's stepfather.

51.     After setting up Apex, Zhang, at the time she received Christie's invoice and payment terms, instructed Xin Li to manipulate the billing documentation for her purchases so as to suggest that she herself was not the buyer.  Thus, on June 9, 2014, Christie's employees raised internally that Zhang – whom they referred to as the "actual buyer" who "bought [the Artworks] in our NY evening sales" – wanted payment for the Artworks to be processed by her son, Wang, through "his personal or BVI account."  (CHR_LDV_000072)

52.     Christie's then amended its documentation to remove Zhang's name and show that payment for the Artworks would be made by Apex, which did not even exist at the time of

the May 12 auction and obviously had nothing to do with the bidding on the Artworks. Christie's sent a revised invoice dated June 11, 2014 to Wang and Apex, at Apex's P.O. address in Seychelles, that was otherwise identical to the May 20, 2014 invoice addressed to Zhang.  On June 12, 2014, however, Rebecca Mo, a Director at Cornucopiae Asset Management Ltd. in Hong Kong – a company that Zhang owns or uses as her investment advisors – emailed Xin Li to say that the "correspondence address" for Apex should be Cornucopiae's address in Hong Kong, not the Seychelles "registered address."   Christie's then revised its June 11 invoice to make that address change.  So while the invoice now listed Apex in place of Zhang, the delivery address was Zhang's agent's, rather than any address associated with Apex.

53.    Although Zhang tried to hide that she herself bought the Artworks – by using an anonymous account and having Christie's amend the billing documentation to suggest that Apex would be paying for the Artworks – further evidence betrays her efforts and confirms that she alone paid for the Artworks.  That evidence thereby further confirms that Apex was just a front used by Zhang to shield the Artworks – and the $29.1 million used to pay for them – from her future creditors, and particularly Petitioners.

54.    Thus, under the Extended Payment Terms Summary, the Artworks were to be paid in three separate installments:  $12,057,000 by June 11, 2014, $12,057,000 by August 8, 2014, and $5,000,000 by September 9, 2014.  The documentary evidence shows that Zhang herself made each of those payments:

(i)    On or about June 10, 2014, Zhang authorized a wire transfer of $12,057,000 from her account at UBS AG to Wang's account at UBS AG, and the transfer was confirmed on June 12, 2014.  On June 16, 2014, Wang wired the same amount, $12,057,000, from his UBS AG account to Christie's JPMorgan account in New York.  (APEX0000088)

(ii)     On or about July 30, 2014, an individual within Christie's Client Operations and Accounting department checked with Xin Li on the status of the second installment payment then coming due on August 8.  Xin Li responded that she had "sent reminder a couple of days ago to the client, *she*" – a reference to Zhang – "is aware of the payment date."  (CHR_LDV_000136) (emphasis added)

(iii)    On or about August 7, 2014, Zhang wired an additional $12,057,000 to Wang's UBS account.  On August 8, 2014, Wang wired the same amount, $12,057,000, from his UBS AG account to Christie's JPMorgan account in New York.  (APEX0000157)

(iv)    On or about September 9, 2014, the due date of the final installment payment, an agent of Zhang's, Rebecca Mo, emailed Xin Li of Christie's to inform her that "*since Ms. Zhang is out of town*, the final payment of the painting will be delayed a couple of days, we'll let you know once it's done."  (CHR_LDV_000213-20 (emphasis added))

(v)     On or about September 25, 2014, Zhang wired an additional $5,000,000 to Wang's account at UBS AG, and the transfer was confirmed on September 29, 2014. On September 30, 2014, Wang wired the same amount, $5,000,000, from his UBS AG account to Christie's JPMorgan account in New York. (APEX0000161)

55.    Zhang's payment for the Artworks and her simultaneous effort to conceal that she had done so – by manipulating Christie's billing and sending the money to Christie's indirectly through her son's bank account – confirms that she controlled and remained the *de facto* owner of the Artworks even after she created Apex.  Zhang, after all, is the collector of art, not her son. Apex was simply a tool to aid Zhang's scheme to defraud Petitioners, as her then-future creditors.  Indeed, documents produced by Apex show that Apex's New York counsel, in 2016 (while the Arbitrations were pending) and again in 2019 (after the Arbitral had been issued)**,**

repeatedly and aggressively tried to pressure Christie's into releasing the Artworks to Apex. Christie's declined to do so.

56.     That Zhang injected herself into New York to bid on the Artworks at a Christie's auction in New York accords with her history as an art collector, as described in the interview, referred to above, published by Christie's in 2015.  Zhang also utilized New York's legal system to help create a medley of companies, including Apex, used to hide her ownership of the Artworks, the attached Baccarat condominium (Apt. 39A) in *Metro Joy I and II*, and another Baccarat condominium that Zhang was able to sell just before *Metro Joy I* was commenced.

