USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  3/24/26_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LA DOLCE VITA FINE DINING COMPANY
LIMITED and LA DOCLE VITA FINE
DINING GROUP HOLDINGS LIMITED,

        **Petitioners,**

    **-against-**

ZHANG LAN et al,

        **Respondents.**

---

**1:19-mc-00536 (ALC)**

**OPINION & ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

Petitioners La Dolce Vita Fine Dining Company and La Dolce Vita Fine Dining Group

Holdings Limited (together "Petitioners") bring this action against Respondent Zhang Lan

("Respondent" or "Zhang") and Intervenor-Respondent Apex Led Investment Holdings Limited

("Apex"). Zhang owes millions of dollars to Petitioners. A court in Hong Kong and another court

in this district have previously found that Zhang has failed to truthfully disclose assets. Here,

Petitioners seek to confirm attachment of two paintings that Zhang bid on at Christie's. Zhang

seeks to vacate the *ex parte* Order of Attachment, claiming that another entity, Apex, owns the

paintings. Apex also claims that it owns the paintings. Apex, an offshore company, incorporated

in Seychelles, did not exist at the time Zhang bid on the paintings. When Apex was created, the

sole shareholder and director was Zhang's son. For the reasons discussed below, the Order of

Attachment is hereby **CONFIRMED.**

## BACKGROUND

### I.    Foreign Arbitral Awards

In December of 2013, Petitioners acquired a majority interest in the "South Beauty" chain of restaurants in China and two other companies from Zhang. ECF No. 119, ¶27 ("Second Amended Petition" or "SAP"). Following the discovery of fictitious transactions, Petitioners commenced two arbitral proceedings before the China International Economic and Trade Arbitration Commission ("CIETAC") against Zhang. *Id.* ¶¶ Petitioners were granted *ex parte* injunction orders in Hong Kong and Singapore freezing Respondent's assets. ECF No. 119, ¶23 ("Second Amended Petition"). On March 5, 2019, due to Respondent's failures, in violation of court orders, to disclose her assets truthfully, the Hong Kong court found her in contempt and issued a warrant for her arrest. In April 2019, Petitioners were awarded a combined $142,463,666.28 by the arbitral panel. *Id.* ¶. Zhang appealed these awards, and in February 2021, the Second China International Commercial Court affirmed the arbitral awards ("Awards"). *Id.*

## II.    The Paintings

On May 12, 2014, Respondent Zhang, through her agent, bid on two paintings at a single auction at Christie's Auction House ("Christie's"). ECF No. 119, ¶47 (hereafter "Second Amended Petition" or "SAP"). The artworks are Andy Warhol's "Little Electric Chair" (1965) (purchased for $10.5 million) and Martin Kippenberger's untitled self-portrait (1988) (purchased for $18.6 million). *See id*. On February 5, 2026, this Court held oral argument on the Parties cross-motions to confirm and vacate the Order of Attachment. Transcript of Oral Argument, *La Dolce Vita Fine Dining Limited, et al. v. Zhang Lan* (S.D.N.Y. argued Feb 5, 2026) (No. 19-MC-536) (hereinafter "Tr.") The following undisputed facts were established as to the bidding and purchasing of the Paintings at Christie's.

Respondent's agent, Xin Li, created an anonymous account ("Anon 9 – Xin Li") with Christie's on the day of the auction; Li confirmed to Christie's that the anonymous bidder was

2

Zhang. *See* Tr. at 17:16-25. On May 20, 2014, Christie's extended credit to Respondent in the form of extended payment terms, addressed to Ms. Lan Zhang. *See* Tr. at 18:3-17. The payment terms were revised on June 11, 2014, to name Apex on the payment terms. *See* Tr. at 18:14-17.

Apex, an offshore company incorporated in Seychelles, was created on May 26, 2014, two weeks after the auction. *See* Tr. 16:13-25, 17:1-4. Respondent's son, Wang, was the sole shareholder and director of Apex, appointed on June 9, 2014. *See* Tr. 17:5-15.