57.     Thus, on January 2, 2014, Zhang created an entity called Metro Joy International Limited and incorporated it in the British Virgin Islands.  On March 20, 2014, Metro Joy – i.e., Metro Joy International LLC – was registered as a domestic limited liability company with New York Department of State's Division of Corporations, with an address at 200 West 90th Street in Manhattan.  (*See* Metro Joy's NYS DOS Record.)  Also on March 20, 2014, an entity called Metro Joy Management LLC was registered as a domestic limited liability company with New York Department of State's Division of Corporations, and gave the same address as Metro Joy's. Zhang put her ownership of Baccarat Apt. 39A in Metro Joy's name, and of the Baccarat apartment in Metro Joy Management LLC's name.  Zhang or her agents created a fourth Metro Joy entity, Metro Joy Trust, whose Deed of Addition of Assets dated November 4, 2014 says that it owns Apex and what appears to be a second entity with the name Metro Joy International Limited, which was incorporated in the Cook Islands.

58.     In sum, the evidence shows that Zhang undertook multiple acts in New York to further her scheme to secrete her assets in anticipation of being sued by Petitioners for her misrepresentations in connection with the sale of the South Beauty restaurant chain.  The

evidence also confirms that Apex is simply another means by which Zhang secreted her assets to shield them from eventual execution by Petitioners to help enforce the Arbitral Awards. Apex's claimed ownership of the Artworks accordingly does not affect the validity of the Attachment Order and is no defense to Petitioners' eventual motion to confirm the Attachment Order.

IV.    The Procedural History of This Proceeding to Date

59.    The procedural history of this proceeding, much of which has already been described, can be summarized as follows:

60.    Petitioners commenced this proceeding on November 18, 2019, obtained the Attachment Order, then *ex parte*, on November 21, 2019, and served the Attachment Order on Christie's on November 25, 2019. The Court unsealed the proceeding by order dated December 2, 2019, and Petitioners served the original Respondents with the Attachment Order, and their original motion to confirm it, between November 30 and December 2, 2020.

61.    By Order dated December 20, 2019, the Court established a briefing schedule on Petitioners' original motion to confirm the Attachment Order. On January 6, 2020, the date on which their opposition to the motion was due, Zhang and her companies submitted a letter to the Court alleging that Apex, not any of them, owned the Artworks and proposing that the motion be suspended to allow Apex to intervene and assert its position. Apex never intervened, however, and never agreed to a discovery schedule or produced any of the documents requested by Petitioners. Petitioners proceeded to file their reply papers on the confirmation motion on January 27, 2020. No ruling on the motion was ever made.

62.    On March 10, 2020, the original Respondents moved to vacate the Attachment Order on the grounds, among others, that they had not been properly served with the attachment

papers.  Petitioners opposed the motion on multiple grounds.  By Opinion and Order dated December 11, 2020 (ECF No. 71), the Court denied the motion.

63.    On December 31, 2020, Petitioners amended their petition to add Apex as an intervenor-respondent.  Around the same time, Petitioners served separate document requests on the original Respondents and Apex for documents relating to the question of who owns, controls or otherwise has an interest in the Artworks.  Zhang and her companies ultimately produced no documents.  Apex made two productions, and though its counsel said it might make another by the end of May or early June, Apex never did.

64.    On April 5, 2021, Petitioners moved in this proceeding to confirm the Arbitral Awards under the New York Convention and for a judgment against Zhang (but not her companies).  By Order dated April 7, 2021, the Court ruled that a motion to confirm arbitral awards does not come within any of the miscellaneous categories and directed Petitioners to commence a new civil action and re-file their motion there.

65.    Petitioners commenced the Civil Action on April 13, 2021, simultaneously filing a petition and re-filing their motion to confirm the Arbitral Awards.  After a conference with Judge Vyskocil on June 8, 2021, before Zhang had ever responded to the motion, Petitioners, Zhang and Apex entered into a June 11, 2021 stipulation in the Civil Action in which it was agreed that after Petitioners filed an amended petition, as they did on June 17, 2021, the proceedings in the Civil Action, including a renewed motion to confirm the Arbitral Awards, would be stayed pending the outcome of Petitioners' motion in this proceeding to confirm the Attachment Order.

FIRST CLAIM FOR RELIEF
(For Confirmation of the Attachment Order Under
CPLR § 6211(b), as Incorporated by Fed. R. Civ. P. 64)

66.     Petitioners repeat the foregoing allegations as if they were set forth herein.

67.     Petitioners readily met the requisite elements under CPLR §§ 6201 and 7502(c),

incorporated by Fed. R. Civ. P. 64, to obtain an *ex parte* order of attachment as to the Artworks.

Those same requirements apply to a motion to confirm the Attachment Order, and Petitioners

meet them just as readily.

68.     First, the Arbitrations serve to satisfy the cause of action requirement under CPLR

§§ 6201 and 7502(c).  Second, the Arbitral Awards, having by now been affirmed on appeal,

establish that Petitioners have succeeded on the merits in the Arbitrations.