Under Christie's rules, title to the lot passes when payment is made in full, and as long as Christie's consents, the winning bidder can assign title to another purchaser. *See* Tr. at 19:13-17. It is undisputed that Zhang was the winning bidder at the auction of the Paintings. *See* Tr. at 21:7-10. On June 9, 2014, there is a Christie's internal email sent that says the following: "Hi. Xin had a question regarding captioned client, who bought in our NY evening sales. Now the actual buyer wants her son, thru his personal or BVI account to pay for the lot. Once done they also want invoice on the BVI or Son's account." *See* Tr. at 20:1-7; ECF No. 128, Exhibit 7. A more senior Christie's person writes back and says: "I have no concern, as Li Xin has informed me who they are." *See* Tr. at 20:7-9; ECF No. 128, Exhibit 7.

On or about June 10, 2014, Zhang transferred the first installment of $12 million from her SETL CS account to her son Wang's account, and on June 16, the same amount was wired from Wang's account to Christie's.[1] *See* Tr. at 26:1-23. On August 7, 2014, Respondent wired the same amount for the second installment from her Credit Suisse AG Singapore Account ("SETL CS Account") to Wang's UBS AG account, and the identical amount was wired from Wang's account to Christie's a day later. *See* Tr. at 27:1-8. When a payment was missed, Christie's credit manager

---

[1] The Court notes that the exact amount of these payments was $12,057,000. Further, the Court notes that Respondents clarified that as to the SETL account referred to as belonging to Zhang, their only basis for believing so is based on a Singapore court finding that Zhang is the beneficial owner of that account. *See* Tr. at 27: 9-16.

sent Li a reminder that the $5 million balance was due, and Li responded that they sent the client a reminder. *See* Tr. at 27:17-24. Mo, a financial advisor, replied to the inquiry that "since Ms. Zhang is out of town, the final payment will be delayed a couple of days." *See* Tr. at 27:25; 28:1-4. On September 25, 2014, Zhang wired the $5 million from her SETL CS account to Wang's account which was thereafter wired from Wang's account to Christies. *See* ECF No. 126 at ¶ 62, Ex. 41. When Apex sought to take possession of the art, Christie's refused to deliver to them. *See* Tr. at 29:5-17. When Apex sought to take possession of the artwork, it requested that Christie's deliver the paintings to Zhang's husband, Yibin. *See* Tr. at 29:18-24.

### III.    Attachment Matter

While the appeal of the arbitral awards was pending in Beijing, in November 2019, Petitioners initiated this action and moved to attach two paintings—Andy Warhol's "Little Electric Chair" (1965) and an untitled Martin Kippenberger self-portrait (1988) (together "Paintings")— Petitioners allege were purchased by Zhang at a 2014 Christie's New York ("Christie's") auction. *See* ECF No. 9 ¶ 32. This Court granted Petitioners an *ex parte* Order of Attachment on November 21, 2019. *See* ECF No. 20.

On December 20, 2019, the Court set a briefing schedule on Petitioners' original motion to confirm the Attachment Order. *See* ECF No. 28. On January 6, 2020, Zhang submitted a letter to the Court alleging that Apex actually owned the Paintings and proposing that the motion be suspended to allow Apex to intervene and assert its position. *See* ECF No. 29. Petitioners allege that Apex is a shell company used by Zhang to disguise her purchase of the Paintings in an effort to render herself judgment proof from the arbitration awards. *See* ECF No. 30. On December 31, 2020, Petitioners amended their petition to add Apex as an intervenor-respondent. *See* ECF No. 74 ("First Amended Petition"). In July 2021, Petitioners filed a motion to amend the petition for

an order of attachment. *See* ECF No. 95. On December 27, 2024, the Parties jointly stipulated to grant Petitioners leave to file the Second Amended Petition. *See* ECF No. 118. The Second Amended Petition was filed on January 2, 2025. *See* SAP.