69.     Third, Zhang's history of secreting assets and willingness to lie under oath

confirm that, absent confirmation of the Attachment Order, the Arbitral Awards will be rendered

largely ineffectual.  Zhang has taken multiple steps to dissipate, transfer, conceal and otherwise

secrete her assets, including the Artworks.  The Artworks – purchased for the combined amount

of $29.1 million and likely worth even more today – are among the few known assets in her

possession or control that, once liquidated, can materially help satisfy the Arbitral Awards.

70.     Fourth, Zhang and her companies have no counterclaims in the Arbitrations that

could exceed the $142,463,666.28 already awarded to Petitioners.  The counterclaims they had

asserted were dismissed in their entirety, and the amount they seek on their still-pending

application for costs, though substantial in absolute terms, is only a small fraction of the Arbitral

Awards and highly unlikely to be awarded in any event considering they did not prevail in the

Arbitrations.  It follows that the amount Petitioners are demanding from Zhang, to enforce the

Arbitral Awards, necessarily exceeds all known counterclaims or other claims against them.

71.     Finally, Apex's contention that it owns the Artworks does not affect Petitioners' right to confirmation of the Attachment Order.  At the time of the original petition, and despite the news reports specifically identifying Zhang as the purchaser of the Artworks, Zhang's history of secreting assets led Petitioners to believe it highly possible that the Artworks were being held at Christie's in the name of a third-party individual or entity so as to shield them from execution. So Petitioners requested that any attachment order require Christie's to secure the Artworks regardless of whether they were held in Zhang's name, in Grand Lan Holdings' or QJL Development's names, or in the name of any other individual or entity that beneficially owns the assets for Zhang.  The Attachment Order therefore includes the names of third parties, identified in the original petition, that Petitioners had reason to believe might hold assets on Zhang's behalf.  First on that list was Wang, Zhang's son.  Apex, Tian Yijin and Tian Yibin, too, would have been on the list had Petitioners known of Apex when they commenced this proceeding.

72.     In all events, the evidence confirms that Zhang, not Apex, has full control over the Artworks and is therefore their *de facto* owner.  And even if Apex were the Artworks' actual owner, that ownership is the product of Zhang's fraudulent conveyance and subject to nullification.  Zhang's conveyance of ostensible ownership of the Artworks to Apex for no consideration was in furtherance of her broader scheme to secrete her assets and was carried out with intent to hinder, delay, or defraud Petitioners, as future creditors that Zhang knew would very likely commence an arbitration against her, having suffered significant financial loss as a result of her misrepresentations.  Specifically:

i.      At the time of the fraudulent conveyance, Zhang was aware that the dramatic decline in South Beauty's financial performance would eventually lead to the discovery

of the pervasive manipulation and material misrepresentations for which she and her companies would later be found liable in the Arbitrations.

      ii.      She was also aware that the monetary amount of her potential liability was in nine figures, since she and her companies had been paid more than $286 million for the Acquisition, of which she herself received more than $244 million.

      iii.      Zhang and her agents therefore undertook a broad scheme to secrete her assets worldwide so as to make herself insolvent and thereby unable to satisfy any potential judgment obtained by Petitioners.  As she told her personal bankers, she was moving around her assets to "ease the concern on the with-recourse term of her business sold to" Petitioners.

      iv.      As part of her scheme and with intent to defraud, Zhang formed Apex for the sole purpose of putting the Artworks in its name and thereby render them judgment-proof.  Zhang's creation of Apex enabled her to manipulate the invoices and other documents relating to the Artworks so as to hide her ownership of them.  That Apex is a ruse is manifest:  Zhang funded Apex with $1; Apex has never had any business or valid operations; Zhang's son was its original sole shareholder and director; and Apex has been disregarded except when Zhang has used it in recent years to immunize the Artworks from execution.

      73.      [Deleted pursuant to Stipulation and Order, 12/27/24 (Doc. 118)]

74.    [Deleted pursuant to Stipulation and Order, 12/27/24 (Doc. 118)]

75.    [Deleted pursuant to Stipulation and Order, 12/27/24 (Doc. 118)]

76.    [Deleted pursuant to Stipulation and Order, 12/27/24 (Doc. 118)]

*    *    *

Petitioners accordingly request that they be granted the following relief:

1.    Confirmation of the Attachment Order under CPLR § 6211(b), as incorporated by Fed. R. Civ. P. 64;

2.    In the event the Attachment Order is not confirmed, an order maintaining the Attachment Order pending any appeal or the outcome of subsequent proceedings in the Civil Action, whichever is concluded last; and

3.    For such other and further relief as the Court deems just.

Dated:   New York, New York
         December 31, 2024

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC

By: _s/ Jack B. Gordon_____

Jack B. Gordon
Alexander Bedrosyan (admission pending)
1050 K Street NW, Suite 400
Washington, DC 20001
(202) 833-8900
Jack.Gordon@lbkmlaw.com
Alexander.Bedrosyan@lbkmlaw.com

*Attorneys for Petitioners La Dolce Vita Fine Dining Company Limited and La Dolce Vita Fine Dining Group Holdings Limited*

33