The Parties thereafter submitted cross motions to confirm and vacate the Order of Attachment. On February 7, 2025, Petitioners filed their motion to confirm the Order of Attachment along with their accompanying memorandum of law, declaration, and exhibits. *See* ECF Nos. 124-26. On March 10, 2025, Apex filed its opposition along with its supporting papers. *See* ECF No. 127-28. On March 10, 2025, Apex also filed a cross motion to vacate the Order of Attachment along with its accompanying papers. *See* ECF No. 129-131. On March 31, 2025, Petitioners filed their reply briefs in support of their motion to confirm and in opposition to Apex's cross-motion to vacate. *See* ECF Nos. 132-34. On April 10, 2025, the Parties filed a consent letter motion to grant Apex leave to file a sur-reply which the Court granted. *See* ECF Nos. 137-38. On April 18, 2025, Apex filed its sur-reply in opposition to Petitioners' motion to confirm. *See* ECF No. 139.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 64, a district court may order attachment "under the law of the state where the court is located." Fed. R. Civ. P. 64. "Under New York law, attachment is available pursuant to Article 62 of the CPLR." *Blue Axis Glob. Ltd. V. Alopex Advisors, LLC*, No. 24-MC-508 (RA), 2025 WL 343500, at *2 (S.D.N.Y. Jan. 30, 2025). "[T]o confirm an *ex parte* order of attachment, the petitioner bears the burden of establishing that; (1) there is a cause of action; (2) it is probable that the plaintiff will succeed on the merits; (3) a ground for attachment exists; and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." *Id*. (quoting *Swift Splash Ltd. V. Rice Corp.*, No. 10-CV-

5

6448m 210 WL 3767131, at *2 (S.D.N.Y. Sept. 27, 2010)). The party seeking attachment carries a heavy burden in invoking such remedy. *See id.* (internal quotations and citations omitted). If all four statutory factors are met, it is in the court's discretion whether to grant an attachment. *See id.* (quoting *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 271 (2d Cir. 2022).

## DISCUSSION

The Court begins by addressing the issue of who owns the paintings: Zhang or Apex. After resolving this issue, the Court then turns to consideration of whether Petitioners are entitled to an order confirming the attachment of the Paintings.

### I.    Zhang Has an Ownership Interest in the Paintings

As an initial matter, Petitioners must establish that the property they seek to attach belongs to Zhang because under New York law, the "right to attach the property is only the same as the defendant's own interest in it." *Bank of New York v. Norilsk Nickel*, 14 A.D.3d 140, 145 (1st Dep't 2004) (internal citations and quotations omitted). Zhang argues that the owner of the Paintings is Apex since Zhang assigned her right to purchase the Paintings to Apex, and Apex ultimately made the payments. *See* ECF No. 130 at 13-14. Petitioners argue that Zhang has an ownership interest in the Paintings since she was the successful bidder at the May 12, 2014 auction, Christie's extended credit to Zhang pursuant to terms negotiated on behalf of Zhang, and Zhang subsequently paid for the paintings. *See* ECF No. 125 at 19-20.

The Court is persuaded by Petitioners argument. On May 12, 2014, Zhang was the successful bidder of the Paintings at the Christie's auction. SAP at ¶47. Zhang's agent, Xin Li, created an anonymous account ("Anon 9 – Xin Li") with Christie's on the day of the auction and Li confirmed to Christie's that the anonymous bidder was Zhang. *See* Tr. at 17:16-25. On May 20, 2014, Christie's extended credit to Respondent in the form of extended payment terms, addressed

6

to Ms. Lan Zhang. *See* Tr. at 18:3-17. The payment terms were revised on June 11, 2014, to name Apex on the payment terms. *See* Tr. at 18:14-17.

Apex, an offshore company incorporated in Seychelles, was not created until May 16, 2014, two weeks after Zhang successfully bid on the Paintings. *See* Tr. 16:13-25, 17:1-4. Zhang's son, Wang, was the sole shareholder and director of Apex, appointed on June 9, 2014. *See* Tr. 17:5-15. The day after Wang's appointment at Apex, on June 10, 2014, Zhang transferred the first installment of $12 million from her SETL CS account to her son Wang's account, and on June 16, the same amount was wired from Wang's account to Christie's. *See* Tr. at 26:1-23. On August 7, 2014, Respondent wired the same amount for the second installment from her Credit Suisse AG Singapore Account ("SETL CS Account") to Wang's UBS AG account, and the identical amount was wired from Wang's account to Christie's a day later. *See* Tr. at 27:1-8. On September 25, 2014, Zhang wired the $5 million from her SETL CS account to Wang's account which was thereafter wired from Wang's account to Christies. *See* ECF No. 126 at ¶ 62, Ex. 41. When Apex sought to take possession of the artwork, it requested that Christie's deliver the paintings to Zhang's husband, Yibin. *See* Tr. at 29:18-24.

While this evidence does not prove directly that Zhang created and controlled Apex, internal communications at Christie's reveal that Zhang was considered to be the owner of the Paintings as she was understood to be ultimately responsible for the payments. For example, on the day Wang was appointed as the shareholder and director of Apex, an internal email was sent at Christie's, stating, "Hi. Xin had a question regarding captioned client, who bought in our NY evening sales. Now the actual buyer wants her son, thru his personal or BVI account to pay for the lot. Once done they also want invoice on the BVI or Son's account." *See* Tr. at 20:1-7; ECF No. 128, Exhibit 7. A more senior Christie's person writes back and says: "I have no concern, as Li Xin

has informed me who they are." *See* Tr. at 20:7-9; ECF No. 128, Exhibit 7. Further, when a payment was missed, Christie's credit manager sent Li a reminder that the $5 million balance was due, and Li responded that they sent the client a reminder. *See* Tr. at 27:17-24. Mo, a financial advisor, replied to the inquiry that "since Ms. Zhang is out of town, the final payment will be delayed a couple of days." *See* Tr. at 27:25; 28:1-4. Lastly, the evidence shows that even if Wang or Apex ultimately made the payments directly to Christie's, Zhang was the one providing these funds to Wang.

Zhang fails to offer compelling evidence in rebuttal other than pointing to evidence that Apex is the true owner of the paintings as the purchaser which the Court address below. As such, Zhang does not come close to overcoming the evidence put forward by Petitioners demonstrating that Zhang has an ownership interest in the Paintings.

## II.      Zhang's Fraudulent Conveyance to Apex

The Court must now address Apex's claim of ownership in the Paintings. Petitioners argue that Apex's ownership claim is the result of Zhang's fraudulent conveyance of the Paintings. *See* ECF No. 125 at 20. Apex argues any fraudulent conveyance claim is time-barred as the statute of limitations has passed. *See* ECF No. 127 at 13. Under New York law, fraudulent conveyance claims must be brought within "the greater of six years from the date the cause of action accrued or two years from the time plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." CPLR Section 213 (8); *see In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 416 (2d Cir. 2014) ("New York's fraudulent conveyance law has a six-year statute of limitations.").

Apex concedes the alleges transfers occurred no later than September of 2014, meaning any fraudulent conveyance claims would need to be brought by September of 2020.[2] *See* ECF No. 127 at 13. Apex asserts Petitioners waited until June 2021 to assert any fraudulent conveyance claim. *See id*.

However, Petitioners argue they asserted timely fraudulent conveyance in their First Amended Petition ("FAP") filed on December 31, 2020. *See* ECF No. 132 at 5. Petitioners rely on the applicability of Executive Order 202.8 issued during the exigencies of the COVID-19 pandemic. *See id*. Courts in this district have concluded that Executive Order 202.8 "applies to federal cases applying New York's statute of limitations." *See D.S.R. v. New York City Dep't of Educ.*, NO. 21-CV-7591 (ALC), 2023 WL 1993349, at *4 (S.D.N.Y. Feb. 14, 2023) (citing *Rich v. New York*, No. 21-CV-3835 (AT), 2022 WL 992885, at *8 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks omitted). As such, the Court concludes Executive Order 202.8 is applicable here and will toll the statute of limitations for a period of 228 days. *See id*.

Apex argues even with the applicability of Executive Order 202.8 and the additional 228 days, Petitioners' fraudulent conveyance claims are not timely since the Second Amended Petition was not filed until July 20, 2021. *See* ECF No. 139 at 2-3. Apex argues the First Amended Petition did not assert a fraudulent conveyance claim. *See id*. at 3. The Court finds otherwise. "[A] time-barred claim may be raised in an amendment and related back to the date of the timely complaint if 'the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out – in the original pleading." *In re M. Fabrikant & Sons, Inc.*, 480 B.R. 480, 492 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013) (quoting

---

[2] The Court need not address Apex's argument concerning when Petitioners could have discovered the fraud with reasonable diligence. Apex asserts Petitioners were on notice of the alleged transfers by 2015-2017, meaning any fraudulent conveyance claims would need to be brought by 2017-2019. *See* ECF No. 127 at 13. However, the law allows for the *greater* of the two time periods. As such, the six-year time statute of limitations is controlling year.

F.R.C.P. 15(c)(1)(B)).  The key question in determining whether an amendment relates back to a earlier pleading is whether the earlier pleading "put the defendants . . . on notice of what must be defended against in the amended pleadings." *Id*. (citations omitted). To do so, "the earlier pleading must inform the defendants of the facts that support those new claims." *Id*. (internal quotations and citations omitted). The Second Amended Petition asserts a fraudulent conveyance claim. *See* ECF No. 119 at 20 (section arguing Zhang's fraudulent conveyance of her ownership of the Paintings to Apex in an effort to shield the Paintings from an eventual judgement against her). Petitioners point to facts in the First Amended Petition that describe the "conduct, transaction, or occurrence" that gave rise to the fraudulent conveyance claim later asserted in the Second Amended Petition. Paragraph 40 of the First Amended Petition lays out substantially all of the same facts pertaining to the bidding and purchase of the Paintings at Christie's that are later alleged in the Second Amended Petition. *See* ECF No. 74, ¶ 40. Notably, these are also largely the same facts relied on in this Opinion establishing Zhang's ownership interest in the Paintings. As such, the Court finds the First Amended Petition sufficiently alleges facts pertaining to the fraudulent conveyance allegations later raised in the Second Amended Petition such that those allegations relate back. As the First Amended Petition was filed on December 31, 2020, it is timely given the additional 228 days provided by Executive Order 202.8.

Now that it has been established that Petitioners' fraudulent conveyance claims are timely, the Court can address whether Zhang's conveyance of the Paintings to Apex was fraudulent. Apex does not substantively respond to whether there was a fraudulent conveyance here, but rather only argues that "[e]ven if petitioners' claims were timely, they would not support the attachment" of the Paintings themselves. *See* ECF No. 127 at 20. However, N.Y. Debt. & Cred. Law ("DCL") § 278 (2019) establishes that fraudulent conveyances may be set aside or disregarded.

Under DCL § 273, a fraudulent conveyance is one made by a person who "is or will be thereby rendered insolvent" if the conveyance is made "without a fair consideration." The burden is on the party challenging the conveyance to prove lack of fair consideration. *See RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 199 (S.D.N.Y. 2001) (citations omitted). "When a transfer is made without consideration, courts have applied a presumption of insolvency that shifts the burden to the defendant to rebut by showing continued solvency after the transaction." *Id.* (citations omitted). Petitioners argue there has been no evidence of any consideration paid by Apex for the paintings and to point to the fact that Apex had only one dollar in capital. The Court finds this, coupled with the facts relied on in establishing Zhang's ownership interest in the Paintings, sufficient to establish fraudulent conveyance here, especially given Apex's failure to rebut by providing sufficient evidence to the contrary regarding either consideration or insolvency. Accordingly, the Court finds Zhang fraudulently conveyed the Paintings to Apex. As such, the Paintings are attachable. *See Helicon Partners, LLC v. Kim's Provision Co.*, No. ADV 12-01602 (SMB), 2013 WL 1881744, at *7 (Bankr. S.D.N.Y. May 6, 2013) (acknowledging precedent that fraudulently transferred property may be attached).

**III.    Petitioners are Entitled to an Order Confirming the Attachment**

Having now determined that Zhang has an ownership interest in the Paintings that can be attached, the Court now turns to consider whether Petitioners are otherwise entitled to an order confirming the attachment. The Court finds that all four prongs are met as follows. First, Petitioners have a cause of action in the form of the Arbitrations. Second, Petitioners have a likelihood of success on the merits in the Arbitrations having been awarded interim damages against the Arbitral Respondents in the amount of $142,463,666.28 plus $9.8 million in costs. Third, without an attachment here, the awards may be rendered ineffectual. Fourth, Respondents

have no counterclaims against Petitioners. Accordingly, the Court hereby **CONFIRMS** the *ex parte* Order of Attachment.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Petitioners' motion to confirm the Order of Attachment and **DENIES** Apex's cross-motion to vacate the Order of Attachment. As such, the Order of Attachment is **CONFIRMED.**

The Clerk of Court is respectfully directed to terminate the pending motions at ECF Nos. 124 and 129 and close this case.

**SO ORDERED.**

Dated:    **March 24, 2026**
          **New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**